James E. Magleby (7247)
  magleby@mgpclaw.com
Christine T. Greenwood (8187)
  greenwood@mgpclaw.com
Christopher M. Von Maack (10468)
  vonmaack@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Defendants and Counterclaim Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **DERMA PEN, LLC,** | **DEFENDANTS' TRIAL BRIEF ON SPECIFIC PERFORMANCE AND DECLARATORY JUDGMENT** |
| **Plaintiff,** | |
| **v.** | |
| **4EVERYOUNG LTD., DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY. LTD. d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,** | |
| **Defendants.** | |
| **4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,** | |
| **Counterclaim Plaintiffs,** | |
| **v.** | **Case No.:  2:13-cv-00729-DN-EJF** |
| **DERMA PEN, LLC,** | **District Judge David Nuffer** |
| **Counterclaim Defendant.** | **Magistrate Judge Evelyn J. Furse** |

Defendants and Counterclaim Plaintiffs 4EverYoung Ltd. ("4EverYoung") and Equipmed International Pty. Ltd. ("Equipmed") and Defendants Biosoft (Aust) Pty. Ltd. ("Biosoft") and, Stene Marshall ("Marshall") (collectively, "Defendants"), by and through counsel of record MAGLEBY & GREENWOOD, P.C., respectfully submit Defendants' Trial Brief on Specific Performance and Declaratory Judgment.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION .................................................................................................. 1

STATEMENT OF RELEVANT FACTS ................................................................ 2

LAW AND APPLICATION OF FACTS ............................................................. 11

I.   4EVERYOUNG'S BREACH OF CONTRACT CLAIM .............................. 11

II.  4EVERYOUNG'S SPECIFIC PERFORMANCE CLAIM ......................... 13

III. DERMA PEN'S DEFENSES TO SPECIFIC PERFORMANCE ............... 17

    A.   Derma Pen's Unclean Hands Defense ................................... 17

    B.   Derma Pen's Laches Defense ................................................ 20

    C.   Derma Pen's Waiver Defense ................................................ 21

    D.   Derma Pen's Estoppel Defense ............................................. 22

    E.   Derma Pen's Failure to Meet a Necessary Precondition Defense .......... 24

    F.   Derma Pen's Lack of Standing Defense ................................. 25

    G.   Derma Pen's Fraudulent Inducement Defense ....................... 25

    H.   Derma Pen's Undue Hardship Defense .................................. 26

    I.   Derma Pen's Lack of Mutuality Defense ................................. 27

    J.   Derma Pen's Nonrenewal Defense ......................................... 28

    K.   Derma Pen's Survival Clause Argument ................................. 29

    L.   Derma Pen's First Material Breach Defense ........................... 30

IV.  DERMA PEN'S DECLARATORY JUDGMENT CLAIM ...................... 34

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*1-800 Contacts, Inc. v. Memorial Eye, P.A.*, No. 2:08-CV-983 TS, 2010 WL 5149269
(D. Utah Dec. 13, 2010) ........................................................................... 18

*Allen v. Rose Park Pharmacy*, 237 P.2d 823 (Utah 1951) ............................................ 28

*Angelos v. First Interstate Bank of Utah*, 671 P.2d 772 (Utah 1983) ............................ 20

*Bair v. Axiom Design, LLC,* 2001 UT 20, 20 P.3d 388.................................................... 11

*Cache Cnty. v. Beus*, 1999 UT App 134, 978 P.2d 1043 ................................................ 31

*Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269.................................................... 25

*Dekalb Genetics Corp. v. Syngenta Seeds, Inc.*, 4:06CV01191 ERW, 2008 WL 382385,
(E.D. Mo. Feb. 12, 2008) ......................................................................... 18

*Fischer v. Johnson*, 525 P.2d 45 (Utah 1974) ............................................................. 18

*Frontier Commc'ns of New York, Inc. v. Int'l Bhd. of Elec. Workers*, 07 CIV.10327 GEL,
2008 WL 1991096 (S.D.N.Y. May 6, 2008) ............................................... 25

*HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-02220-JWL, 2012 WL 4476085
(D. Kan. Sept. 8, 2012)............................................................................. 16

*In re Pickel*, 493 B.R. 258, 271 (Bankr. D.N.M. 2013) ....................................... 13, 14, 16

*Iota, LLC v. Davco Mgmt. Co., LC*, 2012 UT App 218, 284 P.3d 681 ........................... 22

*Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231 (D. Utah 2009) ....... 13, 14

*Koch v. Koch*, 903 F.2d. 1333 (10th Cir. 1990) ......................................................... 15-16

*McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185,
307 P.3d 650 ............................................................................................ 21

*Morris v. Sykes*, 624 P.2d 681 (Utah 1981)........................................................... 13, 14

*Mylan Pharm., Inc. v. Thompson,* 268 F.3d 1323 (Fed. Cir. 2001) ............................... 18

*Otteson v. Malone*, 584 P.2d 878 (Utah 1978) ...................................................... 14, 15

*Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, Inc., 706 P.2d 1028
(Utah 1985) .............................................................................................. 27

*Roberts v. Braffett*, 92 P. 789, 794-95 (1907) ............................................................. 20

*Ross v. Producers Mut. Ins. Co.*, 295 P.2d 339 (1956) ............................................... 27

*WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, 54 P.3d 1139 ............. 29

*Worthington v. Anderson*, 386 F.3d 1314, 1320 (10th Cir. 2004) ................................ 18

**Other Authorities**

71 Am. Jur. 2d Specific Performance § 90 ................................................................... 26

**INTRODUCTION**

4EverYoung and Plaintiff Derma Pen, LLC ("Plaintiff" or "Derma Pen") are parties to the August 2, 2011 Sales Distribution Agreement (the "Distribution Agreement"). Through its first cause of action against Derma Pen, 4EverYoung seeks specific performance of Sections 12.2 and 14.6 of the Distribution Agreement, which provide that, upon termination under Section 11 of the Distribution Agreement, Derma Pen must offer and sell to 4EverYoung the United States "Dermapen" trademark (the "Trademark") and the www.dermapen.com domain name (the "Domain Name"),

The evidence in this case, the majority of which is undisputed, will show that 4EverYoung is entitled to the equitable remedy of specific performance.  On May 30, 2013, Derma Pen sent a letter terminating the Distribution Agreement effective August 1, 2013, at the expiration of the agreement's initial, two-year term.  In doing so, Derma Pen specifically invoked Section 11.1 of the Agreement.  Derma Pen alleged neither breach nor fraud in its termination letter or in any of its other contemporaneous communications with 4EverYoung and its principal director, Marshall. Instead, Derma Pen lay in wait for the expiration date.  On that same date, 4EverYoung notified Derma Pen of its intent to exercise its rights under Sections 12.2 and 14.6, but Derma Pen deflected, informing Marshall that it would deal with the post-termination obligations later, upon final termination.

Later, but before the end of the term, 4EverYoung again expressed its intent to exercise its rights and asked that Derma Pen, by August 1, 2014, allow access to its books and records for purposes of complying with the Distribution Agreement.  On that

date, rather than responding to 4EverYoung's request for access to Derma Pen's books and records for purposes of valuing the Trademark and Domain Name, Derma Pen filed this lawsuit, alleging trademark infringement and numerous related claims and asserting that the Distribution Agreement was voidable for fraudulent inducement.  Even now, Derma Pen persists in frustrating 4EverYoung's exercise of its rights.  As the evidence will show, Derma Pen breached its post-termination obligations to offer and sell to 4everYoung the Trademark and Domain Name, entitling 4EverYoung to specific performance.

