IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>                 Plaintiff,<br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>                 Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING 4EVERYOUNG'S 238 MOTION FOR PARTIAL SUMMARY JUDGMENT ON RESCISSION**<br><br>Case No.: 2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>    Counterclaim Plaintiffs,<br>v.<br><br>DERMA PEN, LLC,<br><br>    Counterclaim Defendant. | |

       This order grants 4EverYoung LTD's ("4EverYoung") motion[1] for partial summary judgment directed against Derma Pen, LLC's ("Derma Pen") claim for the equitable remedy of rescission, contained in Derma Pen's claim that it was fraudulently induced to enter into an agreement with 4EverYoung.[2]

---

[1] Defendants' Motion for Partial Summary Judgment on Rescission and Memorandum in Support ("Motion"), docket no. 238, filed July 3, 2014.

[2] First Amended Complaint (Redacted) 22nd Cause of Action at 144–46, docket no. 118 (unredacted version filed under seal as docket no. 136, filed May 2, 2014).

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... 2
Background .................................................................................................................... 2
Undisputed Facts ........................................................................................................... 4
DISCUSSION ................................................................................................................. 9
    Several Defenses to Rescission Bar the Equitable Remedy of Rescission ........................ 9
        Termination ................................................................................................... 9
        Full Performance ......................................................................................... 11
        Continuing to Perform; Waiver .................................................................. 12
        Restoration .................................................................................................. 13
        Prompt Notice ............................................................................................. 14
        Summary of Conclusions on Rescission ..................................................... 15
    Further Discovery is Not Necessary ............................................................................ 16
    This Motion Can Be Decided Before Fraudulent Inducement is Tried ........................ 17
ORDER ........................................................................................................................ 18
    Note to Counsel ........................................................................................................... 19

# BACKGROUND

Plaintiff Derma Pen is a Delaware limited liability company, with its principal office in Utah.[3] 4EverYoung is a private limited liability company organized under United Kingdom law, with its principal place of business in London.[4] Stene Marshall is a principal in 4EverYoung.

Sometime in the Spring of 2011, the parties started discussions of Derma Pen's distribution of a micro-needling product which became known as Dermapen.[5] The product is manufactured by Sunwoo, a Korean company.[6] According to Derma Pen, in these negotiations,

---

[3] First Amended Complaint ¶ 1; Answer to First Amended Complaint, Counterclaim, Third Party Amended Complaint and Demand for Jury Trial ("Answer to First Amended Complaint") ¶ 1 at 2, docket no. 139, filed May 2, 2014.

[4] First Amended Counterclaim ¶ 1, docket no. 215, filed June 26, 2014; Plaintiff's Answer to Defendants' First Amended Counterclaim ¶ 1, docket no. 233, filed July 3, 2014.

[5] Originally referred to as the ePen device.

[6] First Amended Counterclaim ¶ 2 at 2; Plaintiff's Answer to Defendants' First Amended Counterclaim ¶ 2 at 1.

Marshall misrepresented many aspects of 4EverYoung's capabilities and position as a distributor of the micro-needling product:

> 34. Stene Marshall represented . . . that the manufacturer of the ePen product . . . had obtained patent registrations to protect the technology embodied in the ePen product.[7]
> 35. Stene Marshall represented that . . . [the manufacturer of the ePen product] had worldwide exclusivity to the technology embodied in the ePen product.[8]
> 36. Stene Marshall further represented that he had the exclusive right worldwide to distribute and/or license the ePen product to distributors . . . .[9]
> 38. Because Stene Marshall had redacted the identity of the manufacturer of the ePen product from the manufacturer agreement provided to Derma Pen . . . , Derma Pen could not perform its own patent search prior to entering into a sales distribution agreement . . . .[10]
> 47. On or around July 5, 2011, Stene Marshall provided Derma Pen with an allegedly "revised" unsigned, redacted version of the [Original Equipment Manufacturer ("OEM")] agreement . . . [between Equipmed International Pty. Ltd.,[11] and] . . . Sunwoo, [the manufacturer of the ePen product,] throughout which Sunwoo's name and other [material] provisions had been redacted.[12]
> 55. Several key provisions from the Actual[13] OEM Agreement were materially altered by Stene Marshall prior to sending the Falsified[14] OEM Agreement to Derma Pen . . . .[15]
> 64. Stene Marshall only produced the Actual OEM Agreement after it was requested during his [October 20, 2013] deposition[, after this litigation had commenced].[16]

---

[7] First Amended Complaint ¶ 34.

