IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>               Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING 4EVERYOUNG'S 240 MOTION FOR PARTIAL SUMMARY JUDGMENT DIRECTED AGAINST DERMA PEN LLC'S DEFENSES TO SPECIFIC PERFORMANCE**<br><br>Case No.:  2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>               Counterclaim Plaintiffs,<br>v.<br><br>DERMA PEN, LLC,<br><br>               Counterclaim Defendant. | |

This order grants 4EverYoung LTD's ("4EverYoung") motion[1] for partial summary judgment ("Motion") directed against Derma Pen, LLC's ("Derma Pen") defenses to specific performance.[2]

---

[1] Defendants' Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance and Memorandum in Support ("Motion"), docket no. 240, filed July 3, 2014.

[2] Plaintiff's Answer to Defendants' First Amended Counterclaim at 12–14 ("Answer to First Amended Counterclaim"), docket no. 233, filed July 3, 2014.

BACKGROUND ....................................................................................................... 1

UNDISPUTED FACTS .......................................................................................... 2

DISCUSSION ......................................................................................................... 5

Construction and Operation of Sections 12.2 and 14.6 of the Sales Distribution Agreement ........ 5

    1.    Construction of Sections 12.2 and 14.6 of the Sales Distribution Agreement ................ 6

        a)    Derma Pen's Acknowledgment of Ownership ..................................... 7

        b)    Acknowledgment, Agreement and Contingency ................................. 7

        c)    4EverYoung's Rights ..................................................................... 9

        d)    Non Judicial Valuation ................................................................. 10

        e)    Judicial Valuation ....................................................................... 11

        f)    Terms of Payment ....................................................................... 12

    2.    Operation of Sections 12.2 and 14.6 of the Sales Distribution Agreement .................. 12

Derma Pen's Defenses to Specific Performance of Sections 12.2 and 14.6 ........................ 12

    1.    The Defense of Unclean Hands .................................................................. 13

    2.    The Defense of Laches ............................................................................ 14

    3.    Waiver Defense .................................................................................... 15

    4.    Equitable Estoppel Defense ...................................................................... 18

        a)    Inconsistent Statement ................................................................. 19

        b)    Action or Inaction Based on First Statement .................................... 19

        c)    Resulting Injury ......................................................................... 20

    5.    Failure to Meet a Necessary Precondition Defense ....................................... 20

    6.    Standing Defense .................................................................................. 22

    7.    Fraud/Fraudulent Inducement Defense ...................................................... 22

    8.    Undue Hardship Defense ........................................................................ 23

    9.    Lack of Mutuality Defense ...................................................................... 24

    10.  "Nonrenewal" of the Sales Distribution Agreement Defense ........................... 25

    11.  Survival Clause Defense .......................................................................... 26

    12.  First Material Breach Defense ................................................................... 27

    Further Discovery is Unnecessary ................................................................. 29

    ORDER ................................................................................................... 31

## BACKGROUND

Plaintiff Derma Pen is a Delaware limited liability company, with its principal office in Utah.[3] Michael Morgan ("Morgan") is Derma Pen's CEO and Chad Milton ("Milton") is Derma Pen's President.[4] 4EverYoung is a private limited liability company organized under United Kingdom law, with its principal place of business in London, United Kingdom.[5] Stene Marshall ("Marshall") is a principal in 4EverYoung. Sometime in the Spring of 2011, the parties started discussions of Derma Pen's distribution of a micro-needling product which became known as Dermapen.[6] The product is manufactured by Sunwoo, a Korean company. In the Summer of 2011, the parties executed a Sales Distribution Agreement ("Sales Distribution Agreement" or "Agreement").[7] On May 30, 2013, nearly two years later, Derma Pen gave 4EverYoung its 60 day notice of intent to terminate the Sales Distribution Agreement pursuant to Section 11.1 of the Agreement, effective as of the end of the term, August 1, 2013.[8]  On August 1, 2013, Derma Pen filed the Complaint in this case against 4EverYoung.[9]

4EverYoung answered Derma Pen's Complaint and filed a Counterclaim, alleging several causes of action.[10] 4EverYoung's first cause of action, in its Counterclaim, is for breach of contract. One part of this claim seeks specific performance of Derma Pen's post-termination

---

[3] First Amended Complaint ¶ 1 ("First Amended Complaint"), docket no. 118, filed May 1, 2014; Answer to First Amended Complaint, Counterclaim, Third Party Amended Complaint and Demand for Jury Trial ¶ 1 at 2 ("Answer and Counterclaim"), docket no. 139, filed May 2, 2014.

[4] First Amended Complaint ¶ 12; Answer and Counterclaim ¶ 12.

[5] First Amended Counterclaim and Demand for Jury Trial ¶ 1 ("First Amended Counterclaim"), docket no. 215, filed June 26, 2014; Plaintiff's Answer to Defendants' First Amended Counterclaim ("Answer to First Amended Counterclaim") ¶ 1, docket no. 233, filed July 3, 2014.

[6] Originally referred to as the ePen device.

[7] First Amended Counterclaim ¶ 15; Answer to First Amended Counterclaim ¶ 21.

[8] First Amended Counterclaim ¶ 41; Answer to First Amended Counterclaim ¶ 44.

[9] Complaint, docket no. 2, filed August 1, 2013.

[10] *See* Answer and Counterclaim at 56–93; *see also* First Amended Counterclaim at 29–37.

1

obligations to offer the Dermapen US Trademark ("Trademark") and the dermapen.com domain ("Domain Name") to 4EverYoung for purchase.[11] In part of its answer to that claim,[12] Derma Pen raises various affirmative defenses, which are addressed in this order.

**UNDISPUTED FACTS**

The following statement of undisputed facts comes largely from careful comparison of the Motion and Opposition[13]. In some cases, fact statements proposed by 4EverYoung are modified to remove immaterial disputes. Derma Pen's 268 additional fact statements proposed in its Opposition were not rebutted by 4EverYoung which said only: "Derma Pen has regurgitated hundreds of its allegations from its First Amended Complaint, which it now labels as 'Additional material Facts.'"[14] Very few of Derma Pen's additional facts are material. Those which are material are included here, some with modifications to reflect the actual content of source material and to remove irrelevant detail.

1.      On July 17, 2011, Marshall sent Milton a revised, redlined draft of the proposed [Sales] Distribution Agreement with an email stating as follows: "I have added clarification as to the process with the Trademark and the Domain [Name] should the agreement terminate, as that is what we discussed, I think you will find that it is acceptable now to all."[15]

2.      On July 18, 2011, having reviewed the red-lined version sent by Marshall, Milton acknowledged that Derma Pen's territory would be the United States, explained the Trademark and Domain Name "buyback" provisions to Morgan and [Mike] Anderer ("Anderer"), and wrote

---

[11] Answer and Counterclaim ¶ 62 at 85, and Prayer for Relief ¶ C at 93.

[12] Answer to First Amended Counterclaim at 12–14.

[13] Plaintiff/Counterclaim Defendant Opposition to 4EverYoung Limited's Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance ("Opposition"), docket no. 283, filed July 16, 2014.