The evidence will also show that none of the multiple defenses asserted by Derma Pen precludes 4EverYoung's from obtaining specific performance.  Specially, the evidence will not support the unclean hands, first material breach, laches, waiver, estoppel, lack of mutuality, or any other defense asserted by Derma Pen.  The evidence will show that 4EverYoung is entitled to equity, including the benefits of the careful bargain it struck with Derma Pen, which specifically contemplated that, if the business relationship were to end, the Trademark and Domain Name would be subject to purchase by 4EverYoung.

## STATEMENT OF RELEVANT FACTS

### Background

1.      4EverYoung is an international supplier of micro-needling devices used for aesthetic treatments, including a product referred to as the "Dermapen."[1]

---

[1] *See* Transcript of 6-5-14 Deposition of Stene Marshall ("6-5-14 Marshall Depo.") at 60-61, Trial Ex. 41.

2.      Marshall had input into the design of the Dermapen.[2]

3.      Equipmed is a company affiliated with 4EverYoung that holds certain exclusive agreements with the manufacturer of the Dermapen devices.[3]

4.      On or about April 5, 2011, Equipmed entered into an original equipment manufacturing agreement (the "First OEM Agreement") with the South Korean manufacturer of the Dermapen.[4]

5.      Since 4EverYoung first contracted with the manufacturer, two versions in addition to the original Dermapen have been produced by the manufacturer, the Dermapen2 and the Dermapen3.[5]  Marshall also had input into the design and functioning of the Dermapen2 and Dermapen3 devices.[6]

6.      The Dermapen3 is the device currently being offered for sale by Equipmed, through its international manufacturers.  In the United States, Equipmed USA, LLC, is currently marketing and selling the Dermapen3.[7]

---

[2] *See* Transcript of 10-20-13 Deposition of Stene Marshall ("10-20-13 Marshall Depo.") at 7, Trial Ex. 4.

[3] *See id.* at 10, 16, Trial Ex. 4.

[4] *See* First OEM Agreement, Trial Ex. 55.

[5] *See* 10-20-13 Marshall Depo. at 12, Trial Ex. 4.

[6] *See id.* at 39-40, Trial. Ex. 4.

[7] *See id.* at 27, Trial Ex. 4.

**The Distribution Agreement**

7.      In early 2011, Marshall was attempting to locate a distributor for the Dermapen product in the United States.[8]

8.      Marshall engaged Justin Williams ("Williams") to assist with the distribution of the Dermapen product in the United States.[9]

9.      Williams introduced Marshall to two of the future principals of Plaintiff Derma Pen – Michael Morgan ("Morgan") and Chad Milton ("Milton"), who at the time were working on sales lead software with Franklin Covey Software.[10]

10.      On July 28, 2011, Milton signed the Distribution Agreement on behalf of Derma Pen and sent the partially-signed agreement to Marshall.[11]

11.      On August 1, 2011, Marshall executed the Distribution Agreement on behalf of 4EverYoung and sent the fully-executed agreement to Derma Pen.[12]

12.      The Distribution Agreement provided to Derma Pen the right to serve as the United States distributor for the Dermapen products supplied by Equipmed, an affiliate of 4EverYoung.[13]

---

[8] *See* 6-5-14 Marshall Depo. at 60-61, Trial Ex. 41.

[9] *See* Transcript of 10-22-13 Deposition of Chad Milton ("Milton Depo.") at 19-20, Trial Ex. 14.

[10] *See* 6-5-14 Marshall Depo. at 126, Trial Ex. 41.

[11] *See* 7-27-11 Email C. Milton to S. Marshall, Trial Ex. 588.

[12] *See* 8-1-11 Email S. Marshall to M. Morgan, Trial Ex. 117

[13] *See generally*, Distribution Agreement, Trial Ex. 8.

13.     Under the Distribution Agreement, while Derma Pen is permitted to "own" the Trademark in the United States until the agreement is terminated, 4EverYoung reserves to itself the right to "own" the Trademark in "the rest of the world:"[14]

### 12.0 Trademarks

12.1 Distributor shall promote, market, distribute and sell the Product(s) under the trademark "DermaPen".

The parties acknowledge that Distributor owns the U.S. trademark rights to "DermaPen" and that 4EVER YOUNG owns the DermaPen Trademark in the rest of the world including the UK trademark rights to "DermaPen". All of Distributor's actions under this Agreement in promoting, marketing, distributing and selling the Product(s) will be done using the U.S. trademark rights owned by Distributor in "DermaPen". The parties agree that the Distributor's use of the U.S. "DermaPen" trademark will not infringe with 4EVER YOUNG's use of the "DermaPen" trademark, and vice versa. While not relinquishing any of its U.S. trademark rights, Distributor agrees that it shall comply with 4EVER YOUNG's standard cooperative advertising policies, and shall use and display the "DermaPen" trademark in accordance with such policies.

[*Id.* § 12.1, Trial Ex. 8].

14.     Section 11.1 of the Agreement, entitled "Term," provides in relevant part as follows:[15]

11.1 Term.

The term of this Agreement shall be a two (2) year contract from the Effective Date of this Agreement. It will renew automatically in one (1) year intervals, except when notice of termination is provided by either party before 60 days of the next renewal date.

15.     Termination of the Distribution Agreement pursuant to Section 11 triggers the obligation, under Section 12.2, to offer the Trademark for sale to 4EverYoung:[16]

---

[14] *Id.* § 12.1 (emphasis added), Trial Ex. 8.

[15] *Id.* § 11.1, Trial Ex. 8.

[16] *Id.* § 12.2 (emphasis added), Trial Ex. 8.

As part of acknowledging the Distributors ownership of the DermaPen Trademark in the US, The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen Trademark in the US for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal for such trademark. The Distributor and 4EVER YOUNG further agree that the value of the Dermapen US Trademark will be determined by independent auditors of which one will be appointed by both parties.

Should a satisfactory agreement on the price of the Dermapen US Trademark not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

16.　　Likewise, upon termination of the Distribution Agreement pursuant to Section 11, Derma Pen's obligation to offer the Domain Name to 4EverYoung is triggered:[17]

As part of acknowledging the Distributors ownership of the DermaPen.com domain, The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen.com domain for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal for such domain. The Distributor and 4EVER YOUNG further agree that the value of the Dermapen.com domain will be determined by independent auditors of which one will be appointed by both parties.

Should a satisfactory agreement on the price of the Dermapen.com domain not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

**Derma Pen's Termination of the Distribution Agreement**

17.　　On May 30, 2013, Derma Pen voluntarily terminated the Distribution Agreement effective as of August 1, 2013, expressly referencing Section 11.1 of the

---

[17] *Id.* § 14.6 (emphasis added), Trial Ex. 8

agreement and making no reference to breach or fraud:[18]

Mr. Marshall,

By this writing and pursuant to Section 11.1 of the Sales Distribution Agreement between Derma Pen LLC and 4Ever Young Limited, Derma Pen LLC hereby exercises its right to terminate the same Sales Distribution Agreement, with such termination becoming effective immediately upon the expiration of the current term on August 1, 2013.