[8] *Id.* ¶ 35.

[9] *Id.* ¶ 36.

[10] *Id.* ¶ 38.

[11] More specifically, the OEM Agreement was made and entered into by Biosoft Pty Ltd trading as Equipmed International Pty. Ltd..

[12] First Amended Complaint ¶ 47.

[13] The "Actual" OEM Agreement Derma Pen is referring to is the April 5, 2011 agreement. *See* First Amended Complaint (Un-redacted) ¶ 50.

[14] The "Falsified" OEM Agreement Derma Pen is referring to is the July 5, 2011 revised agreement that Marshall provided Derma Pen. *See* First Amended Complaint (Un-redacted) ¶ 47.

[15] First Amended Complaint (Un-redacted) ¶ 55, [docket no. 136](docket no. 136), filed under seal May 2, 2014.

[16] First Amended Complaint (Redacted) ¶ 64.

Because of these alleged misrepresentations, Derma Pen claims it was fraudulently induced to enter into an agreement with 4EverYoung at the end of July 2011. Derma Pen's 22nd cause of action seeks damages and rescission of the agreement.[17] This claim is, with others, set for trial in August 2014.

4EverYoung moves for summary judgment on the claim for rescission because: (1) The parties' agreement was fully or substantially performed and terminated; and (2) Derma Pen failed to timely assert or pursue rescission, and failed to provide a timely notice of intent to rescind.

## UNDISPUTED FACTS

The following statement of undisputed facts comes largely from careful comparison of the Motion and Opposition[18]. In some cases, fact statements proposed by 4EverYoung are modified to remove immaterial disputes. Most of the 147 additional fact statements Derma Pen proposed in its Opposition were not rebutted by 4EverYoung which said only: "[T]he facts set forth in that lengthy portion of Derma Pen's opposition are largely, if not wholly, irrelevant to the instant motion, in addition to being duplicative, unnecessary, and, frankly, harassing. As such, they can be disregarded for purposes of the instant motion."[19] Very few of Derma Pen's 147 additional facts are material. Those which are material are included here, some with modifications to reflect the actual content of source material and to remove irrelevant detail.

1. On behalf of Derma Pen, Chad Milton signed the Distribution Agreement on July 28, 2011.[20]

---

[17] First Amended Complaint 22nd Cause of Action at 144–46.

[18] Plaintiff/Counterclaim Defendant Derma Pen, LLC's Response in Opposition to Defendants' Motion for Partial Summary Judgment on Rescission [Doc. 238] ("Opposition"), docket no. 282, filed July 16, 2014.

[19] Reply Memorandum in Support of Defendants' Motion for Partial Summary Judgment on Rescission ("Reply") at vi, docket no. 300, filed July 22, 2014.

[20] Motion ¶ 1 at x; Opposition at xviii.

2.      On August 1 or 2, 2011, Marshall executed the Distribution Agreement on behalf of 4EverYoung.[21]

3.      Section 11.1 of the Distribution Agreement provides as follows:[22]

> 11.0 Term and Termination
> 11.1 Term.
> The term of this Agreement shall be a two (2) year contract from the Effective Date of this Agreement. It will renew automatically in one (1) year intervals, except when notice of termination is provided by either party before 60 days of the next renewal date.