[14] Reply Memorandum in Support of 4EverYoung's Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance at vii ("Reply"), docket no. 296, filed July 22, 2014.

[15] Motion ¶ 2, at xxiii (citing Trial Exhibit ("TE") 580); Opposition xli-xlii.

that "THE ONLY QUESTION WE NEED TO ASK OURSELVES IS IF THE TRADEMARK CLAUSE IS A DEAL KILLER."[16]

3.      On July 28, 2011, Milton signed the [Sales] Distribution Agreement on behalf of Derma Pen and sent the partially-signed agreement to Marshall.[17]

4.      On August 1, 2011, Marshall executed the [Sales] Distribution Agreement on behalf of 4EverYoung.[18]

5.      On May 30, 2013, Derma Pen notified 4EverYoung of Derma Pen's decision to exercise "its right to terminate the . . . Sales Distribution Agreement[,] with such termination becoming effective immediately upon the expiration of the current term on August 1, 2013[.]"[19]

6.      Derma Pen's termination was "pursuant to Section 11.1 of the Sales Distribution Agreement . . . ."[20]

7.      On July 25, 2013, Marshall sent Jeremy Jones ("Jones"), Morgan, and Milton, an email, which said:[21]

> Jeremy /Mike/Chad,
>
> I am writing to follow up your email to terminate the distribution contract dated the 30th of May 2013 and the 60 days [*sic*] notice that is required to negotiate a new contract.
>
> It is clear now that no contract is planned to be negotiated. Hence in accordance with sections 12.2 and 14.6 of the contract, 4Ever Young has engaged KPMG in Salt Lake city [*sic*] to audit Dermapen LLC's accounts so that we can ascertain a valuation for the www.dermapen.com domain and the "Dermapen" trademark that was acknowledged as part of the contract to be used while the contract was in force.

---

[16] Motion ¶ 4, at xxiv-xxv (citing TE 48); Opposition at xlii.

[17] Motion ¶ 5, at xxv (citing TE 588); Opposition at xliii.

[18] Motion ¶ 6, at xxv (citing TE 117 & 8); Opposition at xliii.

[19] Motion at ix, (citing TE 16); Opposition at xii.

[20] Motion ¶ 2, at xx (citing TE 16); Opposition at xxxvii.

[21] Motion at x (citing TE 10); Opposition xiii–xiv.

4Ever Young requires a suitable date from Dermapen LLC within the
next 7 days as a [*sic*] to enable KPMG to carry out such analysis.

Should this date not be forth coming within the next 7 days, 4Ever
Young will forward the calculated price and the appropriate offer in
accordance with the contract.

Should that offer not be accepted by the 25th of August 2013, court
proceedings to enforce a valuation acceptable to the court will
commence in the courts of the United Kingdom.

Further breaches of section 12 of the contract have also been noted in
relation to Trademarks and should proceedings commence will be used
in assessing the value of the relevant domains and trademarks.

One such breach is the release of cosmetic products utilising the
Dermapen logo and name without authorisations of such product. Should
these products not be removed from the Dermapen.com website within 7
days of todays [*sic*] date, injunctive action will commence to force such
removal until ownership can be finalised.

Regards

Stene Marshall

8.      On November 11, 2013, 4EverYoung emailed counsel for Derma Pen proposing

an outline of how the dispute, among the parties, should be handled.[22]

9.      On May 15, 2014, 4EverYoung emailed counsel for Derma Pen, offering to

purchase the Trademark and Domain Name.[23]

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24] When

analyzing a motion for summary judgment, the court must "view the evidence and draw all

---

[22] Motion at xi (citing TE 691); Opposition at xv–xvi.

[23] *Id.* (citing TE 26); Opposition at xv–xvi.

[24] Fed. R. Civ. P. 56(a).

reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[25] However, "the nonmoving party must present more than a scintilla of evidence in favor of his position."[26] A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[27]

## DISCUSSION

### Construction and Operation of Sections 12.2 and 14.6 of the Sales Distribution Agreement

In at least two motions now pending decision,[28] the parties dispute the construction and operation of Sections 12.2 and 14.6 of the Sales Distribution Agreement.[29] In neither of the two principal motions do the parties' memoranda discuss the construction and operation of these sections which are critical to framing useful arguments, and which are critical to the resolution of the pending motions.

Whether contract language is ambiguous is a question of law.[30] "In interpreting a contract, the intentions of the parties are controlling."[31] The court must "first look to the four corners of the agreement to determine the intentions of the parties."[32] "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain

---

[25] *Mathews v. Denver Newspaper Agency LLP,* 649 F.3d 1199, 1204 (10th Cir. 2011) (internal quotations omitted).

[26] *Ford v. Pryor,* 552 F.3d 1174, 1178 (10th Cir. 2008) (citations omitted).

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[28] The present Motion and Defendants' Motion for Partial Summary Judgment on Specific Performance and Memorandum in Support, docket no. 241, filed July 3, 2014.

[29] The Sales Distribution Agreement is TE 8, and was first in the record as docket no. 25, filed under seal October 10, 2013.

[30] *See Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.,* 899 P.2d 766, 770 (Utah 1995).

[31] *Cent. Florida Investments, Inc. v. Parkwest Associates*, 2002 UT 3, ¶ 12, 40 P.3d 599.

[32] *Ron Case Roofing & Asphalt v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989); *see also Reed v. Davis Co. Sch. Dist.,* 892 P.2d 1063, 1064–1065 (Utah Ct. App. 1995).

meaning of the contractual language, and the contract may be interpreted as a matter of law."[33]

"If the language within the four corners of the contract is ambiguous, however, extrinsic

evidence must be looked to in order to determine the intentions of the parties."[34] An ambiguity

exists where the language is "reasonably capable of being understood in more than one sense."[35]

The language of Sections 12.2 and 14.6 are clear and unambiguous as to the rights and

obligations of each party. Extrinsic evidence will not be considered.

### 1.   Construction of Sections 12.2 and 14.6 of the Sales Distribution Agreement

Part of 4EverYoung's claim for breach of contract[36] seeks specific performance and

damages under Sections 12.2[37] and 14.6[38] of the Sales Distribution Agreement. These clauses

provide contingent rights in 4EverYoung with regard to the Trademark and the Domain Name.

---

[33] *Cent. Florida Investments, Inc.*, 2002 UT at ¶ 12 (citing *Dixon v. Pro Image, Inc.,* 1999 UT 89, ¶ 13, 987 P.2d 48).

[34] *Id.*

[35] *R & R Energies v. Mother Earth Indus., Inc.,* 936 P.2d 1068, 1074 (Utah 1997) (citing *Black's Law Dictionary* 73 (5th ed. 1979)).

[36] First Amended Counterclaim, First Cause of Action ¶¶ 59–65 at 29–30.

[37]          As part of acknowledging the Distributors ownership of the Derma Pen Trademark in the US, The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen Trademark in the US for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal for such trademark. The Distributor and 4EVER YOUNG further agree that the value of the Dermapen US Trademark will be determined by independent auditors of which one will be appointed by both parties.

          Should a satisfactory agreement on the price of the Dermapen US Trademark not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

Sales Distribution Agreement at 12.