## 4EverYoung's Attempts to Obtain Derma Pen's
## Performance of Sections 12.2 and 14.6

18.    On May 30, 2013, Marshall responded to Jones's e-mail terminating the

Distribution Agreement stating:[19]

Hi Jeremy,

Sunwoo will certainly be sending the units complete to you in the Blue box's.

No problems with the notice to not renew.

However as per the contract also, in not renewing the contract you must now sell to me as a first right of refusal the Dermapen.com domain and the Dermapen trademark, I think it would be best to appoint independent valuers to assess the value of these items so that an informed discussion can take place.
I would think that this take place straight away so that we can agree on a location and time to meet.


Regards

Stene Marshall
**Equipmed**

19.    Four days later, Jones replied that the parties should wait to discuss

Derma Pen's post-termination obligations until the end of the term:[20]

---

[18] 5-30-13 Letter J. Jones to S. Marshall (emphases added), Trial Ex. 16.

[19] 5-30-13 E-Mail S. Marshall to J. Jones (emphases added), Trial Ex. 108.

[20] 6-4-13 E-Mail J. Jones to S. Marshall (emphases added), Trial Ex. 108.

Regarding the trademark we are focused on performing our duties under the agreement until it expires on August 2. We can speak at the end of the term about any post-agreement duties that each of us will have. Looking forward to working with you over the summer.

Best,
Jeremy

20.     On July 25, 2013, Marshall sent a letter and e-mail to Derma Pen in response to its termination of the Distribution Agreement, in which he requested that Derma Pen allow access by a valuation expert to its books and records so that valuations of the Trademark and Domain Name could be prepared in and so that 4EverYoung could exercise its right to acquire the Trademark and Domain Name in accordance with Sections 12.2 and 14.6 of the Distribution Agreement:[21]

---

[21] 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton (emphasis added), Trial Ex. 10; *see also* 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654.

I am writing to follow up your email to terminate the distribution contract dated the 30th of May 2013 and the 60 days notice that is required to negotiate a new contract.

It is clear now that no contract is planned to be negotiated. Hence in accordance with sections 12.2 and 14.6 of the contract, 4Ever Young has engaged KPMG in Salt Lake city to audit Dermapen LLC's accounts so that we can ascertain a valuation for the www.dermapen.com domain and the "Dermapen" trademark that was acknowledged as part of the contract to be used while the contract was in force.

4Ever Young requires a suitable date from Dermapen LLC within the next 7 days as a to enable KPMG to carry out such analysis.

Should this date not be forth coming within the next 7 days, 4Ever Young will forward the calculated price and the appropriate offer in accordance with the contract.

Should that offer not be accepted by the 25th of August 2013, court proceedings to enforce a valuation acceptable to the court will commence in the courts of the United Kingdom.

Further breaches of section 12 of the contract have also been noted in relation to Trademarks and should proceedings commence will be used in assessing the value of the relevant domains and trademarks.

One such breach is the release of cosmetic products utilising the Dermapen logo and name without authorisations of such product. Should these products not be removed from the Dermapen.com website within 7 days of todays date, injunctive action will commence to force such removal until ownership can be finalised.

21.     Marshall's letter requested a response to his letter, including a date on which his valuation expert could access Derma Pen's records, within seven days, *i.e.*, by August 1, 2013.[22]

22.     Rather than respond to the letter, on August 1, 2013, Derma Pen filed the Complaint in this matter.[23]

23.     Derma Pen's counsel in this case sent the Complaint to Marshall by e-mail on August 2, 2013.[24]

---

[22] *See id.*, Trial Ex. 10

[23] *See* Complaint, Docket No. 2.

24.     Even during this lawsuit, 4EverYoung has attempted to exercise its rights under Sections 12.2 and 14.6.[25]

25.     Derma Pen has been non-responsive to 4EverYoung's attempts to purchase the Trademark and Domain Name.[26]

26.     In fact, Derma Pen's only response to 4EverYoung's efforts to exercise its rights under the Distribution Agreement did not include any effort by Derma Pen to comply with Sections 12.2 and 14.6, but instead set forth various preconditions for its performance, including requiring numerous concessions from 4EverYoung and the other defendants named in this case.[27]

27.     Despite not having performed under Sections 12.2 and 14.6 of the Agreement, Derma Pen's Rule 30(b)(6) witness testified that 4EverYoung is entitled to enforce those provisions:[28]

---

(...continued)

[24] *See* 8-2-13 Letter S. Miller to S. Marshall ("In response to your email dated July 25, 2012, please see letter and copy of lawsuit filed against you and your various companies."), Trial Ex. 657.

[25] *See* 11-11-13 Email C. Von Maack to S. Miller, Trial Ex. 691; *see also* 5-15-14 Letter C. Von Maack to S. Miller, Trial Ex. 26

[26] *See* 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's Motion for Temporary Restraining Order and Preliminary Injunction at 5 , Docket No. 70; *see also* 8-2-13 E-Mail S. Miller to S. Marshall ("In response to your email dated July 25, 2013, please see letter and copy of lawsuit filed against you and your various companies."), Trial Ex. 657

[27] *See, e.g.,* 11-26-13 Letter S. Miller to C. Von Maack, Trial Ex. 23.

[28] 6-6-14 Rule 30(b)(6) Deposition of Derma Pen, LLC ("Derma Pen Depo.") at 109 (emphasis added), Trial Ex. 46.

```
11        Q.   And then with respect to the -- you're aware of
12   the claim by 4EverYoung that it is entitled to evaluation
13   and then tender an opportunity to purchase the trademark
14   and domain name?
15        A.   Yeah.
16        Q.   Do you have an understanding that Derma Pen
17   believes -- or do you have an understanding that
18   4EverYoung is not entitled to the enforcement of those
19   provisions?
20        A.   No, they are probably entitled to the
21   enforcement of those provisions depending on how you
22   interpret the provisions.
```

28.     Since terminating the Agreement, Derma Pen has continued to use the

Trademark and Domain, competed in the United States marketplace with Defendants,

represented itself as the true source of the Dermapen devices, threatened Defendants'

customers with legal action for trademark infringement, and continued to sell Dermapen

devices and related products branded with the Trademark.[29]

## LAW AND APPLICATION OF FACTS

### I.     4EVERYOUNG'S BREACH OF CONTRACT CLAIM.

To prevail on its claim for breach of contract, 4EverYoung must show by a

preponderance of the evidence: "(1) a contract, (2) performance by the party seeking

recovery, (3) breach of the contract by the other party, and (4) damages."[31]

---

[29] *See, e.g.,* 10-8-13 Email Derma Pen to Valued Customer, Trial Ex. 688 (FEY001013-
FEY1014); 1-18-14 Email Derma Pen to Customers re International Tradeshow
Schedule, Trial Ex. 665; 1-30-14 Email S. Hennefer to R. Greaves, Trial Ex. 667.

[31] *See Bair v. Axiom Design, LLC,* 2001 UT 20, ¶ 14, 20 P.3d 388.