4.      Derma Pen performed under the Distribution Agreement through the expiration of its two-year term. In this regard, Derma Pen's Rule 30(b)(6) witness testified as follows:[23]

> 22 After -- after that broke down, we -- we
> 23 still -- from day one, and even right then, it was still
> 24 business as usual for us, meaning -- meaning we are going
> 25 to perform on the contract.
> 1 We entered in this contract even though now we
> 2 realized it's a debacle. But we are still going to
> 3 perform. [24]
>
> 22 Again, I wasn't there back then. But -- but
> 23 with that being the case, the clause around the transfer
> 24 of the trademark upon -- upon termination is -- is, I
> 25 guess -- I don't know -- is fueled or is born out of
> 1 that -- that other flaw in the contract or my perception
> 2 of the flaw in the contract of it being a distribution
> 3 agreement and not a transfer of rights agreement
> 4 because -- because we didn't fail. And -- and we -- we
> 5 executed on the contract. We performed on the contract.
> 6 And because of that, those -- those transfer rights are
> 7 not automatically, I guess, invoked or whatever, if
> 8 that's the right terminology there.
> 9 But -- and so -- and so regarding whether or
> 10 not that clause or -- or that is -- that is enforceable
> 11 is -- is -- I would say that is not enforceable. We did

---

[21] Motion ¶ 2 at x; Opposition at xviii. The Distribution Agreement is part of Derma Pen's Trial Exhibit ("TE") 8.

[22] Motion ¶ 3 at x; Opposition at xviii–xix.

[23] Motion ¶ 4 at xi–xii; Opposition at xxi.

[24] 30(b)(6) Deposition of Derma Pen, LLC (Derma Pen Dep.), Derma Pen's TE 46 at 104:22–105:3.

> 12 not fail. We performed on the contract and, you know, of
> 13 course not.[25]

> 6 But the -- but the understanding is that the
> 7 trademark transfer coincides with the performance of the
> 8 contract. And Derma Pen performed on the contract.[26]

5. On May 30, 2013, Derma Pen sent notice, specifically invoking Section 11.1 of the Distribution Agreement:[27]

> Mr. Marshall,
> By this writing and pursuant to Section 11.1 of the Sales Distribution Agreement between Derma Pen LLC and 4Ever Young Limited, Derma Pen LLC hereby exercises its right to terminate the same Sales Distribution Agreement with such termination becoming effective immediately upon the expiration of the current term on August 1, 2013.

6. The parties have at times referred to this letter as a "non-renewal" letter.[28] However, the parties agree the effect of the letter was to terminate the Distribution Agreement.[29]

7. Derma Pen was aware of many of the bases for its claim of fraudulent inducement by March[30] or September 2012.[31] This awareness came by:

- The revelation at a trade show in Cancun in early 2012 in response to requests for copies of patents that "that the intellectual property was a little bit less than [Stene Marshall] had thought"[32]
- Discussions at a San Diego trade show in March 2012, when Stene Marshall admitted that there was only a single Korean patent.[33]

---

[25] *Id.* at 137:22–138:13.

[26] *Id.* at 162:6–8.

[27] Motion ¶ 5 at xii–xiii; Opposition at xxii.

[28] Opposition at xxv (citing Derma Pen Dep. TE 46 at 107:2–4).

[29] First Amended Complaint ¶ 97; Answer to First Amended Complaint, Counterclaim, Third-Party Amended Complaint and Demand for Jury Trial ¶ 97, docket no. 139, filed May 2, 2014.

[30] The First Amended Complaint alleges: "In or around March 2012, Derma Pen discovered that neither Stene Marshall, 4EverYoung, nor Sunwoo owned patents granting worldwide exclusive rights to make, use, sell, offer for sale, or import the invention embodied in the ePen product." First Amended Complaint ¶ 40.

[31] Motion ¶ 1 at xiii; Opposition at xxiv.

[32] Motion ¶ 1 at xiii and n. 15 (citing Derma Pen Dep. TE 46 at 43:18–23); Opposition at xxiv.

[33] Opposition ¶ 45 at xlviii (citing Derma Pen Dep. TE 46 at 51:10–53:11).