[38]          As part of acknowledging the Distributors ownership of the DermaPen.com domain, The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen.com domain for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal for such domain. The Distributor and 4EVER YOUNG further agree that the value of the Dermapen.com domain will be determined by independent auditors of which one will be appointed by both parties.

          Should a satisfactory agreement on the price of the Dermapen.com domain not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

The two clauses are remarkably parallel. Except for substituting the objects (domain name vs. trademark) they are identical.

> As part of acknowledging the Distributors ownership of the Derma Pen Trademark in the US [DermaPen.com domain], The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen Trademark in the US [Dermapen.com domain] for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal for such trademark [domain]. The Distributor and 4EVER YOUNG further agree that the value of the Dermapen US Trademark [Dermapen.com domain] will be determined by independent auditors of which one will be appointed by both parties.
> Should a satisfactory agreement on the price of the Dermapen US Trademark [Dermapen.com domain] not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

Each phrase of these sections is examined and construed below.

### a) *Derma Pen's Acknowledgment of Ownership*

> "As part of acknowledging the Distributors ownership of the Derma Pen Trademark in the US [DermaPen.com domain],"

Each clause opens with an acknowledgment of Derma Pen's ownership of the property in question. Derma Pen registered the US Trademark "Dermapen"[39] and the domain name "dermapen.com."[40] Each clause says that what is to follow is in *partial* acknowledgment of this ownership.

### b) *Acknowledgment, Agreement and Contingency*

> "The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees . . . ."

---

Sales Distribution Agreement at 14.

[39] U.S. Trademark Registration for Dermapen, TE 1.

[40] WHOIS Registration Information on dermapen.com, TE 339.

This phrase makes clear that "acknowledgment" is being given by the Distributor, Derma Pen. And the acknowledgment is in the form of an agreement by the Distributor. It also states that the clause operates contingently.

The contingency for the entire clause coming into effect is stated: "should this distribution agreement be terminated in accordance with Section 11 . . . ." Section 11 is entitled Term and Termination and has six subsections:

11.1 Term
11.2 Events of Termination
11.3 Survival
11.4 Consequences of Termination
11.6. Accelerated Payments

There is no subsection 11.5.

The essential operation of each subsection is summarized in the following table:

| 11.1 Term | The Agreement term is two years, and it automatically renews for one year terms unless a party gives notice of termination 60 days prior to the next renewal date. |
|---|---|
| 11.2 Events of Termination | 4EverYoung may terminate the Agreement for six enumerated causes. |
| 11.3 Survival | Sections 11, 13, 14, 15, and 16 survive termination. Termination does not affect rights or remedies under the Agreement or at law. |
| 11.4 Consequences of Termination | After termination 4EverYoung may permit Distributor to sell product and may repurchase Distributor inventory. |
| 11.6. Accelerated Payments | All invoiced amounts are immediately due. |

The Sales Distribution Agreement was terminated under subsection 11.1 when Derma Pen gave notice of termination.[41]

---

[41] Memorandum Decision and Order Granting 4EverYoung's 238 Motion for Partial Summary Judgment on Rescission at 11, docket no. 397, filed August 4, 2014.

### c) 4EverYoung's Rights

". . . the Distributor agrees to offer the Dermapen Trademark in the US [Dermapen.com domain] for sale to 4EVER YOUNG and 4EVER YOUNG has the first right of refusal . . . . "

This phrase confers two rights on 4EverYoung and imposes corresponding obligations on Derma Pen. First, Derma Pen must offer the Trademark/Domain Name to 4EverYoung for purchase by 4EverYoung. This means that upon termination Derma Pen must take the initiative to make offers of each item. This is the functional equivalent of an option which would allow 4EverYoung to give notice to *require* Derma Pen to sell,[42] but it is even stronger than an option because Derma Pen is required to take the initiative—before 4EverYoung signals a desire to buy —and make the offer to sell.

Derma Pen's argument that 4EverYoung was required to take the first action[43] is incorrect. 4EverYoung had no obligation to act first. Upon termination, Derma Pen had the obligation to offer the property to 4EverYoung. There is no evidence Derma Pen made such an offer other than in the context of settlement negotiations. "Derma Pen offered to sell the trademark and domain name on November 26, 2013 as part of [a] proposed global resolution . . . ."[44]

The time for Derma Pen to make the offer is not specified by the Sales Distribution Agreement. The law implies that the offer would be made within a reasonable time.[45] Given the 30 day time frame stated later in the Section for appointment, valuation, and bargaining, this would be a time shorter than 30 days.

---

[42] *Coulter & Smith, Ltd. v. Russell,* 966 P.2d 852, 859 (Utah 1998).

[43] Opposition at xvi–xvii.

[44] *Id.* at xvii.

[45] *Alpha Partners, Inc. v. Transamerica Inv. Management, L.L.C.*, 2006 UT App 331, ¶ 24, 153 P.3d 714.

Second, 4EverYoung has a right of first refusal. This is a separate and cumulative restriction on Derma Pen's ownership of the Trademark and Domain Name.

> A right of first refusal to purchase property is different from an option in that a right of first refusal is not binding unless the offeror decides to sell the property. A right of first refusal limits the owner's right to dispose of his property by requiring him to first offer it to the party who has the right of first refusal.[46]

A right of refusal only gives the holder a right to purchase when a third party makes an offer to purchase property, or the seller of property makes an offer to sell to a third party. Only when the owner decides to sell does the holder of the right of refusal have to act. "[T]hen the right of refusal does become an option in that its possessor has the first opportunity to purchase the property at the price at which the owner will sell to anyone."[47] If Derma Pen received an offer from a third party for purchase of the Trademark or Domain Name, or made an offer to sell to anyone, 4EverYoung would have the right to first refuse that offer. In other words, 4EverYoung stands in the way of any purchaser of the Domain Name and Trademark held by Derma Pen. There is no evidence of a third-party offer made or received by Derma Pen.

### d)  *Non Judicial Valuation*

> The Distributor and 4EVER YOUNG further agree that the value of the Dermapen US Trademark [Dermapen.com domain] will be determined by independent auditors of which one will be appointed by both parties. Should a satisfactory agreement on the price of the Dermapen.com domain [US Trademark] not be obtained within 30 days from the appointment of each independent auditor[.]

This clause provides a means of valuation for the property that does not require judicial intervention. It only applies in the event of an offer made by Derma Pen where a price is not set. If the right of refusal is being exercised, the price is set by the offer to or from the third party.[48]

---

[46] *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Ct. App. Utah 1989) (citations omitted).

[47] *Russell v. Park City Utah Corp.*, 548 P.2d 889 (Utah 1976).

[48] *Id.*

But when Derma Pen makes the required offer to sell to 4EverYoung, then a price must be established by this method. Each party is to appoint an independent auditor. The next sentence (discussed in more detail the next part of this order) indicates that the parties have a thirty-day period from the appointment of each auditor to reach agreement. The appointments, valuations, and bargaining based on the valuations must be complete in that short period of time. This would ensure a smooth and quick transition.