The evidence will show that a valid and binding agreement exists, *i.e.*, the Distribution Agreement.  In addition, 4EverYoung has performed under the Distribution Agreement.  Indeed, the Distribution Agreement was fully performed and then terminated at the expiration of its initial term by Derma Pen, without any allegation of breach or fraud.[32]  Derma Pen breached the Distribution Agreement by failing to comply with its obligation to tender the Trademark and Domain Name under Sections 12.2 and 14.6 of the Distribution Agreement.[33]

Moreover, Derma Pen refused comply with those obligations,[34] attempted to delay 4EverYoung's discovery of its scheme to breach those obligations,[35] and sued 4EverYoung on the very date by which 4EverYoung requested a response regarding whether Derma Pen would comply.[36]  Derma Pen had formulated a strategy to evade

---

[32] *See* 5-30-13 Letter J. Jones to S. Marshall, Trial Ex. 16.

[33] *See* Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

[34] *See* 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's Motion for Temporary Restraining Order and Preliminary Injunction at 5, Docket No. 70; *see also* 8-2-13 E-Mail S. Miller to S. Marshall ("In response to your email dated July 25, 2013, please see letter and copy of lawsuit filed against you and your various companies."), Trial Ex. 657.

[35] *See* 5-30-13 E-Mail S. Marshall to J. Jones, Trial Ex. 108.

[36] *Compare* Complaint, Docket No. 2, filed August 1, 2013, *with* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton (requesting a response "within the next 7 days"), Trial Ex. 10, *and* 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton (same), Trial Ex. 654.

the obligation to transfer the Trademark and Domain Name long before terminating the

Distribution Agreement.[37]

Finally, 4EverYoung has been damaged by Derma Pen's failure to comply with

its post-termination obligations.  4EverYoung has been forced to compete in the market

against its own former distributor, which now has gone rogue but continues to use the

Trademark and Domain Name, without regard to the plain terms of the Distribution

Agreement.

## II.   4EVERYOUNG'S SPECIFIC PERFORMANCE CLAIM.

The remedy of specific performance is available when "(1) the terms of the

contract are sufficiently certain; (2) no adequate remedy of law exists; (3) the party

seeking relief has materially performed his obligations under the contract; and (4) the

grant of such relief is not unfair, against public policy, or otherwise inequitable."[38]  "The

Utah Supreme Court has held that specific performance is an equitable remedy

addressed to the sense of justice and good conscience of the court."[39]  "[T]he trial court

enjoys 'considerable latitude of discretion' in determining whether specific performance

shall be granted."[40]  "In determining whether to grant specific performance, the court

examines the contract at issue and the circumstances pertaining to its execution and

---

[37] *See, e.g.,* 9-9-12 Email M. Anderer to E. Felsted (discussing strategy for obtaining Trademark and evading terms of Distribution Agreement).

[38]  *In re Pickel*, 493 B.R. 258, 271 (Bankr. D.N.M. 2013).

[39] *Nilson v. JPMorgan Chase Bank, N.A.*, 690 F. Supp. 2d 1231, 1251 (D. Utah 2009) (citing *Morris v. Sykes*, 624 P.2d 681, 684 (Utah 1981)).

[40] *Id.* (quoting *Morris*, 624 P.2d at 684).

formation to determine whether equitable grounds exist to grant or deny specific performance."[41]

Specific performance should be awarded in favor of 4EverYoung because the obligations imposed by Sections 12.2 and 14.6 of the Distribution Agreement are clear and readily susceptible to enforcement, because 4EverYoung lacks an adequate remedy at law and has performed its obligations under the Distribution Agreement, and because the equities strongly favor specific performance under the facts of this case.

"The Utah Supreme Court has held that specific performance is an equitable remedy addressed to the sense of justice and good conscience of the court."[42]  "[T]he trial court enjoys 'considerable latitude of discretion' in determining whether specific performance shall be granted."[43]  "In determining whether to grant specific performance, the court examines the contract at issue and the circumstances pertaining to its execution and formation to determine whether equitable grounds exist to grant or deny specific performance."[44]  Specific performance is available when:  "(1) the terms of the contract are sufficiently certain; (2) no adequate remedy of law exists; (3) the party seeking relief has materially performed his obligations under the contract; and (4) the grant of such relief is not unfair, against public policy, or otherwise inequitable."[45]

---

[41] *Id.* (citing *Otteson v. Malone*, 584 P.2d 878, 877-80 (Utah 1978)).

[42] *Id.*

[43] *Id.* (quoting *Morris*, 624 P.2d at 684).

[44] *Id.* (citing *Otteson v. Malone*, 584 P.2d 878, 877-80 (Utah 1978)).

[45] *In re Pickel*, 493 B.R. at 271.

Here, the terms of the Distribution Agreement, and of Sections 12.2 and 14.6 in particular, are more than sufficiently certain to order specific performance.[46]  The provisions are triggered by termination pursuant to Section 11 of the Distribution Agreement, which is precisely the section invoked by Derma Pen in its termination letter.[47]  Once triggered, Sections 12.2 and 14.6 require Derma Pen to offer the Trademark and Domain Name to 4EverYoung, require the parties to obtain valuations performed by independent auditors and, if the parties cannot agree to a valuation, require the value to be determined by "the courts of the land that is governing this contract."[48]  Whether the value is agreed upon between the parties or determined by the courts, 4EverYoung at that point has the unequivocal right to purchase the Trademark and Domain Name.  Thus, specific performance should be awarded.[49]

4EverYoung also has no adequate remedy at law.  While the monetary values of the Trademark and Domain Name are disputed, it cannot be disputed that these items are unique, have special or intrinsic value, and are not readily replaceable with damages.  Accordingly, this factor weighs heavily in favor of specific performance.[50]  In

---

[46] *See* Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

[47] *See* 5-30-13 Letter J. Jones to S. Marshall (terminating Distribution Agreement "pursuant to Section 11.1"), Trial Ex. 16.

[48] Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

[49] *See, e.g., Otteson*, 584 P.2d at 877-80 (reversing trial court judgment and ordering specific performance where option agreement was "a simple contract without complex language, which should be easily understood by persons of average intelligence.").

[50] *See, e.g., Koch v. Koch*, 903 F.2d. 1333, 1335 (10th Cir. 1990) (affirming summary judgment dismissal of fraudulent inducement claim and ordering specific performance of

(continued...)

fact, due to the unique nature of the personal property addressed in Sections 12.2 and 14.6 of the Distribution Agreement, specific performance is particularly appropriate in this instance.

In addition, as discussed above, 4EverYoung has fully and substantially performed its obligations under the Distribution Agreement, and Derma Pen voluntarily terminated the Distribution Agreement without alleging either fraud or breach.

Finally, equity and fairness favor specific performance in this case.  The provisions requiring Derma Pen to transfer the Trademark and Domain were the *quid pro quo* for 4EverYoung's agreement to allow Derma Pen to register and "own" the Trademark in the United States during the term of the Distribution Agreement.  In other words, this was a bargained-for exchange.  To allow Derma Pen to evade its transfer obligation would undermine the agreement's consideration, the mutuality underlying the agreement, and the purpose and nature of this carefully-negotiated bargain, unjustly enriching Derma Pen to the detriment of 4EverYoung.  Specific performance is therefore warranted.[51]

---

(...continued)

agreement to transfer real estate in exchange for interest in family coin collection); *HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-02220-JWL, 2012 WL 4476085, *9 (D. Kan. Sept. 8, 2012) (awarding specific performance of post-termination contractual obligation to return confidential information to licensor because information was "unique or had some intrinsic or special value").