- An email on March 23, 2012, from Stene Marshall, disclosing that there was at most a Korean patent for a predecessor product.[34]
- An email from Mike Anderer (of Derma Pen) on September 9, 2012, disclosing awareness that "EPen never had any US or any other international patents to sell exclusive territories on. They only held partial patents filed in South Korea only which are worthless, so Dermapen has zero protection against cheap knockoffs and other new entries to the micro-needling market as we were initially sold."[35]

8. However, it was not until May 19, 2014[36] that Derma Pen

- received Marshall's communications with Sunwoo, including the May 11, 2011 email waiving worldwide exclusivity;
- received a Second Signed OEM Agreement,[37] which disclosed the product's true pricing; and
- discovered that the Second Signed OEM Agreement was not executed at the time Derma Pen entered into the Distribution Agreement.

9. In April 2012, representatives of Derma Pen and 4EverYoung met in Sydney, Australia to investigate the single Korean patent and determine whether the patent could be extended internationally given that it had now been offered for sale.[38]

10. In April and May 2012, representatives of Derma Pen and 4EverYoung discussed a joint venture.[39]

11. In a meeting between representatives of Derma Pen and 4EverYoung in Australia in May or June 2012, Marshall revealed that 4EverYoung purportedly owned the rights to the Dermapen trademark "in the rest of the world."[40]

---

[34] Motion at xiii n. 15 (citing TE 79); Opposition at xxiv.

[35] Motion at xiii and n. 15 (citing TE 49 at 1); Opposition at xxiv.

[36] Opposition at xxiv–xxv (citing TE 27 (containing Second Signed OEM Agreement), TE 56, and TE 75). The OEM Agreement disclosed in Marshall's Deposition ([docket no. 68](docket no. 68), filed under seal October 24, 2013) is Exhibit 5 to that deposition.

[37] The Second Signed OEM Agreement was signed by Marshall on September 1, 2011.

[38] Opposition ¶¶ 64–65 at l–li (citing Derma Pen Dep. TE 46 at 53:18–54:4).

[39] Opposition ¶¶ 66–67 at li (citing TE 163 and 171).

[40] Opposition ¶¶ 68–71 at li (citing Derma Pen Dep. TE 46 at 54:5–57:14).

12. In late August 2012, Marshall traveled to the United States for joint venture discussions.[41]

13. On September 12, 2012, Marshall sent an email to Derma Pen with the subject line "Merger Proposal" containing a document entitled "Merger Details v.1."[42] Derma Pen referred to this as the "joint venture proposal."[43]

14. Derma Pen made subsequent demands to Marshall and 4EverYoung during the parties' attempt to renegotiate the Distribution Agreement after the joint venture discussions broke down, including, without limitation, the following:[44]

> 3 And so -- but what happened was -- what started
> 4 to happen is that on top of everything I just said that
> 5 leads up to this is Mr. Marshall's behavior after the
> 6 joint venture did not work out. There's – there's
> 7 demands for leave that we generate. There's demands for
> 8 marketing materials that we paid for and copyrighted
> 9 materials that we paid for. All of our marketing efforts
> 10 that we -- that we put forth and created the brand that
> 11 we did now all of a sudden he is coming in and saying,
> 12 "Okay. Now you have to start giving me this stuff." This
> 13 is before termination.
> 14 "You need now to start giving me customer
> 15 information by having -- making your customers register
> 16 their warranties on my website. And if you don't, their
> 17 warranties are invalid." That is -- and that was also
> 18 not -- not in the original contract in any way, shape, or
> 19 form.
> 20 We -- we -- anyway, so us realizing that --
> 21 that we really didn't think he had any intent to renew.
> 22 There was actual -- then, there was actual communication
> 23 that came and said, "I will only renew if we change all
> 24 of these terms." And there's -- there's a lot of terms
> 25 there that he now is saying, "I am going to renew" based

---

[41] Opposition ¶ 79 at liii (citing TE 111 and Derma Pen Dep. TE 46 at 68:24–69:21). Opposition ¶ 79 refers to a "merger," but the deposition text at 67:2–9 frames the questions in terms of "joint venture." *See also* Derma Pen Dep. TE 46 at 68:23 and 69:17.

[42] Opposition ¶ 84 at liv (citing TE 100); *see also* TE 96.