### e) *Judicial Valuation*

> Should a satisfactory agreement on the price of the Dermapen US Trademark [Dermapen.com domain] not be obtained within 30 days from the appointment of each independent auditor, both the Distributor and 4EVER YOUNG agree that the value will be determined by the courts of the land that is governing this contract and their decision will be final and binding upon both parties.

In the event the parties do not agree on a valuation within the thirty day period, then judicial valuation may occur.

The court "of the land that is governing this contract" refers to Section 17.7. It reads: "This Agreement shall be construed and enforced in accordance with the laws of the United Kingdom. This Venue Agreement shall be enforced In London, United Kingdom." The construction of this phrase has not been briefed or decided.[49]

The contract is silent as to which party submits the valuation to the courts of the United Kingdom. Therefore, the obligation could fall on the parties jointly. "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."[50]

---

[49] Memorandum Decision and Order Re: Choice of Law for August 2014 Proceedings at 7, docket no. 213, filed June 26, 2014.

[50] *Alpha Partners,* 2006 UT App ¶ 24 (citing Restatement (Second) of Contracts § 204 (1981)).

### f)   *Terms of Payment*

There is no provision regarding terms of payment. Therefore, cash payment within a reasonable time is contemplated.[51] Again, given the stated time frame for appointment, valuation and bargaining, this would be no longer than 30 days.

### 2.   Operation of Sections 12.2 and 14.6 of the Sales Distribution Agreement

The application of these sections, so far as is known on the undisputed facts, is discussed below.

The Sales Distribution Agreement was terminated by Derma Pen, so the contingent rights pursuant to Sections 12.2 and 14.6 came into effect. 4EverYoung has the right to receive an offer from Derma Pen and also holds a right of refusal of the Trademark and the Domain Name. Derma Pen has never offered the Trademark and the Domain Name to 4EverYoung. The right of refusal is not operative because no evidence has been provided that a third party has offered to purchase either the Trademark or the Domain Name. Also, no evidence has been provided that Derma Pen has taken any steps towards valuation of the Trademark and the Domain Name.

Subject to defenses, specific performance could require Derma Pen to make an offer to 4EverYoung and appoint an independent auditor, and to actively participate in and pay half the costs of filing in the United Kingdom to determine valuation.

**Derma Pen's Defenses to Specific Performance of Sections 12.2 and 14.6**

Derma Pen asserts the following twelve affirmative defenses in response to 4EverYoung's request for specific performance: (1) unclean hands; (2) laches; (3) waiver; (4) estoppel; (5) failure to meet a necessary precondition; (6) lack of standing; (7) fraud/fraudulent inducement; (8) undue hardship; (9) lack of mutuality; (10) inapplicability of Sections 12.2 and 14.6 because they do not apply on nonrenewals; (11) inapplicability of Section 12.2 because it is

---

[51] *Id.*

not included in the survival clause; and (12) excused performance based on material breach. These defenses are addressed in turn below.

### 1.  The Defense of Unclean Hands

Derma Pen argues that genuine issues of material fact preclude summary judgment on its affirmative defense of unclean hands. Derma Pen provides a list of facts in support of its unclean hands defense.[52] The list includes facts related to pre-contract formation, post-contract performance, and post-termination.

The unclean hands defense is an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ."[53] The doctrine applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation."[54] Specifically, the doctrine is applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."[55] Thus, only misconduct immediately and necessarily related to the matter in which a party seeks relief triggers the defense.

Derma Pen's unclean hands defense, associated with pre-contract and post-contract formation misconduct, is legally insufficient because the misconduct does not "immediate[ly] and necessary[ly]" relate to the relief that 4EverYoung seeks. It is undisputed that Derma Pen and 4EverYoung performed through the term of the Sales Distribution Agreement. Two months prior to the end of the first term of the agreement, as provided in Section 11.1 of the Sales

---

[52] Opposition at 5.

[53] *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806 (1945).

[54] *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 174 (3d Cir. 2001) (citing *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240 (1933)).

[55] *Keystone Driller Co.,* 290 U.S. at 246.

Distribution Agreement, Derma Pen gave notice of its decision to terminate the Sales

Distribution Agreement at the end of the term. After termination, performance of the Sales

Distribution Agreement ended. At termination (or perhaps at the time notice of termination was

given), Derma Pen's obligation, pursuant to Sections 12.2 and 14.6, to offer the Trademark and

Domain Name, arose. 4EverYoung seeks equity to compel Derma Pen to fulfill its obligation to

offer the Trademark and Domain Name pursuant to Sections 12.2 and 14.6. Any alleged

misconduct constituting "unclean hands" must relate to the post-termination time frame, when

Derma Pen's obligation to offer the Trademark and Domain Name arose under Sections 12.2 and

14.6.

      Derma Pen's post-termination facts—(1) Marshall's "white ant" email,[56] and (2) Brian

Marshall's and Joel Marshall's representations to Derma Pen customers[57]—bear a temporal

relationship to the specific performance claim 4EverYoung asserts against Derma Pen. However,

neither of these actions are immediately and necessarily related to the provisions from which

4EverYoung seek specific performance. Derma Pen has not alleged any misconduct by

4EverYoung under Sections 12.2 and 14.6 which excuses Derma Pen of its obligation to offer.

### 2. The Defense of Laches

      The doctrine of laches "is based upon [the] maxim that equity aids the vigilant and not

those who slumber on their rights."[58] "Laches is not mere delay, but delay that works a

disadvantage to another. To constitute laches, two elements must be established: (1) The lack of

---

[56] Opposition at 6, 8.

[57] Opposition at 6.

[58] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 29, 289 P.3d 502 (alteration in original) (citation and internal quotation marks omitted).

diligence on the part of the plaintiff; [and] (2) An injury to defendant owing to such lack of diligence."[59]

Derma Pen contends "genuine issues of material fact exist as to whether 4EverYoung acted promptly in offering to purchase the D[ermapen] trademark and domain name,"[60] and whether Derma Pen was injured by 4EverYoungs' lack of diligence. In support of its lack of diligence argument, Derma Pen points out that *4EverYoung did not make an offer* for the Trademark and Domain Name until May 2014.

Derma Pen's lack of diligence argument fails for two reasons. First, Sections 12.2 and 14.6 of the Sales Distribution Agreement are clear that upon termination, *Derma Pen is to take the initiative to make an offer* for purchase of the Trademark and Domain Name. Derma Pen never made such an offer after terminating the Sales Distribution Agreement. And second, the undisputed facts show that on July 25, 2013 and November 11, 2013, Marshall, on behalf of 4EverYoung, emailed Derma Pen, requesting to go forward with the purchase process. 4EverYoung, therefore, did not lack diligence. Because Derma Pen has failed to show any evidence of the lack of diligence element of laches, the doctrine is inapplicable to 4EverYoung's claim.

### 3.   Waiver Defense

Derma Pen argues that Marshall's July 25, 2013 letter waived 4EverYoung's ability to enforce Sections 12.2 and 14.6 of the Sales Distribution Agreement. The letter reads in relevant part:

---

[59] *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 777 (Utah 1983) (alteration in original) (citation and internal quotation marks omitted).

[60] Opposition at 10.