[51] *See, e.g., In re Pickel*, 493 B.R. at 272 (stating that specific performance should be awarded "if [performance] will prevent unjust enrichment").

III.     **DERMA PEN'S DEFENSES TO SPECIFIC PERFORMANCE.**

As an initial matter, during its Rule 30(b)(6) deposition, Derma Pen candidly

acknowledged that 4EverYoung is entitled to specific performance of Sections 12.2 and

14.6:[52]

```
11       Q.   And then with respect to the -- you're aware of
12   the claim by 4EverYoung that it is entitled to evaluation
13   and then tender an opportunity to purchase the trademark
14   and domain name?
15       A.   Yeah.
16       Q.   Do you have an understanding that Derma Pen
17   believes -- or do you have an understanding that
18   4EverYoung is not entitled to the enforcement of those
19   provisions?
20       A.   No, they are probably entitled to the
21   enforcement of those provisions depending on how you
22   interpret the provisions.
```

While Derma Pen later attempted to retract that admission, it should not be lost

upon the Court that Derma Pen did not identify the facts or legal theories now offered by

its counsel.

A.     **Derma Pen's Unclean Hands Defense.**

Derma Pen's affirmative defense of unclean hands is without merit.  "[U]nclean

hands [is an] equitable defense[]; the Court, not the jury, is obligated to decide these

---

[52] Derma Pen Depo. at 109 (emphasis added), Trial Ex. 46.

issues."[53]  In asserting unclean hands as a defense against specific performance,

Derma Pen must show that 4EverYoung has acted inequitably <u>with respect to</u> the

provisions regarding which it seeks specific performance.[54]

Here, the evidence will show that 4EverYoung has, at all relevant times,

indicated its willingness, desire, and ability to perform on the Trademark and Domain

Name valuation and acquisition provisions.  For instance, after Derma Pen notified

4EverYoung of its intent to terminate the Distribution Agreement at the conclusion of its

initial term, and before the effective date of that termination, 4EverYoung twice wrote to

Derma Pen and invoked its rights to value and acquire the Trademark and Domain

Name.[55]  As this Court has already found, Derma Pen was non-responsive to those

---

[53] *Dekalb Genetics Corp. v. Syngenta Seeds, Inc.*, 4:06CV01191 ERW, 2008 WL
382385, *2 (E.D. Mo. Feb. 12, 2008); *see also Mylan Pharm., Inc. v. Thompson,* 268
F.3d 1323, 1331 (Fed. Cir. 2001) ("The equitable defenses include unclean hands,
unenforceability of the patent for fraud and inequitable conduct, misuse, and delay in
filing suit resulting in laches or estoppel.").

[54] *See 1-800 Contacts, Inc. v. Memorial Eye, P.A.*, No. 2:08-CV-983 TS, 2010 WL
5149269, at *2 (D. Utah Dec. 13, 2010) (reiterating that "the doctrine of unclean hands
'does not empower a court of equity to deny relief for any and all inequitable conduct on
the part of the plaintiff.  <u>Instead, the inequitable conduct must be related to the . . .
cause of action</u>.'" (emphasis in original) (quoting *Worthington v. Anderson*, 386 F.3d
1314, 1320 (10th Cir. 2004))); *see also, e.g., Fischer v. Johnson*, 525 P.2d 45, 46 (Utah
1974) ("[S]pecific performance is a remedy of equity; and one who invokes it must have
clean hands in having done equity himself.  That is, he must take care to discharge his
own duties under the contract; and he cannot rely on any mere inconvenience as an
excuse for his failure to do so.").

[55] *See* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-
13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654; 5-15-14 Letter C.
Von Maack to S. Miller, Trial Ex. 26.

requests.[56]  Worse, Derma Pen sued 4EverYoung, among others, on the very day that

Derma Pen's response to 4EverYoung's requests were due.[57]  Thus, it cannot be said

that 4EverYoung failed to discharge its duties with respect to Sections 12.2 and 14.6 of

the Distribution Agreement.

Moreover, the only conduct Derma Pen alleges as evidence of Defendants'

purportedly unclean hands is use of the Trademark and allegedly "false statements

regarding Derma Pen's business and products."[58]  Even assuming this conduct

amounted to unclean hands, which it does not, the conduct is unrelated to Derma Pen's

post-termination contractual obligation to tender the Trademark and Domain name to

4EverYoung.  Further, the evidence will show that Defendants have acted in good faith

with respect to its of the Trademark for purposes of selling Dermapen products in the

United States, attempting to fill the shoes of its former distributor, which essentially quit

the job.  Indeed, the Court has already ruled that, to the extent Derma Pen has any right

to continue using the Trademark, its "rights in the trademark are waning and will be

extinguished once 4EverYoung completes the purchase of the Domain Name and the

---

[56] *See* 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's
Motion for Temporary Restraining Order and Preliminary Injunction at 5 , Docket No. 70.

[57] *See* 8-1-13 Complaint, Docket No. 2; 8-2-13 E-Mail S. Miller to S. Marshall ("In
response to your email dated July 25, 2013, please see letter and copy of lawsuit filed
against you and your various companies."), Trial Ex. 657.

[58] 7-1-14 Motion to Modify June 24, 2014 Order (Doc. 207) (And Related Scheduling
and Discovery Orders) and for Expedited Oral Argument at 24, Docket No. 227.

United States trademark rights to Dermapen."[59]  The Court has also ruled that, whether or not Defendants were restricted from using the Trademark in the United States prior to Derma Pen's termination of the Distribution Agreement, Section 12.1 of the Agreement "certainly does not restrict Defendants from using the Dermapen trademark *after* termination of the Agreement."[60]  As such, Defendants use of the Trademark following termination of the Distribution Agreement, and following the Court's denial of Derma Pen's motion for temporary restraining order and preliminary injunction was necessarily in good faith and with clean hands.

### B.    Derma Pen's Laches Defense.

Laches is an equitable defense for determination by the Court.  The evidence will show that Derma Pen's affirmative defense of laches is without merit.  At all times, 4EverYoung has shown itself to have been "ready, desirous, prompt, and eager" to assert its rights under Sections 12.2 and 14.6 of the Distribution Agreement.[61]  The doctrine of laches has two elements:  (1) a lack of diligence, and (2) injury resulting from the lack of diligence.[62]

As discussed above, within a short time of receiving notice of Derma Pen's termination of the Distribution Agreement, 4EverYoung twice wrote to Derma Pen and

---

[59] 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's Motion for Temporary Restraining Order and Preliminary Injunction at 5, Docket No. 70.

[60] *Id.* (emphasis in original).

[61] *Roberts v. Braffett*, 92 P. 789, 794-95 (1907) (additional quotations and citation omitted).

[62] *See Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 777 (Utah 1983).

expressly invoked its rights to value and acquire the Trademark and Domain Name.[63]

Derma Pen rebuked those requests through failing to respond, filing the instant lawsuit,

and attempting to condition any sale of the Trademark and Domain Name on numerous

concessions by Defendants.[64]

Because 4EverYoung acted diligently in pursuing its claim for specific

performance, Derma Pen's affirmative defense of laches should fail.