[43] Derma Pen Dep. TE 46 at 103:16–17; 104:4, 16, 20

[44] Opposition at xxi.

```
1 on this, this, this, this, and this that has nothing to
2 do with this contract. It's outside of the scope of this
3 contract.
4 So we really felt that there was -- that he had
5 no intent to renew the contract as it was, even though
6 the contract states it would be an automatic renewal if
7 we meet the terms. And because of that, that's why we
8 sent the letter and opted not to renew.[45]
```

15. The complaint in this case was the first notice 4EverYoung had of Derma Pen's intention to rescind the Distribution Agreement.[46]

## DISCUSSION

For reasons described in greater detail below, several defenses bar Derma Pen from receiving the equitable remedy of rescission. One defense relied on by 4EverYoung does not apply. And several arguments relied on by Derma Pen are inapplicable.

**Several Defenses to Rescission Bar the Equitable Remedy of Rescission**

Several defenses to the equitable remedy of rescission spring from the need to do equity before receiving an equitable remedy. These defenses include full performance, termination, and restoration which prevent a futile rescission. Other defenses, such as ratification, waiver, or affirmance and notice represent the need to be clear and fair about the intention to rescind. Unfairness or futility should not be practiced by a court in equity.

**Termination**

Generally, following termination of a contract, a cause for rescission of that contract cannot be maintained. In *Am. Litho, Inc. v. Imation Corp.*,[47] a case cited by 4EverYoung, termination barred a rescission claim. In that case the patent licensor, in early 2006, notified the

---

[45] Derma Pen Dep. TE 46 at 105:3–106:8.

[46] Motion ¶ 3 at xiv; Opposition at xxvi; Complaint ¶ 164, [docket no. 2](docket no. 2), filed August 1, 2013.

[47] [No. 08-CV-5892(JMR/SRN), 2010 WL 681275, at *4 (D. Minn. Feb. 23, 2010)](No. 08-CV-5892(JMR/SRN), 2010 WL 681275, at *4 (D. Minn. Feb. 23, 2010)).

licensee that their license agreement was terminated because the licensor was unable to obtain the right to grant licenses to practice the patent.[48] When the licensee sued for breach of the license agreement, the licensor counterclaimed for rescission.[49] Rescission would have obliterated all obligations between the parties, defeating the licensee's claim for damages.

The court, in distinguishing between rescission and termination, stated:

> Rescission and termination are distinct legal concepts. Terminating a contract ends the contract going forward and relieves the parties from future performance of the obligations under the contract. In contrast, "[r]escission is the unmaking of a contract which not only terminates the contract but abrogates it and undoes it from the beginning."[50]

According to the court, the distinction is significant because "once a contract has been terminated, the party terminating the contract cannot later seek rescission of the contract. . . . [W]here parties' rights are terminated under a contract for deed, [the] party cannot later seek rescission of the contract; 'One cannot rescind a contract no longer in existence.'"[51]

This makes sense in the equitable context. There is no purpose in rescinding a contract that ended by termination. The contract is already ended. And it makes no sense to rescind at the request of the party who terminated the contract. That would allow a party to elect one course of action and later be allowed to avail himself of an incompatible course.

In *American Litho* the subterfuge was apparent. The patent licensor wanted to defeat the licensee's claim for its breach of the license agreement. The licensee had "incurred over $1,000,000 in out-of-pocket costs and charges in connection with developing the alternative

---

[48] *Id.* at *2.

[49] *Id.*

[50] *Id.* at *4 (citations omitted) (citing 17B C.J.S. Contracts § 448 and 17B C.J.S. Contract § 492 and quoting *Gfrerer v. Lemcke*, No. A08–0873, 2009 WL 749584, at *3 (Minn. Ct. App. March 24, 2009)).

[51] *Id. (*quoting *Henry v. Schultz*, 408 N.W.2d 635, 637 (Minn. Ct. App. 1987)).

technology and damages for lost sales, profits and market share."[52] Rescission would bar the damage claim because the contract would be a nullity from the inception, while termination would leave the licensor liable for breach damages. Ultimately, the court denied rescission of the terminated contract.