I am writing to follow up your email to terminate the distribution contract dated the 30th of May 2013 and the 60 days notice that is required to negotiate a new contract.

It is clear now that no contract is planned to be negotiated. Hence in accordance with sections 12.2 and 14.6 of the contract, 4Ever Young has engaged KPMG in Salt Lake city to audit Dermapen LLC's accounts so that we can ascertain a valuation for the www.dermapen.com domain and the "Dermapen" trademark that was acknowledged as part of the contract to be used while the contract was in force.

4Ever Young requires a suitable date from Dermapen LLC within the next 7 days as a [*sic*] to enable KPMG to carry out such analysis.

Should this date not be forth coming within the next 7 days, 4Ever Young will forward the calculated price and the appropriate offer in accordance with the contract.

Should that offer not be accepted by the 25th of August 2013, court proceedings to enforce a valuation acceptable to the court will commence in the courts of the United Kingdom.

"'A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it.'"[61]

Derma Pen argues that "[p]ursuant to § 17.2.2 of the Sales Distribution Agreement, this letter operated as a waiver of Derma Pen's obligations under Sections 12.2 and 14.6 of the Agreement."[62] Section 17.2.2 states: "Performance of any obligation required of a party hereunder may be waived only by a written waiver signed by a duly authorized officer of the other party, which waiver shall be effective only with respect to the specific obligation described therein."[63] On its face, the letter does not mention waiver of an obligation or describe a specific obligation as Section 17.2.2 requires. Therefore, it cannot be a waiver under 17.2.2.

---

[61] *Soter's, Inc. v. Deseret Fed. Sav. & Loan Ass'n,* 857 P.2d 935, 942 (Utah 1993) (quoting *Phoenix Ins. Co. v. Heath,* 90 Utah 187, 61 P.2d 308, 311–12 (1936)).

[62] Opposition at 13.

[63] TE 8 at 16.

But Derma Pen argues that the July 25, 2013 letter changes the purchase process outlined in Sections 12.2. and 14.6, by (a) disregarding Derma Pen's obligation to make an offer; (b) providing a short timeline for Derma Pen's response; and (c) including an additional step by 4EverYoung—of forwarding a calculated price and an appropriate offer to Derma Pen—which is not contemplated in the Sales Distribution Agreement. 4EverYoung responds that its "warning [letter] was entirely consistent with the terms of the Distribution Agreement"[64] and "[n]owhere in that letter (or in any other document form or act by Defendants) is there even a suggestion of 4EverYoung's intent to relinquish its rights under Section 12.2 and 14.6."[65]

Derma Pen's argument that the July 25, 2013 letter changes the purchase process lacks merit. The letter clearly indicates that 4EverYoung is pursuing its rights "in accordance with sections 12.2 and 14.6 of the contract." The letter states that "4EverYoung has engaged KPMG . . . to audit Dermapen LLC's accounts so that [4EverYoung] can ascertain a valuation for" the Domain Name and Trademark. Appointment of an independent auditor to value the Trademark and Domain Name is a requirement Sections 12.2 and 14.6 placed on both parties. Marshall's letter requests Derma Pen to provide "a suitable date . . . within the next 7 days as a [*sic*] to enable KPMG to carry out such analysis." While Sections 12.2 and 14.6 do not provide a timeline for 4EverYoung's auditor to start its analysis, the sections do require the parties to agree on a price of the Trademark and Domain Name "30 days from the appointment of each independent auditor." The letter's seven day timeframe for the auditor's work to start is reasonable, and consistent with the requirement of Sections 12.2 and 14.6—that the work of the auditors and the parties' agreement must be complete within 30 days.

---

[64] Reply at 8.

[65] Reply at 7.

Under Sections 12.2 and 14.6 Derma Pen has an affirmative duty to "offer the Dermapen trademark in the US [and Domain Name] for sale to 4EverYoung." Derma Pen's affirmative duty to offer was not referenced in or affected by the letter.

The letter also states that 4EverYoung would forward a "calculated price and an appropriate offer" to Derma Pen if Derma Pen fails to provide a date within seven days to enable valuation. In light of the parties' failure to negotiate a new distribution agreement, referenced in the first paragraph of the letter, this suggestion makes sense and is not inconsistent with any of 4EverYoung's rights pursuant to Sections 12.2 and 14.6.

The July 25, 2013 letter further states that if 4EverYoung forwards a calculated price and appropriate offer to Derma Pen, and 4EverYoung's offer is not accepted by August 25, 2013, then "court proceedings to enforce a valuation acceptable to the court will commence." This is also consistent with the Sales Distribution Agreement. The Sales Distribution Agreement states that should an agreement on the price of the Trademark and Domain Name not be obtained within 30 days from the appointment of each auditor, the value of the Trademark and Domain Name will be determined by the courts. The August 25, 2013 deadline is approximately 30 days from the date of the letter.

Accordingly, it is clear beyond any genuine dispute that the July 25, 2013 letter is not a waiver of 4EverYoung's right to enforce Sections 12.2 and 14.6. Rather, it is a clear effort to enforce those sections.

### 4. Equitable Estoppel Defense

Under Utah law, the doctrine of equitable estoppel has three elements: first, "a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted"; next, "reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act"; and, third, "injury to the second party that

would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act."[66]

### a) Inconsistent Statement

Derma Pen cannot establish the most basic element of equitable estoppel—the existence of an initial statement that is inconsistent with a later assertion. Derma Pen argues that 4EverYoung's statement in the "July 25[, 2013] letter that '[s]hould [a date for KPMG to audit Derma Pen] not be forth coming within the next 7 days, 4Ever Young will forward the calculated price and the appropriate offer in accordance with the contract[,]'"[67] is inconsistent with 4EverYoung's specific performance claim. As shown in the prior section of this order, 4EverYoung's July 25, 2013 letter was not inconsistent with 4EverYoung's later assertion of rights under Sections 12.2 and 14.6. The letter is an affirmation of those rights.

4EverYoung's letter stated that if an offer was not accepted by August 25, 2013, court proceedings would commence. As previously discussed, this is consistent with the requirements of Sections 12.2 and 14.6. 4EverYoung did not file such a suit, because Derma Pen filed its Complaint on August 1, 2013 in which Derma Pen repudiates its obligation to sell the Trademark and Domain Name. 4EverYoung's recourse, after Derma Pen filed the Complaint, was to assert its right to performance pursuant to Sections 12.2 and 14.6.

### b) Action or Inaction Based on First Statement

Moreover, Derma Pen has not set forth any evidence of its reasonable action or inaction based on 4EverYoung's July 25, 2013 letter. Derma Pen's act of filing its Complaint, a week

---

[66] *Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, 989 P.2d 1077, 1088 (quoting *CECO Corp. v. Concrete Specialists, Inc.*, 772 P.2d 967, 969–70 (Utah 1989)).

[67] Opposition at 14.

after receiving the letter, was not consistent with the July 25, 2013 letter and cannot be said to be related to that letter.