### C.    Derma Pen's Waiver Defense.

Likewise, Derma Pen's affirmative defense of waiver is without merit.  The

evidence will show that 4EverYoung did not manifest any intention to relinquish its rights

to value and purchase the Trademark and Domain Name.[65]  On the contrary,

4EverYoung has consistently indicated its intent to perform and assert its rights under

---

[63] *See* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654; 5-15-14 Letter C. Von Maack to S. Miller, Trial Ex. 26.

[64] *See* 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's Motion for Temporary Restraining Order and Preliminary Injunction at 5, Docket No. 70; Complaint, Docket No. 2; 8-2-13 E-Mail S. Miller to S. Marshall ("In response to your email dated July 25, 2013, please see letter and copy of lawsuit filed against you and your various companies."), Trial Ex. 657; 11-26-13 Letter S. Miller to C. Von Maack, Trial Ex. 23.

[65] *See McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 2013 UT App 185, ¶ 10, 307 P.3d 650 ("To constitute waiver, there must be [(1)] an existing right, benefit or advantage, [(2)] a knowledge of its existence, and [(3)] an intention to relinquish it." (alterations in original) (additional quotations and citation omitted)).

the Trademark and Domain Name valuation and acquisition provisions.[66]  Thus, Derma

Pen's affirmative defense of waiver should fail.

### D.    Derma Pen's Estoppel Defense.

The equitable defense of estoppel should be determined by the Court.  The

evidence here will show that 4EverYoung's claim is not barred by estoppel,l because

4EverYoung has not acted inconsistently with its claim for specific performance, Derma

Pen has not reasonably taken any action based any inconsistent statement by

4EverYoung regarding the claim for specific performance, and Derma Pen has not been

injured by any inconsistent statement by 4EverYoung regarding the claim to specific

performance.[67]

The evidence will show that 4EverYoung has not at any point claimed that it did

not want specific performance of Sections 12.2 and 14.6 of the Distribution Agreement.

Derma Pen illogically claims that 4EverYoung's expressed intent to compete with

Derma Pen while this case is pending indicates 4EverYoung's intent not to perform.  In

addition to not making sense, Derma Pen's claim is exposed as false by its own actions.

If Derma Pen really wanted to put 4EverYoung's intent to the test, it could and should

have complied with the valuation provisions to assess whether 4EverYoung had the

---

[66] *See* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654; 11-11-13 E-Mail C. Von Maack to S. Miller, Trial Ex. 691; 5-15-14 Letter C. Von Maack to S. Miller, Trial Ex. 26.

[67] *See Iota, LLC v. Davco Mgmt. Co., LC*, 2012 UT App 218, ¶ 27, 284 P.3d 681 (setting forth elements of equitable estoppel).

intent and means to perform on the acquisition.  Derma Pen did not do that.  Instead, as the evidence will demonstrate, Derma Pen has, at every juncture, frustrated 4EverYoung's attempts to specifically enforce Sections 12.2 and 14.6.[68]

Second, Derma Pen has not acted in reliance on any purported inconsistent statement by 4EverYoung regarding Sections 12.2 and 14.6.  Indeed, under its own theory, Derma Pen did not learn about or assert 4EverYoung's purported lack of intent to specifically enforce the Trademark and Domain Name valuation and acquisition provisions until it obtained such information during this case.[69]  Thus, even if the information upon which Derma Pen claims to have relied demonstrated some contrary intent on the part of 4EverYoung, Derma Pen's purported reliance would be manifestly unreasonable.

Finally, Derma Pen has not been injured by any reliance upon purportedly inconsistent positions by 4EverYoung with respect to Sections 12.2 and 14.6.  Rather, Derma Pen has 'dug in its heels' on its theory that it can ignore those sections and simply keep the Trademark and Domain Name, collecting damages for purported

---

[68] *See* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654; 5-15-14 Letter C. Von Maack to S. Miller, Trial Ex. 26.

[69] *See* 5-19-14 E-Mail R. Tringali to M. Morgan, Trial Ex. 142.  It is worth noting that Derma Pen hatched its theory through improperly soliciting, obtaining, and reviewing documents from a former agent of Defendants.  Many of those improperly obtained documents were clearly Defendants' attorney-client privileged or work product protected communications.  Defendants' misdeeds with respect to Defendants' privileged and protected information resulted in an award of Defendants' costs and expenses, including attorney fees.  *See also* Order Granting Defendants' Short Form Discovery Motion [Docket No. 169] ¶ 3, Docket No. 197, filed June 20, 2014.

trademark infringement along the way.  Any injury occasioned by Derma Pen's refusal to accept its contractual obligations is self-imposed.  Accordingly, Derma Pen's affirmative defense of estoppel should fail.

### E.    Derma Pen's Failure to Meet a Necessary Precondition Defense.

Derma Pen's affirmative defense of failure to meet a necessary precondition is without merit.  As a basic matter of contractual interpretation, the relevant provisions – Sections 12.2 and 14.6 – are triggered upon termination of the Distribution Agreement under Section 11.[70]  Derma Pen voluntarily terminated the Distribution Agreement, citing only Section 11.1, which is part of Section 11.[71]

In response, 4EverYoung expressly invoked Sections 12.2 and 14.6, identified its proposed independent auditor,[72] requested information necessary to accomplish a valuation, and requested a response from Derma Pen by August 1, 2013.[73]  Derma Pen rejected those requests through failing to respond and filing the instant lawsuit.[74]  In

---

[70] Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

[71] See 5-30-13 Letter J. Jones to S. Marshall, Trial Ex. 16; Distribution Agreement § 11, Trial Ex. 8.

[72] That 4EverYoung later determined to retain a different auditor from the one it initially contacted is of no moment, and certainly does not demonstrate any intent not to enforce and perform under Sections 12.2 and 14.6.

[73] See 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654.

[74] See 10-29-13 Memorandum Decision and Order Denying Plaintiff Derma Pen, LLC's Motion for Temporary Restraining Order and Preliminary Injunction at 5, Docket No. 70; see also Complaint, Docket No. 2; 8-2-13 E-Mail S. Miller to S. Marshall ("In response to

(continued...)

sum, there was nothing more for 4EverYoung to do to trigger or invoke Sections 12.2 and 14.6.  Thus, Derma Pen's affirmative defense of failure of a necessary precondition should be rejected.

### F.   Derma Pen's Lack of Standing Defense.

Derma Pen's affirmative defense of lack of standing is without merit because 4EverYoung and Derma Pen are the parties to the Distribution Agreement and, accordingly, 4EverYoung has standing to seek specific performance of Derma Pen's obligations under that agreement.[75]  Thus, Derma Pen's affirmative defense of lack of standing should fail.[76]

### G.   Derma Pen's Fraudulent Inducement Defense.

Derma Pen's fraud/fraudulent inducement affirmative defense is without merit because the evidence will show that Derma Pen cannot meet the elements of such a claim.  No false representation was made by 4EverYoung (or Marshall) concerning a presently existing material fact regarding Sections 12.2 and 14.6.[77]  The terms of Sections 12.2 and 14.6 were included in redlines exchanged between the parties nearly

_____

(...continued)
your email dated July 25, 2013, please see letter and copy of lawsuit filed against you and your various companies."), Trial Ex. 657.

[75] Distribution Agreement, Trial Ex. 8.