Derma Pen argues that its May 30, 2013 notice is not a termination letter but is a "non-renewal" letter.[53] This is not what Derma Pen's notice says:

> By this writing and pursuant to Section 11. 1 of the Sales Distribution Agreement between Derma Pen LLC and 4Ever Young Limited, Derma Pen LLC hereby exercises its right to **terminate** the same Sales Distribution Agreement with such **termination** becoming effective immediately upon the expiration of the current term on August 1, 2013.[54]

The Distribution Agreement is clear that renewal is automatic and that termination is the only method of non-renewal.

> [This agreement] will renew automatically in one (1) year intervals, except when notice of termination is provided by either party before 60 days of the next renewal date.[55]

"Non-renewal" is not a genuine issue.

The Distribution Agreement has been terminated. Derma Pen terminated it. Derma Pen cannot now seek rescission.

**Full Performance**

Similar to termination, full performance of a contract can also bar rescission. The reason for this rule is similar to the termination rule. If a contract is completely performed, there is no ground for rescission.

---

[52] *Id.* at *2.

[53] Opposition at 9–10.

[54] Motion ¶ 5 at xii–xiii; Opposition at xxii. The letter is Derma Pen's TE 16 (emphasis added).

[55] Distribution Agreement § 11.1, TE 8.

When a railway sued the Unites States for cement transportation costs connected with Grand Coulee Dam, the government responded with a rescission claim.[56] Because the construction project was over, the contract was "substantially performed in all respects," and rescission was denied.[57]

Derma Pen and 4EverYoung performed through the term of the Distribution Agreement. Then, pursuant to the Distribution Agreement, Derma Pen disclosed its decision to terminate the Distribution Agreement at the end of the prescribed term. Performance of the Distribution Agreement then ended. Derma Pen cannot now rescind after the full term of the contract has been performed.

Derma Pen argues that the contract is not fully performed, because the post-termination obligations of Sections 12.2 and 14.6 (relating to offer and tender of the trademark and domain name) have not been performed.[58] But those obligations are clearly in the *post-termination phase* of the parties' relationship.

**Continuing to Perform; Waiver**

In *Dugan v. Jones,*[59] a party was barred from rescission of a land purchase agreement because, through the time of trial, he remained in possession of the land and continued to make payments. The Utah Supreme Court said: "[A]ny delay on the part of the defrauded party, especially his remaining in possession of the property received by him under the contract, and dealing with it as his own, may constitute a waiver of the right to rescind the contract."[60] The

---

[56] *Northern Pac. Ry. Co. v. U.S.,* 70 F. Supp. 836, 865 (D. Minn. 1946) (denying a rescission of contract claim because the contract was "substantially performed in all respects.").

[57] *Id.* at 865.

[58] Opposition at 7–9.

[59] 615 P.2d 1239 (Utah 1980).

[60] *Id.* at 1247.

court held that while the right to rescission was lost, the right to claim damages was not. "[T]he right to recover damages for the fraud upon the affirmance of the contract is not so easily lost, for the defrauded party, who does not discover the fraud until he has partly performed, may go forward with the contract, keep what he has received, and still maintain his action for damages."[61]

The logic of this rule is clear: rescission vitiates the contract. A party which continues to perform under the contract acts inconsistently with the non-existence of the contract. Existence of the contract allows a damage claim, but a party cannot act like there is a contract and simultaneously seek to repudiate it.

Derma Pen continued to exercise its rights and fulfill its obligations through the term of the Distribution Agreement. Derma Pen's actions are therefore inconsistent with the remedy of rescission.

**Restoration**

*Perry v. Woodall*,[62] enunciated another necessary prerequisite to unwinding a transaction. "The law is well settled that one electing to rescind a contract must tender back to the other contracting party whatever property of value he has received."[63] Failure to restore the value received constitutes performance, which is inconsistent with the equitable remedy of rescission.

In this case, with transactions having been consummated and goods having been delivered to third parties over a two year period, rescission is impractical and would yield an inequitable result.

---

[61] *Id.*
[62] 438 P.2d 813 (Utah 1968).
[63] *Id.* at 815.