### c)  *Resulting Injury*

Similarly, Derma Pen has failed to set forth any competent evidence for damage or injury, the third element of its equitable estoppel defense. Derma Pen claims that "[i]n light of 4E[ver][Y]oung's failure to follow through with its July 25th letter and the 'white ant' campaign, Derma Pen has suffered through its trademark being devalued."[68] The third element for equitable estoppel is not satisfied by alleging an injury. Instead, Derma Pen must allege injury that would result from allowing 4EverYoung to "contradict" its July 25, 2013 statement and pursue its rights under Sections 12.2 and 14.6. Derma Pen has failed to allege that type of injury.

Because Derma Pen has failed to present evidence on any element of equitable estoppel, that defense fails as a matter of law.

### 5.  Failure to Meet a Necessary Precondition Defense

Derma Pen claims that 4EverYoung failed to satisfy certain conditions precedent to any of Derma Pen's obligations under Sections 12.2 and 14.6. Derma Pen lists several unmet preconditions: "[I]ts obligation under Section 10, 'Limited Warranty Disclaimer and Limitations;' engaging an auditor and initiating proceedings in the United Kingdom; withholding product from Derma Pen; and providing an excessively high number of nonfunctioning micro needling devices."[69]

Derma Pen's argument is unavailing. Derma Pen's listed preconditions are not conditions precedent to Sections 12.2 and 14.6, but merely contractual covenants capable of being breached.

---

[68] Opposition at 15.

[69] *Id.* at 17.

The Utah Supreme Court, in *McArthur v. State Farm Mut. Auto. Ins. Co.*,[70] clarified the

distinction between contractual covenants and conditions precedent:

> A contractual covenant is a promise[ ] between the parties to the contract about
> their mutual obligations. If a contractual provision is deemed a covenant, it
> creates specific legal duties for the parties and gives rise to remedies in the case of
> a breach. A promise in a contract creates a legal duty in the promisor and a right
> in the promisee. And once a contract is finalized, each party assumes these legal
> duties and rights. If the contract is breached, however, the non-breaching party
> retains the right to seek the remedies available for a breach[.][71]

> A condition is an event, not certain to occur, which must occur . . . before
> performance under a contract becomes due. Conditions differ from covenants in at
> least three respects. First, no duties arise between the contracting parties until the
> condition has been fulfilled. The failure to fulfill a material condition precedent
> relieves the obligor of any duty to perform. Second, parties whose obligations are
> dependent on a condition precedent have no right to contract remedies until that
> condition is fulfilled and a binding covenant is thereby formed. Finally,
> conditions precedent typically fall outside the control of the parties to the
> contract, often requiring some environmental trigger (such as "weather
> permitting") or action by a third party (such as "upon the lender's approval") for
> the contract to begin.[72]

Conditions precedent are generally created by language such as "on condition that"; "if";

and "provided"; or by explicit statements that certain events are to be construed as conditions

precedent.[73] The sections at issue, Sections 12.2 and 14.6, place the initial burden on Derma Pen

to "offer" the Trademark and Domain Name to 4EverYoung,[74] and do not establish any

conditions precedent to Derma Pen's obligation to "offer" the Trademark and Domain Name for

sale to 4EverYoung.

---

[70] 2012 UT 22, 274 P.3d 981.

[71] *Id.* ¶ 28 (alterations in original) (citations and internal quotation marks omitted).

[72] *Id.* ¶ 29–31 (citations and internal quotation marks omitted).

[73] *Id.* ¶ 32.

[74] *See* Sales Distribution Agreement § 12.2, TE 8 ("The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen Trademark in the US for sale to 4Ever[Y]oung . . . ."); Sales Distribution Agreement § 14.6, TE 8 ("The Distributor hereby acknowledges that should this distribution agreement be terminated in accordance with Section 11, the Distributor agrees to offer the Dermapen.com domain for sale to 4Ever[Y]oung . . . .").

By contrast, as later discussed, Derma Pen's offer to 4EverYoung is a condition precedent to 4EverYoung's obligations to retain an auditor or negotiate the purchase price. And an offer by a third party to purchase from Derma Pen would be a condition precedent under the right of refusal. 4EverYoung, therefore, did not fail to satisfy any conditions precedent to Derma Pen's obligations of offering for purchase the Trademark and Domain Name.

### 6. Standing Defense

Derma Pen claims "4EY lacks standing . . . because any money allegedly owed is due to Equipmed, not 4E[ever]Y[oung]."[75] Derma Pen's standing defense is not relevant to the claim of specific performance but only to the remedy of damages for breach of contract.

### 7. Fraud/Fraudulent Inducement Defense

Derma Pen, citing to and incorporating its Opposition to Defendants' Motion for Summary Judgment on Derma Pen's Fraudulent Inducement Claim,[76] argues that summary judgment on its fraudulent inducement defense is inappropriate, because there are genuine issues of material fact regarding misrepresentations made by Marshall during the pre-formation phase of the contract. The nature of this defense has already been addressed and evaluated in the Court's Rescission Order.[77] As previously stated: "Derma Pen and 4EverYoung performed through the term of the [Sales] Distribution Agreement. Then, pursuant to the Sales Distribution Agreement, Derma Pen disclosed its decision to terminate the Sales Distribution Agreement at the end of the prescribed term. Performance of the Sales Distribution Agreement then ended."[78] Derma Pen's voluntarily termination of the Sales Distribution Agreement prevents it from

---

[75] Opposition at 18.

[76] Plaintiff/Counterclaim Defendant Derma Pen, LLC's Response in Opposition to Defendants' Motion for Partial Summary Judgment on Fraudulent Inducement [Doc. 244], docket no. 285, filed July 16, 2014.

[77] Memorandum Decision and Order Granting 4EverYoung's 238 Motion for Partial Summary on Rescission, docket no. 397, filed August 4, 2014.

[78] *Id.* at 12.

claiming that misrepresentations prior to the execution of the Sales Distribution Agreement shield it from its obligations that arise after termination of the Sales Distribution Agreement. At best, Derma Pen may have a claim for damages for fraudulent inducement.[79] Accordingly, this defense fails as a matter of law.

### 8. Undue Hardship Defense

"A court of equity, in the exercise of its discretion in granting such relief, will refuse to grant a decree of specific performance of a contract if the performance would produce hardship or injustice to the defendant not reasonably within the contemplation of the parties at the inception of the contract[.]"[80] Derma Pen contends that granting the remedy of "specific performance would amount to an undue hardship upon and injustice to Derma Pen because Derma Pen was fraudulently induced into entering into the [Sales Distribution] Agreement."[81]

It is undisputed that Derma Pen's obligation to offer the Trademark and Domain Name upon termination of the Sales Distribution Agreement was contemplated by the parties prior to the inception of the Sales Distribution Agreement. On July 17, 2011, Marshall sent Milton a revised, redlined draft of the proposed Sales Distribution Agreement. Marshall had added the "buyback" language to Sections 12.2 and 14.6. The following day, on July 18, 2011, Milton sent an email to Morgan and Anderer, and in that email, Milton acknowledged the Trademark and Domain Name "buyback" provisions. Further, the Sales Distribution Agreement later signed by Milton, on behalf of Derma Pen, included the same "buyback" language. Sections 12.2 and 14.6 clearly and unambiguously state that upon termination, Derma Pen agrees to offer the Trademark and Domain Name for sale to 4EverYoung. These sections were in the redline draft of the

---

[79] *See* Memorandum Decision and Order Granting in Part and Denying in Part 4EverYoung's 244 Motion for Partial Summary Judgment on Fraudulent Inducement at 12–13, docket no. 400, filed August 4, 2014.