[76] *See, e.g.*, *Frontier Commc'ns of New York, Inc. v. Int'l Bhd. of Elec. Workers*, 07 CIV.10327 GEL, 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) ("It is 'axiomatic' that a party to an agreement has standing to sue a counter-party who breaches that agreement . . . .").

[77] *See Daines v. Vincent*, 2008 UT 51, ¶ 38, 190 P.3d 1269 (identifying elements of fraudulent inducement).

two weeks before Derma Pen executed the Distribution Agreement.[78]  Moreover, those

precise terms were quoted and expressly discussed amongst the principals of Derma

Pen.[79]  And, ultimately, those terms were agreed to by Derma Pen.[80]

      Relatedly, the evidence will also bear out that Derma Pen waived its

fraud/fraudulent inducement defense and cannot show reasonable reliance.  Derma

Pen signed the Distribution Agreement with knowledge of the purportedly fraudulent

provisions contained therein, continuing to perform under the Distribution Agreement

with such knowledge and, eventually, voluntarily terminating the agreement at the

expiration of its initial term, without reference to any alleged fraud.[81]  Thus, Derma Pen's

affirmative defense of fraud/fraudulent inducement should fail.[82]

### H.   Derma Pen's Undue Hardship Defense.

      Derma Pen's affirmative defense of undue hardship, which is an equitable

defense for the Court's determination, is without merit because the specific performance

requested by 4EverYoung was "reasonably within the contemplation of the parties at the

inception of the contract."[83]  Not only is the specific performance requested by

---

[78] *See* 7-17-11 E-Mail S. Marshall to C. Milton, Trial Ex. 580.

[79] *See* 7-18-11 E-Mail C. Milton to M. Morgan, Trial Ex. 48.

[80] *See* Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

[81] *See* Derma Pen Depo. at 84, 104-05, 138, 145, 162, 196-97, Trial Ex. 46; 5-30-13
Letter J. Jones to S. Marshall, Trial Ex. 16.

[82] Derma Pen's affirmative claim of fraudulent inducement is addressed more fully in
Defendants'

[83] 71 Am. Jur. 2d Specific Performance § 90 (internal footnotes omitted).

4EverYoung expressly set forth as a consequence of termination, the requirement to sell the Trademark and Domain Name upon termination was the consideration for 4EverYoung even allowing Derma Pen to have purported ownership rights to the Trademark and Domain Name in the first place.[84]  Thus, Derma Pen's affirmative defense of undue hardship should be rejected.

### I.   Derma Pen's Lack of Mutuality Defense.

Derma Pen also claims that specific performance is unavailable to 4EverYoung because of a purported lack of mutuality, which "is really a statement that the contract lacks consideration."[85]   As explained by the Utah Supreme Court, "<u>a contract does not lack mutuality merely because its terms are harsh or its obligations unequal, or because</u>

---

[84] *See* Distribution Agreement §§ 12.2, 14.6 ("As part of acknowledging [Derma Pen's] ownership of the DermaPen Trademark in the US [and DermaPen.com domain], [Derma Pen] hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, [Derma Pen] agrees to offer the Dermapen Trademark in the US [and Dermapen.com domain] for sale to 4EVERYOUNG and 4EVERYOUNG has the first right of refusal for such trademark [and domain]."), Trial Ex. 8.

[85] *Ross v. Producers Mut. Ins. Co.*, 295 P.2d 339, 344 (1956) ("We agree, of course, that mutuality of obligation is an essential element of the contract.  A plea that a contract is defective in this regard is really a statement that the contract lacks consideration.  Consequently the issue posed is whether, considering the contract as a whole, the plaintiffs here were left without valid consideration for their promise.  Whenever possible a contract should be so construed that there are mutually binding promises on each party." (internal footnotes omitted)); *see also Resource Mgmt. Co. v. Weston Ranch & Livestock Co.*, Inc., 706 P.2d 1028, 1037 (Utah 1985) ("If, however, one party reserves the right to terminate a contract upon the occurrence of a condition subsequent, the contract is not unenforceable ab initio for lack of mutuality of consideration.").

every obligation of one party is not met by an equivalent counter obligation of the other party."[86]

The Distribution Agreement had ample mutual consideration, as the evidence will demonstrate.  4EverYoung promised to provide Derma Pen with, among other things, rights to distribute the Dermapen in the United States, and the right to "own" and use the Trademark in the United States.[87]  In exchange, Derma Pen promised to, among other things, tender the Trademark and Domain Name to 4EverYoung for purchase upon termination of the Distribution Agreement.[88]  Thus, Derma Pen's affirmative defense of lack of mutuality should fail.

### J.    Derma Pen's Nonrenewal Defense.

Derma Pen's defense that Sections 12.2 and 14.6 were not triggered by Derma Pen's "nonrenewal" of the Distribution Agreement is without merit because Derma Pen's termination falls squarely within Section 11, which termination expressly triggers Sections 12.2 and 14.6.  On May 30, 2013, Derma Pen gave notice to 4EverYoung of its termination "pursuant to Section 11.1 of the Sales Distribution Agreement."[89]  Section 11.1 is part of Section 11.[90]  Thus, Derma Pen's termination triggered the Trademark

---

[86] *Allen v. Rose Park Pharmacy*, 237 P.2d 823, 825 (Utah 1951) (reversing trial court's ruling that contract provision was unenforceable for lack of mutuality).

[87] *See* Distribution Agreement § 2.1, Trial Ex. 8.

[88] *See id.* §§ 12.2, 14.6, Trial Ex. 8.

[89] *See* 5-30-13 Letter J. Jones to S. Marshal, Trial Ex. 16.

[90] *See* Distribution Agreement § 11, Trial Ex. 8.

and Domain Name valuation and transfer provisions of Sections 12.2 and 14.6.
Accordingly, Derma Pen's defense premised upon the inapplicability of Sections 12.2
and 14.6 to Derma Pen's "nonrenewal" should be rejected.

### K.   Derma Pen's Survival Clause Argument.

Derma Pen's defense that the purported omission of Section 12 from the survival
clause (Section 11.3) precludes specific performance of the Trademark and Domain
Name valuation and transfer provisions is without merit.  The relevant provisions of
Sections 12.2 and 14.6 are springing provisions that expressly became operative only
upon termination.  Moreover, the survival clause expressly permits the parties to
enforce their rights under the Agreement following termination.

In interpreting a contract, courts "look to the writing itself to ascertain the parties'
intentions, and . . . consider each contract provision . . . in relation to all of the others,
with a view toward giving effect to all and ignoring none."[91]  Sections 12.2 and 14.6
become operative only upon termination under Section 11.[92]  It would be contrary to the
letter and spirit of the Distribution Agreement if those provisions that are triggered only
upon termination are then rendered unenforceable and meaningless upon termination.
Such an interpretation is contrary to the parties' express intentions and reason.

---

[91] *WebBank v. American Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139
(additional quotations and citations omitted) (second omission in original).

[92] *See* Distribution Agreement §§ 12.2, 14.6, Trial Ex. 8.

The survival clause applies to provisions that were operative during the term of the Distribution Agreement and which the parties agreed would persist following termination, such as the protection of confidential information and indemnification.