**Prompt Notice**

The Utah Supreme Court, in *Perry*, also articulated the requirement of prompt notice of intention to rescind. "One who claims he has been deceived and elects to rescind his contract by reason of the fraud or misrepresentation of the other contracting party must act promptly and unequivocally in announcing his intention."[64] *Perry* denied rescission to a business purchaser who remained in possession after discovering the true character of the business liabilities.[65]

The requirement of notice puts the parties on the path to unwinding the transaction, whether by agreement or judicial decree. To be fair to the other party, a party claiming there is no real contract must act consistent with its claim that the contract should be rescinded. Notice provides the other party an opportunity to react by agreeing to agreed rescission or termination.

In the present case, we will never know whether 4EverYoung would have agreed to mutual rescission, since Derma Pen never stated its intention to rescind before filing suit. A court of equity should not be required to grant a remedy for a party which failed to place its intentions before its adversary prior to filing suit.

Derma Pen alleges that the settlement negotiations with 4EverYoung tolled the need for a notice of rescission.[66] None of the cases Derma Pen cites, however, permit such a notice to be given *after* performance or termination of the contract. Derma Pen admits that before it gave the May 30, 2013 notice, "it became clear that 4EY was not interested in a resolution and that negotiations had failed . . . ."[67] But even then, nearly two years into the two year agreement, Derma Pen did not suggest rescission.

---

[64] *Id.*

[65] *Id.*

[66] Opposition at 11–13.

[67] *Id.* at 13.

Derma Pen also suggests that it continues to discover reasons to rescind, so that timeliness is a question of fact.[68] But the undisputed facts show that Derma Pen could amply support its fraudulent inducement allegations by September 2012.

**Summary of Conclusions on Rescission**

Derma Pen, in spite of becoming aware of misrepresentations allegedly made by Marshall, stayed in the contractual relationship through orderly termination *initiated by Derma Pen.* Derma Pen bought and paid for goods and required delivery from 4EverYoung. At no time prior to or in its notice of termination, did Derma Pen say anything about rescission. Derma Pen did not offer restoration or rolling back the years of goods delivered and received. Rescission of the Distribution Agreement would not change anything about that two year relationship.

Rescission might, however, allow Derma Pen to claim non-existence of the post-termination provisions of the Distribution Agreement under which it might be required to tender the trademark and domain name.[69] That argument illustrates the inequity of rescission in this case. After remaining in the contractual relationship and terminating it, which gives rise to the duties to offer and transfer, Derma Pen wants to repudiate the tender and transfer provisions which burden it, but benefit 4EverYoung.

In *Mosher v Long Beach Mortg. Co.*,[70] the District of Colorado rejected a mortgagor's attempt to rescind a loan agreement. "Despite having received the benefit of the $502,000.00 over the nearly eight years since the Loan Documents were executed, Plaintiffs ask the Court to order rescission of the contract and quiet title in their favor without having to repay any portion

---

[68] *Id.*

[69] 4EverYoung's specific performance claim related to these provisions are set for trial in August 2014 along with Derma Pen's fraudulent inducement claim.

[70] No. 12–cv–0729–WJM–MEH, 2014 WL 287441 (D. Colo. January 27, 2014).

of the money they obtained from the transaction."[71] That is, after the benefit was conferred by the lender, the mortgagors sought to avoid the sole benefit to the lender—repayment. Similarly, Derma Pen seeks to retain its benefits and avoid the post-termination benefit to 4EverYoung. This is not equitable.

Denial of the equitable remedy of rescission is, of course, without prejudice to Derma Pen's claim for damages for fraudulent inducement. Derma Pen alleges it was misled as to many important elements of the Distribution Agreement. If proven, those could give rise to identifiable, quantifiable damage claims. Liability for fraudulent inducement will be tried in August.

## Further Discovery is Not Necessary

Pursuant to 56(d) of the Federal Rules of Civil Procedure, Derma Pen argues this motion is not ripe for decision and that more discovery is needed.[72] Derma Pen suggests it needs to depose a representative of Sunwoo to find the truth of "Sunwoo's communications with Marshall regarding patent protection for the micro needling device, sales of the Carita micro needling device in the United States and the rest of the world, negotiations of alleged 'exclusivity' under the Second Signed OEM Agreement, and any patent protection covering Sunwoo's micro needling device."[73] However, those facts are not relevant to the decision made in this order. This order concludes that even if Derma Pen does prove fraudulent inducement, the rescission remedy is not available.