[80] Motion at xxvii–xxviii (quoting 71 Am. Jur. 2d Specific Performance § 90); Opposition at xlvi.

[81] Opposition at 19.

proposed Sales Distribution Agreement and the final signed copy of the Sales Distribution Agreement. Accordingly, there is no genuine issue of material fact that whatever hardship Derma Pen might experience from its obligation to offer the Trademark and Domain name, this hardship was reasonably within the contemplation of the parties prior to the inception of the Sales Distribution Agreement. It is not an undue hardship or an injustice.

### 9.  Lack of Mutuality Defense

Derma Pen contends that 4EverYoung's motion for summary judgment on Derma Pen's lack of mutuality defense should be denied for three reasons. First, there is lack of consideration for Sections 12 and 14 of the Sales Distribution Agreement.[82] Second, 4EverYoung's representation that it had an exclusive right to offer the micro needling device was sham consideration.[83] And third, the Sale Distribution Agreement is illusory because it grants 4EverYoung "the right to discontinue developing, producing, licensing, or distributing any of the Product(s) to modify, replace or add to the Product(s) at its discretion and must provide written notice to the Distributor (120) days prior to any such event."[84]

Derma Pen's mutuality defense fails for several reasons. First, the Sales Distribution Agreement has valid consideration. "Consideration is present when there is an act or promise given in exchange for the other party's promise. Thus, there is consideration whenever a promisor receives a benefit or where a promisee suffers a detriment, however, slight."[85] In the Sales Distribution Agreement, 4EverYoung made several promises to Derma Pen, including among others, granting Derma Pen a right to distribute the product, providing Derma Pen

---

[82] Opposition at 21–23.

[83] Opposition at 24.

[84] Opposition at 25 (quoting Distribution Agreement § 2.2, TE 117).

[85] *Healthcare Serv. Group v. Utah Dep't of Health*, 40 P.3d 591, 596 (Utah 2002) (internal quotation marks and citations omitted).

marketing assistance, training, certain warranties, and indemnification. In return, several promises were made by Derma Pen to 4EverYoung. In this bargained-for-exchange, an enforceable contract was created. However, even assuming that the Sales Distribution Agreement lacked mutuality at its inception, this defect was cured when the contract was executed and substantial performance completed by both parties.[86]

Derma Pen's illusory promise argument is also unavailing. "An illusory promise . . . is . . . a 'façade' that imposes no performance obligations on the promisor and affords no consideration to the promise; the putative promise 'neither binds the person making it, nor functions as consideration for a return promise.'"[87] An illusory promise generally occurs "'where the promisor retains an *unlimited* right to decide later the nature or extent of his or her performance.'"[88] Because 4EverYoung was required to "provide written notice to the Distributor (120) days prior to any such event," 4EverYoung did not retain an unlimited right to determine its performance. 4EverYoung's promises—granting Derma Pen a right to distribute the product, providing Derma Pen marketing assistance, training, certain warranties, and indemnification— are legal detriments that satisfy the requirement of sufficient consideration.[89]

### 10. "Nonrenewal" of the Sales Distribution Agreement Defense

Derma Pen argues that its May 30, 2013 letter terminating the Sales Distribution Agreement was not a "termination" of the Sales Distribution Agreement, but instead a notice of

---

[86] *See e.g.*, 17 C.J.S. Contracts § 140 (A promise lacking mutuality at its inception becomes binding on the promisor after performance by the promise.").

[87] *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1119 (10th Cir. 2010) (quoting *Peirce v. Peirce,* 994 P.2d 193, 199 (Utah 2000) (internal quotation marks omitted)).

[88] *Id.* (quoting 1 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 4:27, at 804–05 (4th ed. 2007) (emphasis added)).

[89] See 3 Williston on Contracts § 7:7 (4th ed.) ( "Where, however, the right to cancellation is tempered by its terms, express or implied, or by operation of law, so that cancellation is not solely at the whim of the promisor, the promise may serve as consideration."); *see also Bank of America, N.A. v. Jill P. Mitchell Living Trust*, 822 F.Supp.2d 505, 527 (D. Maryland 2011) ("Courts may enforce contracts that provide a party with the unilateral right to modify an agreement so long as the contract requires the party to give advance notice of his or her intention to do so.").

"non-renewal".[90] This argument was addressed and rejected in the August 4, 2014 Rescission

Order.[91] There, it was held that the non-renewal is not a genuine issue and that the Sales

Distribution Agreement has been terminated, thus invoking the obligations pursuant to Sections

12.2 and 14.6.[92] This defense fails.

### 11. Survival Clause Defense

The Sales Distribution Agreement contains a survival clause, which states:[93]

> Notwithstanding any termination of this Agreement, Sections 11, 13, 14,
> 15, and 16, and through shall survive and remain in effect in accordance
> with their terms.

> Any termination of this Agreement shall be without prejudice to any
> other rights or remedies under this Agreement or at law.

Derma Pen points out that Section 12 is not mentioned in the survival clause. It argues

that the failure to reference Section 12 "means that either (1) it did not survive Derma Pen's non-

renewal of the Agreement or (2) an ambiguity as to the meaning of the survival provision exists

such that the Court must turn to the parties' intent."[94] Neither argument has merit.

Under basic rules of contract interpretation, courts first look to the writing alone to

determine its meaning and the intent of the contracting parties. "If the language within the four

corners of the contract is unambiguous, the parties' intentions are determined from the plain

meaning of the contractual language, and the contract may be interpreted as a matter of law."[95]

Only where there is ambiguity in the terms of the contract may the parties' intent "be ascertained

---

[90] Opposition at 26.

[91] Memorandum Decision and Order Granting 4EverYoung's 238 Motion for Partial Summary on Rescission, docket no. 397, filed August 4, 2014.

[92] *Id.* at 11.

[93] See Distribution Agreement § 11.3, TE 117.

[94] Opposition at 31.

[95] *Green River Canal Co. v. Thayn,* 2003 UT 50, ¶ 17, 84 P.3d 1134 (citations and internal quotation marks omitted).

from extrinsic evidence."[96] "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[97] The question here is whether the survival clause is ambiguous such that extrinsic evidence must be considered.

The survival clause is not ambiguous because it is capable of only one reasonable interpretation. Looking at the writing in its entirety and considering each contract provision in relation to all of the others, it is clear that while Sections 11, 13, 14, 15, and 16, and through survive termination by virtue of the survival clause, section 12.2 expressly becomes operative upon termination (under section 11) and "[i]t would be contrary to the letter and spirit of the Sales Distribution Agreement if those provisions that are triggered only upon termination are then rendered unenforceable and meaningless upon termination."[98]

Further, the survival clause expressly states that "termination of this Agreement shall be without prejudice *to any other rights and remedies* under this *Agreement* or at law."[99] This language clearly and unambiguously allows the parties, upon termination, to raise any rights or remedies under the Sales Distribution Agreement—which includes 4EverYoung's right to enforce Derma Pen's obligations under Section 12.2.