Moreover, the survival provision does not preclude and, in fact, expressly authorizes 4EverYoung to specifically enforce the Distribution Agreement following termination.[93]  Thus, Derma Pen's affirmative defense anchored upon Section 11.3 should be rejected.

### L.    Derma Pen's First Material Breach Defense.

Finally, Derma Pen's affirmative defense of first material breach is without merit because, as the evidence will conclusively establish, 4EverYoung committed no material breach, let alone any material breach pertaining to Sections 12.2 and 14.6 of the Distribution Agreement.

In determining whether a breach is material, courts consider the following:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior

---

[93] *Id.* § 11.3 ("Any termination of this Agreement shall be without prejudice to any other rights or remedies under this Agreement or at law."), Trial Ex. 8.

of the party failing to perform or to offer to perform comports
with standards of good faith and fair dealing.[94]

Derma Pen argues that its affirmative defense to specific performance of first
material breach swallows up the whole case because it places "at issue the same facts
and contentions supporting Derma Pen's twenty-third alternative cause of action for
breach of contract."[95]   There are several problems with Derma Pen's defense of first
material breach.  First, in this context, the material breach defense is limited to
4EverYoung's purported breaches that occurred before Derma Pen's breach of the
Trademark and Domain Name valuation and purchase provisions of Sections 12.2 and
14.6 of the Distribution Agreement.  In its twenty-third cause of action for breach of
contract in its Amended Complaint, Derma Pen alleges only that "4EverYoung has
breached the Agreement by using the DERMAPEN Marks in commerce in the United
States" and "on Defendants' interactive websites."[96]   All of 4EverYoung's use of the
Trademark in the United States for its own sales occurred after termination of the
Distribution Agreement and, thus, after Derma Pen had breached Sections 12.2 and
14.6.[97]

---

[94] *Cache Cnty. v. Beus*, 1999 UT App 134, ¶ 37, 978 P.2d 1043 (quoting Restatement (Second) of Contracts: Circumstances Significant in Determining Whether a Failure is Material § 241 (1981)).

[95] Derma Pen's Motion to Modify June 24, 2014 Order (Doc. 207) (and Related Scheduling and Discovery Orders) and for Expedited Oral Argument at 24 (emphasis added), Docket No. 227, filed July 1, 2014.

[96] Amended Complaint ¶¶ 802-08, Docket No. 118, filed May 1, 2014.

[97] *See* Marshall Depo. at 55, Trial Ex. 41.

Second, in addition to 4EverYoung's purported breach being temporally outside the relevant scope for Derma Pen's first material breach defense, as the Court has already observed that 4EverYoung certainly had the right to use the Trademark "<u>after</u> termination of the Agreement:"

> Section 12.1 of the Agreement does not clearly and unequivocally restrict Defendants from using the Dermapen trademark in the United States during the term of the Agreement, and it certainly does not restrict Defendants from using the Dermapen trademark *after* termination of the Agreement.[98]

Thus, the Distribution Agreement expressly contemplated 4EverYoung's use of the Trademark.

Third, the Court has already determined that Derma Pen could be adequately compensated through damages, if warranted, for 4EverYoung's use of the Trademark.[99]

Fourth, were the Court to accept Derma Pen's theory of material breach, 4EverYoung would suffer a total forfeiture of its rights to the Trademark and Domain Name. Such a forfeiture is particularly improper here, where Derma Pen was effectively a limited licensee, and forfeiture would effectively convey the license to Derma Pen without compensation.

Fifth, during the term of the Distribution Agreement, after termination of the agreement, and even after Derma Pen filed the instant lawsuit, 4EverYoung fulfilled its

---

[98] October 29, 2013 Order at 5 (emphasis in original), Docket No. 70.

[99] *Id.* ("Even if this were a pure trademark case, monetary damages could adequately compensate Derma Pen if it did ultimately succeed on the merits (which is unlikely)."), Docket No. 70.

duties with respect to Sections 12.2 and 14.6, while Derma Pen has refused to comply with those provisions.[100]  So, 4EverYoung cannot be said to have breached those obligations.

Sixth, to the extent that 4EverYoung has not performed under Sections 12.2 and 14.6, it is a result of Derma Pen's continued frustration of those efforts.[101]

Seventh, Derma Pen voluntarily terminated the Distribution Agreement at the expiration of its initial term, without so much as a peep about breach.[102]  Considering that Derma Pen was at all relevant times represented by a "legal team" including its counsel of record in this case, the importance of Derma Pen's silence regarding breach cannot be overstated.[103]  Indeed, it undercuts any new claim of breach or materiality by Derma Pen.

Finally, 4EverYoung's conduct, especially in light of Derma Pen's transparent scheming to cut 4EverYoung out of the deal and yet keep its distributorship and the Trademark, comports with (and exceeds) standards of good faith and fair dealing. Thus, Derma Pen's new claim of material breach by 4EverYoung should be rejected.

---

[100] *See* 7-25-13 Letter S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 10; 7-25-13 E-Mail S. Marshall to J. Jones, M. Morgan, C. Milton, Trial Ex. 654; 5-15-14 Letter C. Von Maack to S. Miller, Trial Ex. 26.

[101] *See* 11-26-13 Letter S. Miller to C. Von Maack, Trial Ex. 23.

[102] *See* 5-30-13 Letter J. Jones to S. Marshal, Trial Ex. 16.

[103] *See* Derma Pen Depo. at 196-97, Trial Ex. 46.

IV.     **DERMA PEN'S DECLARATORY JUDGMENT CLAIM.**

The question posed by Derma Pen's declaratory judgment claim is whether

Derma Pen must perform under Section 12.2 of the Distribution Agreement.  As set

forth above, the evidence will show that the answer is "yes."

DATED this 28th day of July, 2014.

MAGLEBY & GREENWOOD, P.C.

James E. Magleby
Christine T. Greenwood
Christopher M. Von Maack
*Attorneys for 4EverYoung Ltd., Biosoft Pty Ltd.,*
*Equipped International Pty Ltd., and Stene*
*Marshall*

34

**CERTIFICATE OF SERVICE**

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b) of the Federal Rules of Civil Procedure, a true and correct copy of the

foregoing **DEFENDANTS' TRIAL BRIEF ON SPECIFIC PERFORMANCE AND**

**DECLARATORY JUDGMENT** was delivered to the following this 28th day of July, 2014,

by:

[  ]   Hand Delivery

[  ]   Depositing the same in the U.S. Mail, postage prepaid

[X]   Via CM/ECF System

[  ]   Via Electronic Mail


J. Mark Gibb
   mgibb@djplaw.com
Peter H. Donaldson
   pdonaldson@djplaw.com
Z. Ryan Pahnke
   rpahnke@djplaw.com
DURHAM JONES & PINEGAR, P.C.
111 East Broadway, Suite 900
Salt Lake City, Utah 84111

*Attorneys for Plaintiff Derma Pen, LLC*

Samuel F. Miller
   smiller@bakerdonelson.com
Maia T. Woodhouse
   mwoodhouse@bakerdonelson.com
Nicholas L. Vescovo
   nvescovo@bakerdonelson.com
BAKER, DONELSON, BEARMAN, CALDWELL &
   BERKOWITZ, P.C.
Baker Donelson Center
211 Commerce Street, Suite 800
Nashville, Tennessee  37201

*Attorneys for Plaintiff Derma Pen, LLC*