Derma Pen makes a similar request to depose dozens of customers and potential customers to provide evidence of the lack of worldwide exclusivity, the lack of adequate patent

---

[71] *Id.* at *3.

[72] Opposition at 29.

[73] *Id.* at 29–30.

protection, the lack of any patent search by 4EverYoung or its principals, and representations made to those customers and potential customers.[74] However, Derma Pen has provided ample evidence of the first four of those items, and the last item—representations to others—is not helpful to Derma Pen's claim that *it* was fraudulently induced.

**This Motion Can Be Decided Before Fraudulent Inducement is Tried**

Derma Pen argues that "[t]o be entitled to summary judgment on the potential remedy of rescission, a party must be first entitled to summary judgment on the claim for fraudulent inducement."[75] This motion is decided on the basis of impediments to the remedy of rescission, even when fraudulent inducement is proven. The equitable defenses to the remedy apply on the undisputed facts, leaving Derma Pen with its fraudulent inducement cause of action, but only with a damages remedy.

Cases relied on by Derma Pen do not hold that a summary (or trial) judgment must be entered on a fraudulent inducement claim before rescission can be determined, and certainly do not hold that rescission cannot be denied before fraudulent inducement is decided. *Resolution Trust Corp. v. Heights of Texas, FSB*[76] granted summary judgment finding fraudulent inducement, and then set a hearing to determine which remedy would be appropriate. *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*[77] denied summary judgment on rescission because the contractual defenses to the fraudulent inducement claim did not convince the court. No equitable bar to rescission was argued in the motion. *Mosher v. Long Beach Mortg. Co.*[78] actually did

---

[74] *Id.* at 30.

[75] *Id.* at 4.

[76] No. 89-2099-O, 1991 WL 205040 (D. Kan. Sept. 17, 1991).

[77] 708 F.Supp.2d 1209, 1269 (D.N.M. 2010).

[78] No. 12-cv-0729-WJM-MEH, 2014 WL 287441, at *3 (D. Colo. Jan. 27, 2014).

dispose of the rescission claim—granting summary judgment against the party attempting rescission because of a failure of restitution.[79]

Contrary to Derma Pen's assertion that fraudulent inducement must be decided on the merits before rescission is decided, one of the cases cited in this order denied the rescission remedy to a party claiming fraudulent inducement but acknowledged that the damages claim survived.[80] Without cases holding to the contrary, it is hard to understand why equitable defenses could not be decided apart from the substantive claim.

## ORDER

IT IS HEREBY ORDERED that 4EverYoung's motion[81] for partial summary judgment directed against Derma Pen's claim for the equitable remedy of rescission is GRANTED.

---

[79] Derma Pen's summary of this case is incorrect. Derma Pen stated that the party seeking rescission "could not establish [the] fifth element of fraudulent inducement claim," but the opinion actually states that "Plaintiffs have utterly failed to satisfy the fifth requirement for *rescission of a contract* based on fraudulent inducement." *Id.* at *3.

[80] *Gannett Co., Inc. v. Register Pub. Co.*, 428 F. Supp. 818, 841 (D. Conn. 1977).

[81] Defendants' Motion for Partial Summary Judgment on Rescission and Memorandum in Support, docket no. 238, filed July 3, 2014.

**Note to Counsel**

Derma Pen's memorandum on this motion included many irrelevant facts. This case is challenging with but made more so by the unnecessarily long summary of additional facts which may be based on counsel's lack of understanding of relevance. The multiplication of facts and issues may be unreasonable and vexatious[82] or cause unnecessary delay or increased cost, or not be warranted by a careful analysis of the real issues.[83] No such findings are made at this time, and no motions on this subject will be entertained until the court permits such filings.

Dated August 4, 2014.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[82] 28 U.S.C. § 1927.

[83] Fed. R. Civ. P. 11(b).