### 12. First Material Breach Defense

Derma Pen argues that 4EverYoung "committed several material breaches of the [Sales Distribution] Agreement, thus genuine issues of material fact exist as to this defense."[100] Specifically, Derma Pen alleges there are genuine issues of material fact regarding whether:[101]

---

[96] *Deep Creek Ranch LLC v. Utah State Armory Bd.,* 2008 UT 3, ¶ 16, 178 P.3d 886.

[97] *Daines v. Vincent,* 2008 UT 51, ¶ 25, 190 P.3d 1269 (citations and internal quotation marks omitted).

[98] Motion at 14.

[99] Distribution Agreement § 11.3, TE 8 (emphasis added).

[100] Opposition at 33.

1. 4E[ver]Y[oung] has used the D[ermapen] trademark and misled customers.

2. 4E[ver]Y[oung] did not engage an auditor or make an offer prior to using the trademark, nor did 4E[ver]Y[oung] negotiate in good faith.

3. 4E[ver]Y[oung] did not go to the United Kingdom and otherwise refused to adhere to its obligation.

4. 4E[ver]Y[oung] also withheld product from Derma Pen.

5. 4E[ver]Y[oung] provided devices that had an undisputed failure rate of between 1 of every 5 devices or 1 of every 3 devices that that such failure rate is above accepted rates for manufactured devices.

6. 4E[ver]Y[oung] failed to provide warranty replacements for every failed device, such that Derma Pen had to go directly to Sunwoo to resolve the issue.

7. Marshall attempted and did demand various changes to payment terms and minimum quotas for devices.

8. 4E[ver]Y[oung] violat[ed] . . . Derma Pen's trademark and copyright rights prior to the non-renewal.

9. 4E[ver]Y[oung] . . . ha[d] patents, trademarks, or other proprietary rights with respect to the micro needling devices and needle tips.

In effect, Derma Pen is arguing that any unresolved allegation of 4EverYoung's material breach *during the term* of the Sales Distribution Agreement makes the post-termination provisions of the Sales Distribution Agreement unenforceable. Derma Pen is mistaken in its application of a first material breach defense.

The undisputed facts show that Derma Pen and 4EverYoung performed through the term of the Sales Distribution Agreement. Then, pursuant to the Sales Distribution Agreement, Derma Pen disclosed its decision to terminate the Sales Distribution Agreement at the end of the prescribed term. Performance of the Sales Distribution Agreement then ended. At this point,

---

[101] *Id.* at 33–34.

Derma Pen's obligation arose, pursuant to Sections 12.2 and 14.6, to offer the Trademark and Domain Name. Having voluntarily terminated the Sales Distribution Agreement, Derma Pen cannot base its first material breach defense on alleged breaches that occurred pre-termination, because this would amount to a de facto rescission. Rescission has been rejected by the Court. At best, Derma Pen may have damages claims for these breaches—though these are not clearly alleged in the First Amended Complaint.

The only breach by 4EverYoung that could excuse Derma Pen from performing its post-termination obligation to offer the Trademark and Domain Name must relate to and arise out of Derma Pen's obligation to offer the Trademark and Domain Name pursuant to Sections 12.2 and 14.6.

Derma Pen's alleged breaches, numbers 4–9 above, are pre-termination breaches and bear no relation to Derma Pen's obligation to offer the Trademark and Domain Name after termination. The remaining three breach allegations, numbers 1–3, are post-termination breaches. The first breach (use of the trademark and misleading customers) does not relate to the parties' performance under Sections 12.2 and 14.6. The second and third breaches (to engage an auditor or make an offer prior to using the trademark, or commence court action in the United Kingdom) do not excuse Derma Pen's failure to *offer* the Trademark and Domain Name. Derma Pen had an affirmative obligation to first offer the Trademark and Domain Name before any requirement arose for 4EverYoung to do those things.

**Further Discovery is Unnecessary**

Derma Pen moves for a stay of summary judgment proceedings pursuant to Rule 56(d) of the Federal Rules of Civil Procedure which provides relief when a party lacks discovery of "facts

essential to justify . . . opposition" to summary judgment.[102] "The party requesting additional discovery must present an affidavit that identifies 'the probable facts not available and what steps have been taken to obtain these facts. The nonmovant must also explain how additional time will enable him to rebut the movant's allegations of no genuine issue of material fact.'"[103]

Derma Pen argues that given the limited and expedited nature of the discovery permitted thus far, it cannot present certain facts essential for its opposition.[104] Derma Pen suggests it needs "to depose a corporate representative of Sunwoo in connection with its unclean hands and fraudulent inducement affirmative defenses . . . ."[105] Specifically, Derma Pen wants to inquire about "Sunwoo's communications with Marshall regarding patent protection for the micro needling device, sales of the Carita micro needling device in the United States and the rest of the world, negotiations of alleged 'exclusivity' under the Second Signed OEM Agreement, and any patent protection covering Sunwoo's micro needling device."[106] Derma Pen contends that deposition of a representative of Sunwoo will show:

> (1)　　　that neither Marshall, 4E[ver]Y[oung], or Biosoft had worldwide exclusivity to Sunwoo's micro needling product at the time the [Sales Distribution] Agreement was executed;
>
> (2)　　　that either Marshall, 4E[ver]Y[oung], and/or Biosoft were aware that only a Korean patent existed, or never requested information regarding Sunwoo's alleged patent protection prior to March 2012;
>
> (3)　　　that neither Marshall, 4E[ver]Y[oung], or Biosoft conducted a patent search prior to making representatives of patents to Derma Pen; and

---

[102] Fed. R. Civ. P. 56(d).

[103] *F.D.I.C. v. Arciero*, 741 F.3d 1111, 1116 (10th Cir. 2013) (quoting *Trask v. Franco,* 446 F.3d 1036, 1042 (10th Cir. 2006)).

[104] Opposition at 34.

[105] Opposition at 35.

[106] *Id.*

> (4)     any representations that Defendants or any of their agents have
> made to third parties, including customers and potential
> customers, regarding exclusivity and patent protection.[107]

Derma Pen has not identified any probable facts that are unavailable to it that could change the outcome on 4EverYoung's motion for summary judgment on Derma Pen's unclean hands and fraudulent inducement affirmative defenses. The evidence that Derma Pen believes it will secure from the deposition of a Sunwoo representative would not shed any additional light on the two defenses or affect the resolution of either affirmative defense. All the information necessary to make a decision on 4EverYoung's motion is already before the Court and there is no need for further discovery. Accordingly, Derma Pen's rule 56(d) motion is denied.

## ORDER

IT IS HEREBY ORDERED that 4EverYoung's motion[108] for partial summary judgment directed against Derma Pen's defenses to specific performance is GRANTED.

Dated December 30, 2014.

BY THE COURT:

David Nuffer
United States District Judge

---

[107] Opposition at 35.

[108] Defendants' Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance and Memorandum in Support ("Motion"), docket no. 240, filed July 3, 2014.