IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DERMA PEN, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>4EVERYOUNG LIMITED d/b/a DERMAPENWORLD, BIOSOFT (AUST) PTY LTD d/b/a DERMAPENWORLD, EQUIPMED INTERNATIONAL PTY LTD d/b/a DERMAPENWORLD, and STENE MARSHALL d/b/a DERMAPENWORLD,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART 4EVERYOUNG'S MOTION FOR PRELIMINARY INJUNCTION AGAINST MICHAEL E. ANDERER; DENYING MICHAEL ANDERER'S MOTION TO VACATE** |
| | Case No.:  2:13-CV-00729-DN-EJF<br><br>District Judge David Nuffer<br><br>Magistrate Judge Evelyn J. Furse |
| 4EVERYOUNG LTD. and EQUIPMED INTERNATIONAL PTY. LTD.,<br><br>        Counterclaim Plaintiffs,<br><br>v.<br><br>DERMA PEN, LLC, MICHAEL E. ANDERER, JEREMY JONES, MICHAEL J. MORGAN, CHAD MILTON, MEDMETICS, LLC, a Delaware limited liability company, and JOHN DOES 1-25,<br><br>        Counterclaim Defendants. | |

This order resolves issues in 4EverYoung Limited's ("4EverYoung") Motion for Temporary Restraining Order and Preliminary Injunction against Michael E. Anderer[1] ("Motion for Preliminary Injunction") and Michael E. Anderer's Motion to Vacate TRO and Memorandum in Opposition to Motion for Preliminary Injunction Against Michael E. Anderer ("Motion to Vacate")[2]. Counsel have been extraordinarily diligent and cooperative in working through an arduous schedule, often on short notice. Hearings related to these motions were held on the following dates:

January 29, 2015[3]
February 4, 2015[4]
February 9, 2015[5]
February 11, 2015[6]
February 12, 2015[7]
February 18, 2015[8]
February 19, 2015[9]
February 23, 2015[10]

Testimony was received from John Udy, Stene Marshall, Michael Morgan, Jeremy Jones, Casey Isom, Katie Allen, and Michael Anderer. Deposition testimony was admitted for Michael Anderer[11] and Elliott Milstein.[12] Over 100 exhibits were received.

---

[1] Docket no. 504, filed January 21, 2015.

[2] Docket no. 529, filed January 28, 2015.

[3] January 29, 2015 Preliminary Injunction Hearing Transcript, docket no. 600, filed February 19, 2015; Minute Order, docket no. 533, filed January 29, 2015.

[4] February 4, 2015 Preliminary Injunction Hearing Transcript, docket no. 604, filed February 20, 2015; Minute Order, docket no. 563, filed February 4, 2015.

[5] February 9, 2015 Preliminary Injunction Hearing Transcript, docket no. 596, filed February 19, 2015; Minute Order, docket no. 573, filed February 9, 2015.

[6] February 11, 2015 Preliminary Injunction Hearing Transcript, docket no. 607, filed February 20, 2015; Minute Order, docket no. 579, filed February 11, 2015.

[7] February 12, 2015 Preliminary Injunction Hearing Transcript, docket no. 597, filed February 19, 2015; Minute Order, docket no. 583, filed February 12, 2015.

[8] February 18, 2015 Preliminary Injunction Hearing Transcript, docket no. 605, filed February 20, 2015; Minute Order, docket no. 593, filed February 18, 2015.

[9] February 19, 2015 Preliminary Injunction Hearing Transcript, docket no. 602, filed February 20, 2015; Minute Order, docket no. 595, filed February 19, 2015.

[10] Minute Order, docket no. 617, filed February 23, 2015.

Orders relating to this motion were previously entered.[13] In preparation for final argument on the motion, the parties submitted proposed findings of fact and conclusions of law[14] which have been very valuable in focusing issues.

This motion deals with the emerging stages of the latest battle related to 4EverYoung's contractual right to purchase a trademark and domain name from Derma Pen. This order determines that 4EverYoung is entitled to a preliminary injunction to restrain Michael Anderer, a former board member, current member, person of major influence, and sole contributor of funds in Derma Pen from taking extra-judicial and state judicial action to defeat a principal object of this litigation.

The litigation scenario is complex. This case has been pending about 18 months. But it has been to the Tenth Circuit twice[15] and was suspended from August to December 2014 because Derma Pen filed bankruptcy in Delaware.[16] That bankruptcy was dismissed as not being filed in good faith but as a litigation tactic.[17] Most recently, the Trademark and Domain Name are subject of a public UCC sale by Anderer and part of Anderer's pending execution levy on all of Derma Pen's assets in Utah State Court.

---

[11] Ex. 56.

[12] Ex. 57.

[13] Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer and Taking Under Advisement Motion for Preliminary Injunction, docket no. 505, filed January 21, 2015; Docket Text Order Directing Parties to Exchange Documents, docket no. 506, filed January 22, 2015; Docket Text Order Directing Parties to Exchange Exhibits, docket no. 516, filed January 26, 2015; Docket Text Order Extending TRO, docket no. 556, filed February 4, 2015; Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[14] [Anderer's Proposed] Findings of Fact, Conclusions of Law and Order . . . , docket no. 611, filed February 21, 2015; [4EverYoung's Proposed] Findings of Fact, Conclusions of Law, and Order . . . , docket no. 612, filed February 21, 2015.

[15] *Derma Pen LLC v. 4EverYoung Limited*, No. 13-4176 (10th Cir. May 8, 2014), docket no. 150, filed May 8, 2014; *Derma Pen LLC v. 4EverYoung Limited*, 773 F.3d 1117 (10th Cir. 2014), docket no. 466, filed December 31, 2014.

[16] Petition, docket no. 1, *In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014); Ex. 21.

[17] Memorandum at 17, docket number 273, *In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014), Ex. 125.

FINDINGS OF FACT ..................................................................................................... 5

    The Parties ............................................................................................................ 5

        4EverYoung ................................................................................................. 5

        Marshall ..................................................................................................... 5

        Anderer ...................................................................................................... 5

        Saunders .................................................................................................... 6

        MedMetics ................................................................................................. 6

        S2 Partners V ............................................................................................. 7

        Derma Gen ................................................................................................. 7

        Jones .......................................................................................................... 7

        Morgan ...................................................................................................... 8

    The Sales Distribution Agreement ........................................................................ 8

    Anderer's 2011 and 2012 Loans ......................................................................... 12

    Derma Pen's Termination of the Sales Distribution Agreement ...................... 17

    Derma Pen and Anderer's Strategy to Avoid the Transfer Provisions in the Sales

        Distribution Agreement ............................................................................ 18

    Derma Pen Files this Lawsuit ............................................................................. 20

    Anderer's Knowledge of and Participation in this Action and Related Proceedings ....... 21

    Anderer's Threats of Prolonged Litigation ........................................................ 22

    Derma Pen's Claims Against 4EverYoung ......................................................... 23

    Bifurcation and Stay ........................................................................................... 24

    Anderer's 2014 Advances .................................................................................. 24

    Derma Pen's Bankruptcy Petition ...................................................................... 27

    Debtor In Possession (DIP) Financing ............................................................... 28

    Dismissal of Derma Pen's Bankruptcy Petition ................................................ 30

    The Confession of Judgment .............................................................................. 31

    The Trademark Assignment ................................................................................ 33

    Revival of this Litigation .................................................................................... 34

    The December 23, 2014 TRO .............................................................................. 35

    Withdrawal of Counsel for Derma Pen ............................................................... 37

    The Specific Performance Defenses Order ......................................................... 38

    The Specific Performance Order ......................................................................... 38

    The January 6, 2015 Preliminary Injunction ..................................................... 40

    The January 9, 2015 UCC Filing ........................................................................ 41

    The Notice of UCC Sale ...................................................................................... 41

    The Writ of Execution ........................................................................................ 41

    Adding Anderer as a Party .................................................................................. 42

    The January 21, 2015 TRO .................................................................................. 43

DISCUSSION ............................................................................................................... 45

    Standard Applicable to Motion for Preliminary Injunction ............................... 45

    Irreparable Harm ................................................................................................. 45

    Balance of Harms ............................................................................................... 47

    Public Interest ..................................................................................................... 47

    Likelihood of Success on UFTA Claims ............................................................ 47

        2012 Documents ...................................................................................... 49

        2014 Documents ...................................................................................... 49

Confession of Judgment and the Trademark Assignment ..................................... 53
Debtor-In-Possession Financing Lien ................................................................. 57
Summary .......................................................................................................... 57
Other Issues Related to Likelihood of Success ...................................................... 57
Party Status and Service ................................................................................... 57
Narrow Issues under the UFTA ........................................................................ 58
4EverYoung's Claims Were Not Concluded in Derma Pen's Bankruptcy .......... 59
The Sales Distribution Agreement Does Not Call for a Transfer in Gross ......... 59
Amount of Bond ................................................................................................... 61
ORDER ...................................................................................................................... 63

# FINDINGS OF FACT[18]

## The Parties

### 4EverYoung

4EverYoung LTD ("4EverYoung") is a private limited liability company organized under United Kingdom law, with its principal place of business in London.[19]

### Marshall

Stene Marshall ("Marshall") is a resident of Australia who has interests in various companies doing business in the United States[20] and is a principal in 4EverYoung.

### Anderer

"Anderer is a member and owner of approximately 26% of Derma Pen, LLC ("Derma Pen") and, up until approximately August 1, 2014, he was the chairman of the Derma Pen's board."[21]  Anderer described himself as an "investor" in Derma Pen.[22] Anderer typically works

---

[18] In the event fact statements are contained in other sections of this order they are also findings of fact. Findings of fact and conclusions of law in a preliminary injunction ruling are not binding at the trial on the merits. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

[19] First Amended Counterclaim ¶ 1, docket no. 215, filed June 26, 2014; Plaintiff's Answer to Defendants' First Amended Counterclaim ¶ 1, docket no. 233, filed July 3, 2014.

[20] February 9, 2015 Preliminary Injunction Hearing Transcript at 16:3-8, docket no. 596.

[21] *See* Anderer Dep. at 42-43, Ex.56; January 21, 2015 TRO at 4 ¶ 8, docket no. 505.

[22] *See* Anderer Dep. at 18, 19, 20, Ex. 56.

through entities some of which he calls "incubators."[23]  His entities include, among others, S2,

Derma Gen, and Tensor Cloud Solutions.[24]

**Saunders**

Samuel Saunders ("Saunders") is Anderer's attorney-in-fact, proxy, and counsel across

Anderer's various entities, including MedMetics, LLC ("MedMetics").[25]  Saunders makes the

decisions with respect to Anderer's business transactions.[26]

**MedMetics**

Anderer is the sole owner of MedMetics,[27] which was set up by Saunders, Erik Felsted

("Felsted"), or Baker Donelson.[28]

MedMetics products include or will include micro-needling devices.[29]  Anderer formed

MedMetics because he wanted to develop products that would not be tied up by this litigation.[30]

Anderer described MedMetics as "a construct on paper" and "an accounting piece" with no

employees.[31]  While Anderer denied any license agreement between Derma Pen and

MedMetics,[32] Derma Pen's counsel of record in this case, Samuel F. Miller ("Miller"), claimed

that there was such a license.[33]

---

[23] *See id.*

[24] *See id.* at 11-12.

[25] *See id.* at 12, 144-45; *see also* Milstein Dep. at 68:12-69:18, Ex. 57.

[26] *See* Anderer Dep. at 70-71, 145, 149, 151.

[27] *See* AMS Board Meeting Minutes at 52:11-15, dated December 2, 2014, Ex. 66; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 20:4-5, docket no. 607.

[28] *See* Anderer Dep. at 172, 173, 197.

[29] *See id.* at 175.

[30] *See id.* at 173-74.

[31] *See id.* at 183-84.

[32] *See id.* at 198.

[33] Ex. 56.

MedMetics partnered with Biopelle, Inc. ("Biopelle"), a Canadian company, to form Advanced Microneedling Systems ("AMS") to sell the MDerma micro-needling device.[34]

**S2 Partners V**

S2 Partners V, LLC ("S2 Partners V") is another single-member entity owned 100% by Anderer.[35]  Anderer describes S2 Partners V as "just a container" without any operations or obligations.[36]

**Derma Gen**

Derma Gen, LLC ("Derma Gen") is another single-member entity owned 100% by Anderer.[37]  Derma Gen has no operating agreement, no employees, and was set up by Baker Donelson.[38]  Derma Gen loaned Derma Pen employees money during Derma Pen's bankruptcy.[39]  Those loan documents were drafted by Saunders.[40]  Derma Gen's subsidiary companies were set up during Derma Pen's bankruptcy proceeding.[41]

Derma Gen has a website with Dermapen-branded products identified.[42]

**Jones**

Jeremy Jones ("Jones") is the former COO and CEO of Derma Pen.[43]  Jones performs tasks for MedMetics and has a MedMetics e-mail account.[44]

---

[34] *See* Press Release, dated July 22, 2014, Ex.20; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 6:13-14, docket no. 607.

[35] *See* Anderer Dep. at 117-18.

[36] *See id.* at 118-20.

[37] *See id.* at 152.

[38] *See id.* at 154-55, 188.

[39] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 156:10-20, docket no. 597; *see also* Anderer Dep. at 168.

[40] *See* Anderer Dep. at 168.

[41] *See id.* at 160-61.

[42] *See* Derma Gen Website, Ex. 88; *see also* February 11, 2015 Preliminary Injunction Hearing Transcript at 16:15-17:4, docket no. 607.

[43] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 155:7-156:3, docket no. 597.

**Morgan**

Michael Morgan ("Morgan") claims to be the former CEO of Derma Pen,[45] although in a December 2, 2014 AMS board meeting he claimed not to have resigned.[46]  Morgan also has a MedMetics e-mail account (as does Chad Milton ("Milton"), Derma Pen's President).[47]

**The Sales Distribution Agreement**

During the Summer of 2011, business discussions were held between Morgan and Marshall about a distribution agreement for the sale of micro-needling devices, then known as Epens (the "Device"),[48] and the related disposable micro-needled tips ("Tips") for the Device, throughout the United States of America ("USA").[49]

Marshall was the owner, either directly or indirectly, of 4EverYoung, an Australian company, which purportedly had the ability to grant Morgan's company, Derma Pen, LLC ("Derma Pen"), the exclusive right to sell the Device and related Tips in the USA and elsewhere.[50]

At the time, Morgan knew Anderer who was then, and had been, a successful inventor and investor in a variety of technology based start-up ventures, and with whom Morgan had had a prior business and personal relationship.[51]

Anderer's business model was to lend money to entrepreneurs with promising ideas or products.  He favored businesses that had reliable or recurring revenue streams.  This model

---

[44] *See id.* at 156:22-157:6; *see also* E-Mail Jones to Milstein, dated August 19, 2014, Ex. 48.

[45] *See* February 11, 2015 Preliminary Injunction Hearing Transcript at 5:13-6:1, docket no. 607.

[46] *See* AMS Board Meeting Minutes at 26:4-7, dated December 2, 2014, Ex. 66.

[47] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 158:20-25, docket no. 597.

[48] February 9, 2015 Preliminary Injunction Hearing Transcript at 71:13-25, 78:1.

[49] February 12, 2015 Preliminary Injunction Hearing Transcript a 104-105.

[50] January 6, 2015 Preliminary Injunction Hearing Transcript at 83:19-21; *see also* Ex. 1.

[51] February 11, 2015 Preliminary Injunction Hearing Transcript at 33:11-25, 34:1-10, 35:19-25, 36:1-5.

involved making loans to the businesses, secured with all of the assets, providing favorable lending rates and terms, taking a minority interest in the company's equity and providing mentoring and access to professional services to the entrepreneurs, with the owners to retain control of the managerial and operational aspects of the business.[52]

Morgan approached Anderer to inquire about whether Anderer was interested in providing funds to Derma Pen so that Derma Pen could enter into a distribution agreement with 4EverYoung and begin purchasing Devices from 4EverYoung for resale.[53]

Anderer initially met with Morgan and Morgan's business partner, Milton, to discuss the proposed venture.[54]

Anderer was interested in providing funding and mentoring for the project so long as (i) the financial projections were based on a renewable revenue model, sometimes referred to as a "razor and blades" program, where the company would receive ongoing recurring revenues from sales of the Tips to the owners of the Devices, (ii) 4EverYoung had worldwide patents on the Device and Tips and (iii) 4EverYoung had the ability to grant protectable exclusivity to Derma Pen within the USA with regard to the Device and Tips.[55]

Anderer contacted a renowned local physician and an experienced esthetician, who confirmed, to Anderer's satisfaction, that the Device and Tips actually performed as represented when used by an experienced physician or technician.[56]

Morgan then arranged for a meeting between Anderer and Marshall which occurred during the summer of 2011.[57] During this meeting, Morgan presented Anderer to Marshall as

---

[52] February 19, 2015 Preliminary Injunction Hearing Transcript at 6:5-7:9.

[53] *Id.* 12:24-13:23, 14-15.

[54] *Id.* 12:24-13:23.

[55] *Id.* 14:15-15:12, 46:15-25, 65:22-66:4.

[56] February 19, 2015 Preliminary Injunction Hearing Transcript at 15:17-16:1

Derma Pen's potential investor who would provide Derma Pen with funding for the business.[58]
During this meeting, Marshall "pitched" the program to Anderer and represented to him that
4EverYoung had worldwide patents on the Device and Tips and could grant and protect Derma
Pen's exclusive right to sell the same in the USA.  Marshall knew that Anderer was interested in
the patents and the exclusivity as a condition of supporting the project.[59]

In anticipation of entering into an agreement with Marshall, Morgan caused Derma Pen
to create and register the trademark DERMAPEN® (the "Trademark") in the USA.  He also
created a URL named www.dermapen.com (the "Domain Name").[60]

Simultaneously, Morgan and Marshall were working on a form of a distribution
agreement ("Sales Distribution Agreement") that Marshall drafted and had presented to Morgan
for review. On behalf of 4EverYoung, Marshall was the negotiator and drafter of the contract.[61]

Anderer was involved in the negotiations regarding the Sales Distribution Agreement,
and was well aware of the key provisions, including the post-termination transfer obligations in
that agreement.[62]

Internal discussion between Anderer, Morgan and Milton included the post-termination
transfer obligations and asked the question "WE NEED TO ASK OURSELVES . . . IF THE
TRADEMARK CLAUSE IS A DEAL KILLER."[63]

---

[57] February 12, 2015 Preliminary Injunction Hearing Transcript at 44-45.

[58] *Id.*

[59] February 12, 2015 Preliminary Injunction Hearing Transcript 44:18-45:3, 101-105; February 19, 2015 Preliminary Injunction Hearing Transcript 16:2-17:24.

[60] February 9, 2015 Preliminary Injunction Hearing Transcript at 72:11-24; February 12, 2015 Preliminary Injunction Hearing Transcript at 53-54.

[61] February 9, 2015 Preliminary Injunction Hearing Transcript at 116:11-17, 126:2-8.

[62] *See* Email Chad Milton to Mike Morgan and Mike Anderer, July 18, 2011, Ex. 67; Instant Messages, dated July 5, 2011, Ex. 77; Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer ("January 21, 2015 TRO") at 4 ¶ 9, docket no. 505, entered January 21, 2015.

Derma Pen and 4EverYoung are parties to the Sales Distribution Agreement, which was signed on or about August 1, 2011[64] and had a term of two years.[65]

Under Sections 12.2 and 14.6 of the Sales Distribution Agreement (collectively, the "Transfer Provisions"), upon termination, Derma Pen must offer the Trademark and Domain Name to 4EverYoung for purchase and each party was required to appoint an independent auditor.[66]  "If no agreement on price is reached, valuation must occur."[67]

Jones testified that if the Sales Distribution Agreement was valid, Derma Pen understands that 4EverYoung is entitled to a valuation and opportunity to buy the U.S. Trademark and the Domain Name.[68]

The Sales Distribution Agreement acknowledged that Derma Pen was the owner of the Trademark and Domain Name and had the exclusive right to use the Trademark and Domain Name and to distribute the Devices and Tips in the USA.[69] The Sales Distribution Agreement provided that 4EverYoung had the right to sell the Device and Tips worldwide, except in the USA,[70] but it did not grant 4EverYoung a license to use the Trademark and Domain Name.  The agreement also did not prohibit 4EverYoung from registering the Trademark in countries other

---

[63] Email from Chad Milton to Mike Morgan and Mike Anderer, July 18, 2011, Ex. 67. The "Trademark Clause" referred to here is Sections 12.2 and 14.6 of the Sales Distribution Agreement, which required Derma Pen to offer for sale the Trademark and Domain Name to 4EverYoung upon termination of the Sales Distribution Agreement.

[64] *See* Sales Distribution Agreement at 18, Ex. 1; *see also* January 21, 2015 TRO at 2 ¶ ("4EverYoung and Derma Pen are parties to the Sales Distribution Agreement." (footnote omitted)), docket no. 505.

[65] *See* Sales Distribution Agreement § 11.1 (Term), Ex. 1; January 21, 2015 TRO at 2-3 ¶ 2, docket no. 505.

[66] *See* Sales Distribution Agreement §§ 12.2, 14.6, Ex. 1; *see also* Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction ("Specific Performance Order") at 8, docket no. 476.

[67] Specific Performance Order at 10, docket no. 476; *see also* Sales Distribution Agreement §§ 12.2, 14.6, Ex. 1.

[68] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 158:15-19, docket no. 597.

[69] Ex. 1 at §§ 12.1, 14.6.

[70] Ex. 1 at §§ 2.1, 2.2.

than the USA.[71] Finally, the Sales Distribution Agreement did not contain any negative covenants limiting or restricting, in any way, or at any time, Derma Pen's right to borrow money and pledge the Trademark and Domain Name to secure those loans.[72]

The Sales Distribution Agreement also did not allow 4EverYoung to purchase any property of Derma Pen except the Trademark and Domain Name, and Marshall acknowledged that 4EverYoung had no right to purchase any other assets of Derma Pen, including Derma Pen's goodwill.[73]

### Anderer's 2011 and 2012 Loans

On June 27, 2011, Anderer gave a personal check of $10,000 to Derma Pen.[74] Subsequently, on July 22, 2011, Anderer gave a second personal check to Derma Pen of $60,000. This sum enabled Derma Pen to begin purchasing the Devices and Tips from 4EverYoung. The memo sections of both checks designated the money as "loan."[75]

Initially, Anderer's funds given to Derma Pen were booked on Derma Pen's QuickBooks debt ledgers as "capital contributions." This designation was selected by Derma Pen's bookkeeper as a "placeholder" to record the loan transactions until the loans could be documented.[76]

---

[71] Ex. 1.

[72] Ex. 1; February 9, 2015 Preliminary Injunction Hearing Transcript at 118:11-18.

[73] February 9, 2015 Preliminary Injunction Hearing Transcript at 120:24-121:20, 229:1-24.

[74] February 12, 2015 Preliminary Injunction Hearing Transcript at 164:1-10, 165:6-167:13; February 19, 2015 Preliminary Injunction Hearing Transcript at 13:19-14:22.

[75] Exs. 147, 158; February 11, 2015 Preliminary Injunction Hearing Transcript at 71:1-10; February 12, 2015 Preliminary Injunction Hearing Transcript at 162-63, 164:1-10, 165:6-167:13, 226-28, 231.

[76] February 12, 2015 Preliminary Injunction Hearing Transcript at 229:19-230:8.

Between June 2011 and March 1, 2012, Anderer continued to advance money to Derma Pen. An accounting of the credits (advances) and debits (loan repayments) of these loans is shown by Exhibits 147 and 148.[77]

On February 27, 2012, in an email regarding trademarks and marketing areas, Anderer stated he was going to review the "deal we have with Stene [Marshall] for the DermaPen brand" because "it will affect what we do with potential acquirers."[78] Just days later, on March 1, 2012, Note 1 and the 2012 SA were signed to document and secure advances previously made without a note and without security.

On March 1, 2012, Derma Pen executed a Secured Promissory Note ("Note 1") to Anderer in the amount of $200,000 to memorialize the Note 1 loans.[79] In addition, on the same day, Derma Pen signed a Security Agreement (the "2012 SA") in favor of Anderer that granted Anderer a security interest in the Trademark and Domain Name and Derma Pen's other property, including the proceeds therefrom, whether now owned or hereafter acquired" to secure Note 1.[80] Note 1 also was guaranteed personally by Morgan and Milton up to a total of $27,500 each.[81] Note 1 and the 2012 SA were signed to document and secure advances previously made without a note and without security.[82]

---

[77] Ex. 147 referenced in February 12, 2015 Preliminary Injunction Hearing Transcript 171, 234, 226-30, 255; Ex. 151 referenced in February 12, 2015 Preliminary Injunction Hearing Transcript at 162-68, 181-84, 231.

[78] Email from Mike Anderer to Mike Morgan, February 27, 2012, 10:01 p.m., Ex. 81 at 3.

[79] Exs. 9 and 10.

[80] Ex. 10.

[81] Ex. 11.

[82] Exs. 9 and 10.

On February 20, 2013, UCC-1 financing statements (the "2013 FS") were filed by Anderer in the appropriate public records offices in Utah and Delaware to perfect Anderer's security interests against Derma Pen's assets.[83]

Between September 20, 2012 and December 31, 2013, Anderer gave Derma Pen an additional $100,000. Derma Pen's books treated the advances as "Note 2."[84]

Most of the loan proceeds from Note 1 and Note 2 were used by Derma Pen to purchase Devices and Tips from 4EverYoung.[85]

Between June 25, 2011 and December 21, 2012, Anderer or his entities provided Derma Pen with $280,000.[86]  Only $255,000 of that amount was provided by Anderer directly.[87] There was no negotiation on the terms of those loans.[88] Anderer left it to Derma Pen to keep track of his loans.[89]

Note 1 and the funds identified as Note 2 were paid off, either by payment in full (Anderer received $299,108.09)[90] or by rolling into a subsequent note.[91]

Anderer agrees that his current efforts to foreclose on the assets of Derma Pen are not in collection of amounts owing under Note 1.[92]

---

[83] Exs. 12, 13.

[84] Ex. 148

[85] February 12, 2015 Preliminary Injunction Hearing Transcript at 94:5-25, 244:10-25, 333:16-25; February 19, 2015 Preliminary Injunction Hearing Transcript at 23:7-11.

[86] See Derma Pen Bank Statements at 1, 3, 5, Ex. 151; see also Derma Pen Bank Statements at 2, 4, 5, Ex. 63J; February 12, 2015 Preliminary Injunction Hearing Transcript at 164:22-175:8, docket no. 597.

[87] See Derma Pen Bank Statements at 1, 3, 5, 26, Ex. 151; see also Derma Pen Bank Statements at 2, 4, 5, Ex. 63J.

[88] See Anderer Dep. at 81.

[89] See id. at 103-04.

[90] See Derma Pen Bank Statements at 17, 38, 45, 53, 63, 66, 73, Ex. 151; see also Derma Pen Bank Statements at 1, 2, Ex. 63A; February 12, 2015 Preliminary Injunction Hearing Transcript at 179:18-187:5 docket no. 597.

[91] See February 12, 2015 Preliminary Injunction Hearing Transcript at 325:11-13, 336:12-14, docket no. 597; see also Anderer Dep. at 97.

[92] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

In the spring of 2012, Derma Pen's management and Anderer asked Marshall to provide the proof of worldwide patents protecting the Device. Marshall advised Derma Pen that he had been mistaken about the extent of 4EverYoung's patent protection, and, in fact, the patent on the Device was held by SunWoo, the manufacturer, and was only effective in South Korea.[93]

Anderer then visited Marshall at 4EverYoung's offices in Australia to see if there was a way to fix the lack of sufficient patent protection. He also wanted to personally evaluate Marshall's operations. During this visit, he became "alarmed" by what he saw and learned, and no resolution was reached.[94]

Anderer and Derma Pen's management claim they first became aware at about this same time of 4EverYoung's worldwide rights under the Sales Distribution Agreement and of 4EverYoung's use of the Trademark outside the USA, also permitted under the Sales Distribution Agreement.[95]

They also learned that 4EverYoung was using materials from the Domain Name on 4EverYoung's website entitled www.dermapenworld.com.[96] This use concerned Derma Pen's management because of the brand confusion and possible devaluing of the Trademark and Domain Name.[97]

The Sales Distribution Agreement did not require Derma Pen to forward any "international leads" to 4EverYoung that Derma Pen received from those who accessed its Domain Name or otherwise contacted Derma Pen.[98] Marshall testified that such referrals were

---

[93] February 12, 2015 Preliminary Injunction Hearing Transcript at 102-104; February 19, 2015 Preliminary Injunction Hearing Transcript at 34:15-21, 35:1-6.

[94] February 19, 2015 Preliminary Injunction Hearing Transcript at 35:2-12.

[95] *Id.* 71:3-72:12.

[96] February 12, 2015 Preliminary Injunction Hearing Transcript at 98:11-13.

[97] *Id.* 98:24-100:14; February 19, 2015 Preliminary Injunction Hearing Transcript 72:14-22.

[98] Ex. 1.

"customary in the industry," and that he expected that Derma Pen would forward such leads to 4EverYoung because Derma Pen's territory was limited to the USA.[99]

In an internal email chain generated on or about September 23, 2012, Derma Pen's management discussed the problems their company was having with 4EverYoung in connection with international leads.  Anderer was copied on some of these communications, and responded by recommending that management seek legal advice to review the Sales Distribution Agreement and advise the company about its options.  In the same email he expressed his views of Marshall and the Sales Distribution Agreement, saying, in part,

> If Stene has any threats or any other issues he wants to deal with it will end up with the attorneys and me.  It is going to be a mess to extract ourselves in one piece from this really toxic deal.  We will and we will move forward stronger than ever and unless Stene has some sort of Epiphany in the next week, the only place we will be hearing his name or dealing with him will be in court, unfortunately.[100]

In February 2013, 4EverYoung withheld supply from Derma Pen.  In an email dated February 2, 2013, Marshall wrote to Anderer saying, in part, "we currently have them on stop supply due to the fact that there has been no effort at all from them to resolve the international lead referral problem."  Marshall also stated that "[t]his action however just so happens to coincide with the expiry of the current distribution contract which at this point has expired and will not be renewed without agreement to the following items: . . . ."  The email then contained a list of demands for modifications in the Sales Distribution Agreement.[101]

On November 27, 2012, Anderer also formed Derma Gen, as a company to patent, develop, and market a line of cosmetic and dermatological products, such as a "hydro-mask."

---

[99] February 9, 2015 Preliminary Injunction Hearing Transcript at 142:25-144:7, 212:5-20.

[100] Ex. 82.

[101] Ex. 6.

On May 21, 2013, Anderer formed MedMetics LLC as a research and development company to develop and patent a new micro-needling.  MedMetics was owned 100% by Anderer.[102]  MedMetics was in the process of developing a new form of the Device to be known as the MDerma.[103]  MedMetics was not a distribution company and did not have a sales force. Instead, MedMetics intended to use Derma Pen as a distributor for the MDerma.[104]

Both MedMetics and Derma Gen were separate companies from Derma Pen.[105] MedMetics also had an importer's license to import goods into the USA from other countries.[106]

### Derma Pen's Termination of the Sales Distribution Agreement

On May 30, 2013, Jones, on behalf of Derma Pen and with assistance of counsel,[107] notified 4EverYoung that Derma Pen was terminating the Sales Distribution Agreement effective at the end of its initial two-year term.[108]  Jones's email to Marshall confirmed a wire transfer to 4EverYoung for additional product and indicated that:

> As you are very well aware and have been pushing for some time now, we need to renegotiate our arrangement.  We absolutely agree with this need and therefore are taking the appropriate steps in noticing you of our intent to not renew our existing agreement so that we may begin working on a solution.[109]

That same day, Marshall, on behalf of 4EverYoung, responded "[n]o problems with the notice not to renew," and requested that Derma Pen comply with its post-termination obligations

---

[102] February 12, 2015 Preliminary Injunction Hearing Transcript at 134:13-14.

[103] *Id.* 134: 2-12.

[104] *Id.* 134:10-12.

[105] February 11, 2015 Preliminary Injunction Hearing Transcript at 10:19-11:4; February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10.

[106] February 11, 2015 Preliminary Injunction Hearing Transcript at 18:14-19:4.

[107] February 19, 2015 Preliminary Injunction Hearing Transcript at 41:13-28; February 12, 2015 Preliminary Injunction Hearing Transcript at 158:4-6.

[108] *See* Letter Jones to Marshall, dated May 30, 2013, Ex. 2.

[109] Ex. 3.

under the Sales Distribution Agreement.[110]  "'The Distribution Agreement has been terminated.

Derma Pen terminated it.'"[111]

Several days later, Jones wrote to Marshall, stating "regarding the trademark we are

focused on performing our duties under the agreement until it expires on August 2.  We can

speak at the end of the term about any post-agreement duties that each of us have."[112]

On July 25, 2013, Marshall wrote to Jones again requesting Derma Pen's compliance

with its post-termination obligations under the Sales Distribution Agreement and requested a

response by August 1, 2013.[113]

Between May 30, 2013 and August 1, 2013, Derma Pen's management learned that

4EverYoung was using the Trademark to sell Devices and Tips in the USA.[114]  The situation

became acute for Derma Pen when it was unable to register as a marketer at a medical device

trade show in the USA because 4EverYoung had previously registered at the same trade show

using the Trademark.[115]

### Derma Pen and Anderer's Strategy to Avoid the Transfer Provisions in the Sales Distribution Agreement

Almost immediately after the execution of the Sales Distribution Agreement, Anderer

and Derma Pen became increasingly dissatisfied with the terms of the agreement[116] and

displeased with Marshall.[117]

---

[110] *See* E-Mail Exchange between Jones and Marshall, dated May 30, 2013, Ex. 3.

[111] January 21, 2015 TRO at 3 ¶ 4, docket no. 505 (quoting December 23, 2014 TRO at 4, docket no. 451); *see also* Letter Jones to Marshall, dated May 30, 2013, Ex. 2.

[112] E-Mail Jones to Marshall, dated June 4, 2013, Ex. 3.

[113] *See* Letter Marshall to Jones, dated July 25, 2013, Ex. 4.

[114] February 9, 2015 Preliminary Injunction Hearing Transcript at 87:24-91:12.

[115] February 12, 2015 Preliminary Injunction Hearing Transcript at 99:5-20.

[116] *See, e.g.*, E-Mail Exchange, dated November 1, 2011, Ex. 78; E-Mail Exchange, dated February 13, 2013, Ex. 7.

[117] *See* E-Mail Exchange, dated December 14, 2011, Ex. 79; *see also* E-Mail Anderer to Marshall, dated July 2, 2012, Ex. 80; E-Mail Exchange, dated September 23, 2012, Ex. 82.

In February 2012, Anderer suggested that Derma Pen simply breach the agreement and register trademarks in the name Dermapen in the European Union.[118]  Anderer made clear that he was an architect – if not the architect – of Derma Pen's strategy for exiting the Sales Distribution Agreement and retaining the Trademark in a September 7, 2012 e-mail, in which he outlined the manner in which he thought the facts should be characterized and in which another former member of Derma Pen, Felsted, stated that "over Mike A.'s dead body is he going to just allow Stene to take control of those assets," *i.e.*, the Trademark and Domain Name.[119]

On March 2, 2013, in an e-mail to Derma Pen's board, Morgan wrote that "I hate Stene !!!"[120]

In an e-mail sent by Biopelle's President and CEO, Elliott Milstein ("Milstein"), he reiterated what Jones told him about Derma Pen's strategy with respect to the Trademark and Domain Name:

> Derma Pen, LLC is the owner of the trade name "DermaPen" in the United States.  Equipmed is the owner of the same trade name in a number of other countries.  Derma Pen, LLC used to be affiliated with Equipmed and when they broke that affiliation, Equipmed formed its US subsidiary, Dermapenworld, to challenge Derma Pen's ownership of the trade name DermaPen. This legal battle has been going on for over a year.

> As a strategy in fighting this legal battle, the partners of Derma Pen, LLC formed a new company, Medmetics, LLC, and have transferred most of the assets of Derma Pen, LLC to this new entity, including the ownership of the trademark. But it has been their intention for some time to abandon the Dermapen trademark and develop a new, uncontested trademark.  The new company and its name were part of this strategy as well as creating a new trade name, MDerma FDS, for its new generation device.  The bankruptcy filing was just another step in this strategy.[121]

---

[118] *See* E-Mail Anderer to Derma Pen, dated February 27, 2012, Ex. 81.

[119] E-Mail Felsted to Morgan, *et al.*, dated September 7, 2012, Ex. 5; *see also* January 21, 2015 TRO at 4 ¶ 10, docket no. 505.

[120] E-Mail M. Morgan to Derma Pen Board, dated March 2, 2013, Ex. 8.

[121] E-Mail Milstein to Biopelle, dated August 12, 2014, Ex. 49; *see also* Memorandum at 2 (quoting Milstein e-mail), Ex. 125.

During his deposition, Milstein confirmed that the information contained in his e-mail accurately reflected what was told to him by Jones.[122]  Milstein also testified that Saunders told him that, by terminating the Sales Distribution Agreement, Derma Pen had "unwittingly triggered some aspect of trademark ownership."[123]

During a December 2, 2014 AMS board of directors meeting, Anderer discussed the landscape "[o]nce Dermapen is gone"[124] and strategy to shift to the MDerma micro-needling device.[125]  Derma Pen's minutes also reflect its intent to shift away from the Dermapen name.[126]

During Morgan's and Jones's testimony at the preliminary injunction hearing, they were still visibly and expressly "tender" and angry about the Sales Distribution Agreement and their relationship with 4EverYoung and Marshall.[127]

Other than statements in the hearings on this preliminary injunction motion, neither Anderer nor any representative of Derma Pen has communicated to 4EverYoung that Derma Pen was ready to offer the Trademark and Domain Name to 4EverYoung.[128]

### Derma Pen Files this Lawsuit

On August 1, 2013, Derma Pen filed this lawsuit.[129]  Derma Pen filed this lawsuit on the date that Marshall had requested a response to his July 25, 2013 inquiry whether Derma Pen would honor its post-termination transfer obligations. The Complaint sought declaratory relief

---

[122] *See* Milstein Dep. at 50:16-51:5, 56:20-61:25, 67:3-69:18, 82:14-83:3, 86:20-22, Ex. 57.

[123] *See id.* at 68:12-69:18, Ex. 57.

[124] AMS Board Meeting Minutes at 15:10-14, dated December 2, 2014, Ex. 66.

[125] *See id.* at 21:15-22.

[126] *See* Derma Pen Minutes at 2, 9, 14, 17, Ex. 91.

[127] *See, e.g.*, February 11, 2015 Preliminary Injunction Hearing Transcript at 53:20-22, 68:9-11, 71:12, 73:3-22, docket no. 607; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 141:19-24, docket no. 597.

[128] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[129] *See* Complaint, docket no. 2.

that no such obligation existed. But the Complaint did not identify the post-termination obligations or attach the Sales Distribution Agreement.  Derma Pen only provided the Court a copy of the Sales Distribution Agreement after Derma Pen filed its motion for temporary restraining order and preliminary injunction, after the Court requested a copy, and before 4EverYoung or the other Defendants were represented by counsel.[130]

4EveryYoung counterclaimed on May 2, 2014.[131] "Part of 4EverYoung's claim for breach of contract seeks specific performance and damages under Sections 12.2 and 14.6 of the Sales Distribution Agreement, which 'provide 4EverYoung with certain rights to purchase the Derma Pen US trademark and the dermapen.com domain name after the Sales Distribution Agreement terminated.'"[132]

### Anderer's Knowledge of and Participation in this Action and Related Proceedings

Anderer has attended numerous depositions in this case, including the October 22, 2013 Rule 30(b)(6) deposition of Derma Pen at which Milton testified as the company representative and the June 5, 2014 deposition of Stene Marshall.

In the bankruptcy case, Anderer's own deposition was taken in Florida, and he attended the depositions of two former employees of Derma Pen.

---

[130] Docket no. 25, filed October 10, 2013.

[131] Answer to First Amended Complaint, Counterclaim, Third-Party Amended Complaint, and Demand for Jury Trial ¶C, docket no. 139, filed May 2, 2014; *see also* Third Amended Counterclaim ¶¶ 45, 46, docket no. 547.

[132] January 21, 2015 TRO at 3 ¶ 5, docket no. 505 (quoting Memorandum Decision and Order Granting in Part Defendants' Motion for Temporary Restraining Order ("The December 23, 2014 TRO") at 4, docket no. 451); *see also* Third Amended Counterclaim ¶¶ 45, 46, docket no. 547.

### Anderer's Threats of Prolonged Litigation

At the conclusion of Milton's deposition in the Derma Pen Bankruptcy, Anderer informed Marshall, in the presence of counsel, that he would follow Marshall all over the world and would sue him anywhere and everywhere.[133]

During the December 2, 2014 AMS board of directors meeting[134] attended by Morgan and Milstein, among others, Anderer reiterated his "promise" to sue Defendants "for the next twenty years."[135]   Anderer went on to state, "[Defendants] will not, and this could go on the record, they will not wake up a day in the rest of their lives when they don't wake up to me suing them for something, for the damage that they've done."[136]   Morgan vouched for Anderer's sincerity to the others present.[137]

Anderer also explained that he had been paying for all of the litigation regarding the Trademark and Domain Name and that the cost did not matter to him.[138]

In the summer of 2014, Derma Pen began purchasing Devices and Tips from MedMetics, which, in turn, purchased these products directly from a Philippine supplier of SunWoo. MedMetics resold these products to Derma Pen at a markup.[139]

Also during the summer of 2014, MedMetics entered into a joint venture with Biopelle, which made a cosmetic cream to be used with the Devices.  The joint venture was called

---

[133] *See* February 9, 2015 Preliminary Injunction Hearing Transcript at 186:14-187:1, docket no. 596.

[134] This meeting was recorded by a court reporter, with which recording Anderer expressed he was "not real comfortable."  AMS Board Meeting Minutes at 4:23-25, dated December 2, 2014, Ex. 66.  Anderer even suggested that the minutes be "destroy[ed]" or altered.  *Id.* at 5:23-6:2, Ex. 66.

[135] *See id.* at 16:23-17:7, dated December 2, 2014, Ex. 66.

[136] See *id.* at 17:3-7.

[137] *See id.* at 17:1-2.

[138] *See id.* at 12:24-13:3, dated December 2, 2014, Ex. 66.

[139] February 11, 2015 Preliminary Injunction Hearing Transcript at 18:14-20:18.

AMS.[140]  The purpose of AMS was to sell both the cream and the MDerma device as a package

to physicians and, thereby, take advantage of the combined marketing power of both products

and the increased renewable revenues from selling additional creams and Tips.  Because of

production delays in bringing the MDerma to market, the Device was offered for free to initial

purchasers of the packages, with the promise of replacing the Device with the MDerma once it

became available.[141]

### Derma Pen's Claims Against 4EverYoung

Derma Pen claims that since as least August 1, 2013, 4EverYoung has been using

Dermapenworld to market and sell Devices in the United States by using the Trademark at issue

in this case.[142] Derma Pen recently filed a summary of its motions related to this issue, the

parties will file supplemental briefs, and a hearing is set March 6, 2015 to hear Derma Pen's

motion for a preliminary injunction.[143]

Derma Pen claims that after Keli Cypriano was terminated from Derma Pen, she began

working for Dermapenworld Sales and hacked into Derma Pen's computer systems on multiple

occasions gaining access to Derma Pen's confidential information and trade secrets, including its

lists of current customers and potential customers[144] and that with this information

---

[140] *Id.* at 6:13-14.

[141] February 12, 2015 Preliminary Injunction Hearing Transcript 82:8-10, 99:5-20, 134:5-12.

[142] February 9, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.87:24-91:12; February 11, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.30:8-10.

[143] Identification of Documents Related to Derma Pen's Motion for Temporary Restraining Order and Preliminary Injunction, docket no. 590, filed February 16, 2015; Minute Order docket no. 595, filed February 19, 2015.

[144] February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.109:2-7, 279:13 -282:6; February 18, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.20:4-21:12, 61:14-62:12.

Dermapenworld has actively targeted Derma Pen's customers in an effort to lure them away from Derma Pen and make them customers of Dermapenworld.[145]

## Bifurcation and Stay

On May 2, 2014, Defendants filed a motion for temporary restraining order and preliminary injunction ("Defendants' Injunction Motion"),[146] seeking, among other things, an order requiring Derma Pen to specifically perform on the Transfer Provisions under the Sales Distribution Agreement, including its obligation to offer to 4EverYoung for purchase the Trademark and Domain Name.[147]

On May 15, 2014, this court bifurcated certain threshold claims related to Derma Pen's claim for rescission of the Sales Distribution Agreement and 4EverYoung's claim for specific performance of that agreement, and stayed the remaining claims and issues in the case.[148]

Prior to the January 6, 2015 hearing, the Court had expressly granted, in whole or part, Defendants' motion for partial summary judgment, save Defendants' motion for partial summary judgment regarding specific performance.[149]

## Anderer's 2014 Advances

Anderer also claims a lien by virtue of money paid in 2014, just before Derma Pen filed bankruptcy.[150]  The money was disbursed by Saunders, S2 Partners V, or Tensor Cloud

---

[145] February 18, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.142:8-143:4; February 12, 2015 Preliminary Injunction Hearing Transcript at 82:8-10, 99:5-20, 134:5-12.98:7-100:14

[146] Docket no. 141, dated May 2, 2014.

[147] *See id.* at v.

[148] Memorandum Decision and Order Re: Expedited Schedule on Rescission Claims and Trademark Rights and Staying All Other Issues in the Case, docket no. 155, entered May 15, 2014; *see also* Memorandum Decision and Order Re: Jury Trial on Derma Pen, LLC's 22nd and 24th Causes of Action and Part of Defendants' 1st Counterclaim Cause of Action, docket no. 207, entered June 26, 2014.

[149] Memorandum Decision and Order Granting 4EverYoung's 238 Motion for Partial Summary Judgment on Rescission, docket no. 397, entered August 4, 2014; Memorandum Decision and Order Granting in Part and Denying in Part 4EverYoung's 244 Motion for Partial Summary Judgment on Fraudulent Inducement, docket no. 400, entered under seal August 4, 2014; Memorandum Decision and Order Granting 4EverYoung's 240 Motion for Partial Summary Judgment Directed Against Derma Pen LLC's Defenses to Specific Performance (the "Specific Performance Defenses Order"), docket no. 465, entered December 30, 2014.

Solutions,[151] although the loan documents identified Anderer as the lender.[152]  Saunders

negotiated and documented these loans.[153]  Anderer never read the loan documents.[154]

In order to maximize FDIC insurance protection for his cash assets, Anderer diversified

his cash holdings among various bank accounts in the names of entities that he solely owned and

controlled, such as S2 Partners V, LLC and Tensor Cloud, LLC.[155]

Anderer also relied on his personal attorney, Sam Saunders, who had check signing and

disbursement authority on these affiliated entity bank accounts, to disburse funds from these

accounts as Anderer directed.[156]

Occasionally, some of Anderer's loan advances to Derma Pen were made from these

affiliated bank accounts,[157] but all of the funds advanced were of Anderer's personal money.[158]

In addition, on occasion Anderer authorized Saunders, and Saunders's wife, Patricia

Saunders, to make loan advances for Derma Pen in the form of paying Derma Pen's obligations

to lawyers through the use of personal American Express credit card accounts that were owned

---

[150] *See* Bankruptcy Petition, dated August 8, 2014, Exs. 21, 22.

[151] *See* Saunders Credit Card Statements at 2, 6, 8, 13-15, 17, Ex. 74; *see also* S2 Partners V Credit Card Statement at 3, 5, 8, Ex. 75; Tensor Cloud Solutions Credit Card Statements at 3, Ex. 76. *See also* February 12, 2015 Preliminary Injunction Hearing Transcript at 188:18-195:7, docket no. 597; Anderer Dep. at 117, 122.

[152] *See* Secured Promissory Note, dated July 1, 2014, Ex. 14; *see also* Security Agreement, dated July 1, 2014, Ex. 15; Amendment to Secured Promissory Note and Security Agreement, August 7, 2014, Ex. 16; Utah UCC Filing, dated August 7, 2014, Ex. 17.

[153] *See* Anderer Dep. at 109, 122-23, 137-38.

[154] *See id.* at 135-36.

[155] February 19, 2015 Preliminary Injunction Hearing Transcript at 24:3-25:4.

[156] *Id.* at 25:5-26:20.

[157] Ex. 153.

[158] February 12, 2015 Preliminary Injunction Hearing Transcript at 174:19-175:2, 191:14-192:14; February 19, 2015 Preliminary Injunction Hearing Transcript at 25:25-26:23.

by Mr. and Ms. Saunders.[159] On these occasions, Anderer promptly reimbursed the Saunders' for these credit card charges from his personal funds.[160]

On July 1, 2014, Derma Pen executed and delivered another Secured Promissory Note to Anderer in the amount of $278,400 (the "2014 Note" or "Note 3").[161] The 2014 Note was secured with a Security Agreement of the same date (the "2014 SA").[162] The 2014 SA granted Anderer a security interest in the Trademark and Domain Name and Derma Pen's other property.[163]

The loan proceeds from the 2014 Note were used to pay legal fees that Derma Pen owed to its counsel in connection with this lawsuit.[164]

The 2014 Note was amended on August 7, 2014 (the "2014 Note Amendment") to increase the note balance by an additional $301,884.90, for a total 2014 Note balance, at that date, of $580,284.90.[165] The loan proceeds from the 2014 Note Amendment also were used to pay Derma Pen's legal fees in connection with this lawsuit.[166]

At the time the 2014 Note and the 2014 Note Amendment were signed, both Anderer and Derma Pen expected that Derma Pen would be able to repay the obligations from Derma Pen's future revenues.[167]

---

[159] Exs. 152, 153.

[160] February 19, 2015 Preliminary Injunction Hearing Transcript at 25:25-26:23.

[161] Ex. 14

[162] Ex. 15.

[163] *Id.*

[164] February 12, 2015 Preliminary Injunction Hearing Transcript 235:15-237:15; Exs. 146, 149, 152, 153.

[165] Exs. 16, 149.

[166] February 12, 2015 Preliminary Injunction Hearing Transcript at 235:15-237:15; Exs. 146, 149, 152, 153.

[167] February 19, 2015 Preliminary Injunction Hearing Transcript at 46:25-47:3; February 18, 2015 Preliminary Injunction Hearing Transcript at 78:20-79:4.

### Derma Pen's Bankruptcy Petition

On August 8, 2014, after 4EverYoung had filed and prevailed on multiple motions for partial summary judgment related to its attempt to enforce the transfer provisions, and just one business day before the jury trial on the bifurcated contract claims in this case, Derma Pen filed chapter 11 bankruptcy in Delaware.[168]  Each of the members of Derma Pen, including Anderer, executed a resolution authorizing the filing of the bankruptcy.[169]

Just prior to Derma Pen filing the Bankruptcy Case, Anderer resigned from the board of Derma Pen, because he believed there was a conflict with his role as a creditor and his role as a board member.[170]

That bankruptcy filing halted the August 11, 2014 jury trial and prevented the Court from entering further orders.

In the Bankruptcy Case, Derma Pen scheduled 4EverYoung with a contingent, unliquidated and disputed unsecured claim in the amount of $56,150.05, [Schedule F].  It scheduled Anderer with an undisputed secured claim in the amount of $580,284.90 [Schedule D].  It also scheduled MedMetics as an undisputed, unsecured creditor with a claim of $79,862.77 [Schedule F].[171]

Jones testified that Derma Pen still owed at least approximately $56,000 to 4EverYoung under the Sales Distribution Agreement.[172]

---

[168] *See In Re Derma Pen, LLC*, case no. 14-11894 (KJC), 2014 WL 7269762 (Bankr. D. Del. Dec. 19, 2014); *see also* Notice of Filing of Bankruptcy and Automatic Stay Under 11 U.S.C. § 362, docket no. 422, filed August 8, 2014; *see also* January 21, 2015 TRO at 5 ¶ 12, docket no. 505.

[169] Bankruptcy Petition at 6, Ex. 21; *see also* Amended Bankruptcy Petition at 6, Ex. 22; January 21, 2015 TRO at 5 ¶ 13, docket no. 505.

[170] February 19, 2015 Preliminary Injunction Hearing Transcript at 48:18-24.

[171] Ex. 115.

[172] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 159:23-161:9, docket no. 597.

In the bankruptcy case, Derma Pen attempted to "reject" its post-termination obligations to 4EverYoung under the Sales Distribution Agreement.[173]  Anderer prepared a stalking horse bid so the Trademark and Domain Name could be sold out of bankruptcy.[174]  The price on the stalking horse bid for the Trademark and Domain Name (*i.e.*, $1.08 million) was calculated by Anderer and represented an amount that "would pay off the secured creditors and it would -- it would pay back the rest of the shareholders twice what the average collections were in Delaware in a bankruptcy case."[175]

### Debtor In Possession (DIP) Financing

During the Bankruptcy Case, Derma Pen sought authority to use Anderer's cash collateral, and it also sought authority to borrow up to an additional $150,000 from Anderer.[176] 4EverYoung objected to Derma Pen's efforts to obtain this authority.[177]  Ultimately, after discovery and further hearings, the Bankruptcy Court entered its Final Order authorizing Derma Pen's use of cash collateral, granting adequate protection to Anderer and authorizing post-petition financing.[178]  Among other things, this Final Order recognized that Derma Pen and Anderer stipulated to the validity, priority and amount of Anderer's security interest and secured debt, and the final order granted additional liens to Anderer in connection with his post-bankruptcy loans to Derma Pen.[179]

---

[173] *See* Debtor's Motion for Entry of an Order (A) Approving the Sale of the Debtor's Assets Free and Clear of Liens Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief, Ex. 24.

[174] *See id.*

[175] *See* December 19, 2014 Preliminary Injunction Hearing Transcript at 49:17-50:4, docket no. 602.

[176] Exs. 116, 122.

[177] Exs. 117, 119, 121.

[178] Ex. 123.

[179] *Id.*

The DIP financing was governed by terms consistent with the 2014 Note and 2014 SA[180] but with special protection under Section 364(e) of the Bankruptcy Code.[181]

In Section 3 of the Bankruptcy Court's Final Order, the Bankruptcy Court granted 4EverYoung and Marshall a reservation of rights to challenge Anderer's security interests and liens, but it established a deadline for 4EverYoung and Marshall to do so.[182]   The same section also preserved Anderer's defenses to any such challenge, if one were filed.[183]   Ultimately, the Bankruptcy Court extended 4EverYoung's challenge deadline to December 23, 2014.[184]   The Bankruptcy was dismissed December 19, 2014 before that deadline expired.

The funds from Anderer's post-bankruptcy loans to Derma Pen were used by Derma Pen to retain bankruptcy counsel.[185]   Anderer advanced $100,000 under the post-bankruptcy loans.[186]

Derma Pen has not repaid any of the funds loaned to it by Anderer during the bankruptcy.[187]   As of January 29, 2015, the outstanding balance on the post-petition bankruptcy loan was $102,383.80, consisting of unpaid principal in the amount of $100,000 and accrued and unpaid interest in the amount of $2,383.80.[188]

At the time Anderer made these post-bankruptcy loans to Derma Pen, he expected that Derma Pen would be able to repay him from its operating revenues, or from a sale of the Trademark and Domain Name.[189]

---

[180] *Id.* ¶¶5, 7-9 at 4-6 of Stipulation.

[181] *Id.* ¶ D. at 2.

[182] Ex. 123 at § 3.

[183] *Id.*

[184] Ex. 124.

[185] February 19, 2015 Preliminary Injunction Hearing Transcript at 49:8-16.

[186] Ex. 25.

[187] February 12, 2015 Preliminary Injunction Hearing Transcript at 97:17-98:3; *id.* at 237:18-21.

[188] Ex. 150; February 12, 2015 Preliminary Injunction Hearing Transcript at 243:11-18.

[189] February 19, 2015 Preliminary Injunction Hearing Transcript at 49:8-51:24.

At all times that Anderer was a lender to Derma Pen, he believed that the value of Derma Pen's assets was greater than the amount of its liabilities.[190]

Derma Pen's bankruptcy sworn schedules showed that Derma Pen's assets were significantly greater than its liabilities at the time the Bankruptcy Case was filed.[191]

In its bankruptcy schedules and even now, Derma Pen maintains that the Trademark and Domain Name are worth in excess of $6 million.[192]

No one other than Anderer has advanced funds to Derma Pen, either as a lender or equity investor.

## Dismissal of Derma Pen's Bankruptcy Petition

Following full briefing and evidentiary hearings, Derma Pen's bankruptcy was dismissed on Friday, December 19, 2014, after the bankruptcy court concluded that the bankruptcy was filed "as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors."[193]  The bankruptcy court stated as follows:

> I conclude that the totality of the facts and circumstances of this case support a determination that Derma Pen's bankruptcy petition was filed as a litigation tactic, rather than as a good faith attempt to reorganize or preserve value for creditors. Derma Pen filed the complaint that started the Utah Litigation and the Utah District Court was addressing the numerous claims.  When the Utah District Court entered preliminary rulings that were not in Derma Pen's favor, Derma Pen filed a bankruptcy petition.  The timing of the petition, and the lack of facts demonstrating that Derma Pen was in financial distress at that time, indicate that the bankruptcy petition was filed to avoid the expense of trial and the possibility of additional rulings against it.  The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court.  Rather than filing to assuage operational difficulties and financial stress caused by the trademark dispute, Derma Pen's petition is an attempt to disrupt the

---

[190] *Id.* 39:13-22, 46:15-47:3.

[191] Ex. 115.

[192] *See* Bankruptcy Schedules at 13, Ex. 115; *see also* Draft Navigant Valuation, Ex. 40.

[193] Memorandum at 17, Ex. 125; *see also* January 21, 2015 TRO at 5 ¶ 14, docket no. 505.

litigation process.  The Debtor has failed to meet its burden that its chapter 11 petition was filed in good faith.[194]

On December 19, 2014, after the bankruptcy dismissal, Anderer's counsel sent a default notice to Jones, as the CEO of Derma Pen, demanding immediate payment of $687,918.82, plus interest, in connection with Derma Pen's secured obligations to Anderer.[195]

### The Confession of Judgment

Anderer testified that, up until the bankruptcy case was dismissed, he would have continued to extend funds to Derma Pen indefinitely, had no concern over how the monies were used, and never had any intention of taking action against Derma Pen.[196]

On Friday, December 19, 2014 (*i.e.*, the same day that the bankruptcy case was dismissed), Saunders, on behalf of Anderer, verbally asked Jones to confess judgment on behalf of Derma Pen in favor of Anderer.[197]

Jones testified that, on December 19, 2014, he spoke with Derma Pen's then-counsel, Russell S. Walker ("Walker"), for forty minutes regarding Saunders's request.[198]  Yet, during a December 23, 2014 telephonic conference in court, Walker stated that he only became aware of Derma Pen's intent to surrender assets to Anderer on the evening of December 22, 2014.[199]

Jones testified that he did not perceive that Derma Pen had any defense to Anderer's claims.[200]  However, he was aware of 4EverYoung's standing motion and draft complaint in the bankruptcy on behalf of Derma Pen to avoid obligations to Anderer.[201]

---

[194] Memorandum at 17-18 (internal footnote omitted), Ex. 125.

[195] Ex. 128.

[196] *See* February 19, 2015 Preliminary Injunction Hearing Transcript at 28:6-10, 39:20-22, 45:4-6, 56:18-57:13, 58:21-59:5, docket no. 602; *see also* Anderer Dep. at 111, 124, 138-39.

[197] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[198] *See id.* at 202:21-24, 214:4-215:2.

[199] *See* December 23, 2014 Telephonic Conference Transcript at 16:6-10, 17:10-23, docket no. 520.

[200] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 221:6-9, docket no. 597.

On Monday, December 22, 2014, Anderer appeared at Derma Pen's office with a notary, and Derma Pen executed a Confession of Judgment in favor of Anderer without meeting or discussion.[202]  Jones, on behalf of Derma Pen, executed the Confession of Judgment, acknowledging a liability of Derma Pen to Anderer in the amount of $791,012.18.[203]

The Confession of Judgment correctly recites the principal under the post-bankruptcy loans as $100,000 but is in error in reciting that the interest rate is 10% on those loans.  The correct rate is 5%.

Jones, Morgan, and Milton executed a written consent by which they approved the Confession of Judgment.[204]

Jones testified that he understands that, as an officer of Derma Pen, his fiduciary duties were to the "stakeholders," not the company itself.[205]

On December 22, 2014, Anderer filed an action (the "Confession of Judgment Action") in the Third District Court, State of Utah, to levy on Derma Pen's secured assets.[206]

On December 24, 2014, based on the Confession of Judgment, the state court entered a judgment against Derma Pen in favor of Anderer in the amount of $791,012.18 (the "Judgment").[207]

---

[201] *See id.* at 221:20-24; *see also* 4EverYoung's Standing Motion, Court's Exhibit 3 from February 4, 2015 Hearing.

[202] *See* Confession of Judgment, dated December 22, 2014, Ex. 25; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 199:17-202:2, docket no. 597.

[203] Exs. 25, 135.

[204] *See* Confession of Judgment at 3, Ex. 25.

[205] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 206:6-19, docket no. 597.

[206] *See Anderer v. Derma Pen, LLC,* in the Third Judicial District Court, Salt Lake County, Utah, Case No. 140908635, Honorable Robert Faust.

[207] Ex. 30.

**The Trademark Assignment**

On the evening of December 19, 2014, and again unbeknownst to 4EverYoung, Saunders, Anderer's counsel, purportedly called due Derma Pen's debt to Anderer.[208]  That same evening, Jones expressed Derma Pen's concession to Anderer's position.[209]

On December 22, 2014, Saunders sent an email to Jones that requested a "partial surrender of some of the secured collateral assets in favor of Mike Anderer per Article 9 of the Utah Commercial Code, rather than being in a situation where Mike would have to seize the assets."  As such, Anderer's counsel requested that Derma Pen immediately record an assignment of the Trademark using the USPTO Electronic Transfer Assignment System in order "to effectuate this partial surrender in as timely a manner as possible."[210]  Anderer's counsel also provided a form of Trademark Assignment for Jones to execute on behalf of Derma Pen.[211]

In approximately the hour that followed, Jones made an electronic assignment of the Trademark to Anderer and received a receipt from the USPTO to that effect.[212]  An actual Assignment of the Trademark also was executed on December 22, 2014,[213] and the USPTO acknowledged that the Assignment was effected on December 22, 2014.[214]

---

[208] *See* E-Mail Saunders to Jones, dated December 19, 2014 (6:46 p.m.), Ex. 128; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 212:7-213:12, docket no. 597.

[209] *See* E-Mail Jones to Saunders, dated December 19, 2014 (9:00 p.m.), Ex. 129.

[210] *See* E-Mail Saunders to Jones, dated December 22, 2014 (7:10 p.m.), Ex. 130; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 213:13-215:2, docket no. 597.

[211] Ex. 130.

[212] Ex. 131-132.  *See* Receipt of Trademark Assignment Filing, dated December 22, 2014 (8:17 p.m.), Ex. 28; *see also* E-Mail Jones to Saunders, dated December 22, 2014 (10:17 p.m.), Ex. 131; *see also* Trademark Assignment, dated December 22, 2014, Ex. 27.

[213] Ex. 133.

[214] Ex. 134.

### Revival of this Litigation

The same day that the bankruptcy court dismissed Derma Pen's bankruptcy (*i.e.*, December 19, 2014),[215] 4EverYoung filed a notice of the dismissal and requested a pretrial conference.[216]  On December 21, 2014 (*i.e.*, before the Confession of Judgment or Trademark Assignment were executed), a telephone conference was scheduled for Tuesday, December 23, 2014 "to discuss how the civil case should proceed going forward in light of the recent bankruptcy ruling dismissing the bankruptcy case."[217]  Recipients of that telephone conference notice included Baker Donelson, still counsel of record for Derma Pen and used by Derma Pen, Anderer, and entities owned solely by Anderer; as well as Mark Gibb of Durham Jones & Pinegar, local counsel for Derma Pen.[218]

On December 23, 2014, at the beginning of the telephone conference to discuss the impact of the bankruptcy dismissal, counsel for 4EverYoung requested "that the Court rule upon the motion for preliminary injunction filed by 4EverYoung, which was Document 141."[219]  Further, 4EverYoung's counsel stated the "need to lock down and preserve the trade – what the bankruptcy court I believe referred to as the trademark asset, the trademark and the domain name. So we have a fulsome record before the Court that will enable this Court to enter the preliminary injunction without further proceedings[.]"[220]

---

[215] *See* Memorandum, Ex. 125; *see also* Order Dismissing Bankruptcy Case, dated December 19, 2014, Ex. 126; Bankruptcy Court Docket, Ex. 127.

[216] *See* Notice of Dismissal of Bankruptcy Case and Request for Pretrial Conference, docket no. 448, filed December 19, 2014.

[217] E-Mail Chambers to Counsel, dated December 21, 2014, lodged February 23, 2015 as docket no. 614.

[218] Anderer Dep. at 188:32-37, 197:17-20; *see also* February 19, 2015 Preliminary Injunction Hearing Transcript at 41:12-18, docket no. 602, filed February 20, 2015.

[219] December 23, 2014 Telephone Conference Transcript at 5:2-3, docket no. 520, filed January 27, 2015.

[220] December 23, 2014 Telephone Conference Transcript at 10:15-21, docket no. 520, filed January 27, 2015.

Derma Pen's bankruptcy counsel, Walker, then stated that he had just learned "late" on the prior evening that a Confession of Judgment was filed in Utah State Court on December 22, 2014, which was intended to result in surrender of the Trademark and Domain Name to Anderer.[221]  Derma Pen's counsel in this litigation stated that they were unaware of the Confession of Judgment, Trademark Assignment, or intended surrender.[222]

Mr. Von Maack was directed to submit the form of a TRO.[223]  No objections were made by counsel for Derma Pen. But counsel for Derma Pen did request a TRO be set on Derma Pen's motion that had been recently remanded from the 10th Circuit.[224]

Following that scheduling conference, the Court set the jury trial on the remaining threshold issues for February 2-13, 2015,[225] and, as discussed below, entered the first of several injunctions to prevent further transfer of the Trademark or Domain Name.

### The December 23, 2014 TRO

On December 23, 2014, the Court entered a temporary restraining order (the "December 23, 2014 TRO"),[226] granting in part Defendant's Motion for Temporary Restraining Order and Preliminary Injunction filed May 2, 2014.[227]  That motion contained 76 paragraphs of facts from the record. The Court ordered that "Derma Pen, its officers, agents, servants, employees, and

---

[221] *See* December 23, 2014 Telephone Conference Transcript at 16:6-18:2, docket no. 520, filed January 27, 2015; *see also* December 23, 2014 TRO at 2-3, docket no. 451; January 6, 2015 Preliminary Injunction Order at 4, docket no. 476; January 21, 2015 TRO at 7 ¶ 21, docket no. 505.

[222] *See* December 23, 2014 Telephone Conference Transcript at 16:6-18:22, docket no. 520, filed January 27, 2015; *see also* December 23, 2014 TRO at 3, docket no. 451; January 6, 2015 Preliminary Injunction Order at 4, docket no. 476.

[223] December 23, 2014 Telephone Conference Transcript at 22:12-13, docket no. 520, filed January 27, 2015.

[224] *Id.* 23:20-23.

[225] Notice of Pretrial Status Conference and Trial, docket no. 452, entered December 23, 2014.

[226] *See* December 23, 2014 TRO, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[227] Docket no. 141.

attorneys, and those acting in concert, with them (collectively, the 'Enjoined Parties') shall not transfer the trademark and domain name."[228]

The December 23, 2014 TRO made extensive preliminary findings and recited that the "bankruptcy dismissal declares that the bankruptcy filing was a bad faith attempt to prevent adjudication in this case" and that the "Confession of Judgment is also an attempt to evade this adjudication process by placing the trademark beyond the reach of the court."[229]

The December 23, 2014 TRO includes language similar to that under Rule 65(d)(2)(c) of the Federal Rules of Civil Procedure, reciting that the temporary restraining order binds "persons who are in active concert or in participation with" Derma Pen, which includes Anderer.[230]

On or before December 24, 2014, Anderer, through his counsel, received notice of the December 23, 2014 TRO.[231] Anderer also likely learned of the December 23, 2014 TRO during his holiday party in early January 2015, which was attended by "Derma Pen people, Derma Gen people," Jones, Morgan, and at least one of Anderer's attorneys, among others.[232]

The Court required 4EverYoung to post security of $10,000 related to the issuance of the December 23, 2014 TRO.[233] 4EverYoung timely posted that security.[234]

The December 23, 2014 TRO also set a preliminary injunction hearing for January 6, 2015.[235]

---

[228] December 23, 2014 TRO at 6 ¶ 2, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[229] December 24, 2014 TRO at 5, docket no. 451; *see also* January 21, 2015 TRO at 7 ¶ 22, docket no. 505.

[230] *See* Fed. R. Civ. P. 65(d)(2).

[231] *See* E-Mail Von Maack to Scofield, dated December 24, 2014, docket no. 481 at 28; *see also* E-Mail Von Maack to Hon. Faust and Counsel, dated December 24, 2014, Docket no. 481 at 30; Letter D. Scofield to Hon. Faust, dated January 8, 2015, Docket no. 481 at 16.

[232] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, Docket no. 597.

[233] January 6, 2015 Preliminary Injunction Order at 5, docket no. 476.

[234] *See* Notice of Security Bond, docket no. 462, entered December 29, 2014; *see also* Notice of Posting of Security for Temporary Restraining Order, docket no. 463, filed December 29, 2014; January 6, 2015 Preliminary Injunction Order at 5, docket no. 476; January 21, 2015 TRO at 7 ¶ 23, docket no. 505.

**Withdrawal of Counsel for Derma Pen**

On December 23, 2014, after entry of the TRO, the Court granted the pending motions to withdraw filed by Derma Pen's counsel.[236]  In granting those motions to withdraw, the Court required Derma Pen to appear through counsel "[o]n or before January 5, 2015, at 3:00 p.m." and warned that Derma Pen's failure "to file a Notice of Substitution of Counsel or Notice of Appearance as set forth above, may . . . subject [it] to sanction pursuant to Federal Rule of Civil Procedure 16(f)(1), including but not limited to dismissal or default judgment."[237]

On January 5, 2015, at 4:38 p.m. Walker and Reid W. Lambert of Woodbury & Kesler filed a Notice of Limited Appearance.[238]  According to that notice, "[t]he scope of Woodbury & Kesler's appearance is limited to [the January 6, 2015] hearing.  Derma Pen, LLC remains responsible for all matters not specifically described in this notice."[239] No general appearance followed.

On January 7, 2015, the Court entered the Order to Show Cause and Warning, which warned Derma Pen that "it has failed to comply with the Orders and with the local rules of this court.  Derma Pen's default and an order striking claims may be entered if this failure is not immediately cured."[240]

---

[235] *See* December 23, 2014 TRO at 6 ¶ 3, docket no. 451; *see also* January 6, 2015 Preliminary Injunction Order at 5, docket no. 476; January 21, 2015 TRO at 7 ¶ 23, docket no. 505.

[236] Order on Motion for Withdrawal of Counsel (Nicholas L. Vescovo), docket no. 453, entered December 23, 2014; Order on Motion for Withdrawal of Counsel (Maia T. Woodhouse), docket no. 454, entered December 23, 2014; Order on Motion for Withdrawal of Counsel (Samuel F. Miller), docket no. 455, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Peter Donaldson), docket no. 456, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Ryan Pahnke), docket no. 457, entered December 23, 2014; Order Granting Motion to Withdraw as Counsel (Mark Gibb), docket no. 458, entered December 23, 2014 (collectively, the "Withdrawal Orders").

[237] *See id.*

[238] Docket no. 467, filed January 5, 2015.

[239] *See id.* at 1-2.

[240] Docket no. 470 at 3, entered January 7, 2015.

**The Specific Performance Defenses Order**

On December 30, 2014, the Court granted Defendants' Motion for Partial Summary Judgment on Plaintiff's Defenses to Specific Performance[241] through the Court's Specific Performance Defenses Order.[242]  In the Specific Performance Defenses Order, the Court rejected all of Derma Pen's defenses to specific performance, including unclean hands, laches, waiver, equitable estoppel, failure to meet a necessary precondition, lack of standing, fraud or fraudulent inducement, lack of mutuality, nonrenewal of Sales Distribution Agreement, survival clause, and first material breach.[243]

**The Specific Performance Order**

On January 6, 2015, the Court granted 4EverYoung's Motion for Partial Summary Judgment on Specific Performance.[244]  That ruling was memorialized on January 12, 2015 in the Court's Memorandum Decision and Order Granting 4EverYoung's 241 Motion for Partial Summary Judgment on Specific Performance and Granting in Part Defendants' 141 Motion for Preliminary Injunction (the "Specific Performance Order" or "January 6, 2015 Preliminary Injunction Order").[245]

In the Specific Performance Order, the Court ruled as follows:

Summary judgment is granted on 4EverYoung's specific performance claim as there remain no genuine issues as to any material fact regarding Derma Pen's obligation, pursuant to Sections 12.2 and 14.5 of the Sales Distribution Agreement, to offer the Trademark and Domain Name.  As discussed in the Specific Performance Defenses Order, it is clear from the undisputed facts that Derma Pen terminated the Sales Distribution Agreement.  The language of Sections 12.2 and 14.6 of that Sale Distribution Agreement makes it clear that

---

[241] Docket no. 240, filed July 3, 2014.

[242] Docket no. 465, entered December 30, 2014.

[243] *See generally* Specific Performance Defenses Order, docket no. 465.

[244] Defendants' Motion for Partial Summary Judgment on Specific Performance and Memorandum in Support, docket no. 241, dated July 3, 2014; *see also* Specific Performance Order, docket no. 476, entered January 12, 2015.

[245] Specific Performance Order, docket no. 476.

Derma Pen had the obligation to offer the Trademark and Domain Name to 4EverYoung for purchase and each party was required to appoint an independent auditor.  The record is clear that Derma Pen did not make an offer and did not timely appoint an auditor to value the Trademark and Domain Name.  Sections 12.2 and 14.6 also contain the implied obligation that Derma Pen cooperate with the auditor appointed by 4EverYoung.  That, on the undisputed facts, was not done.  In fact, Derma Pen repudiated the process by filing this suit and including a claim for a declaration that it had no obligations under Sections 12.2 and 14.6.

. . . .

Specific performance of Sections 12.2 and 14.6 is not a single event, but a process, due to the stages of activity outlined in each section. The Specific Performance Defenses Order outlined, in construing the sections, the process to follow.  The specific performance process in its various phases will be supervised by this Court. . . .

. . . .

. . . The Sales Distribution Agreement states "that the value will be determined by the courts of the land that is governing this contract."  Section 17.7 (Governing Law) of the Sales Distribution Agreement contemplates the United Kingdom as the land governing that contract.  These provisions have been at issue many times in the case.

As trial on important issues approached in August 2014 an order declaring choice of law for the proceeding stated that Utah law will govern the breach of contract claims and fraudulent inducement claims.  Thus, Utah is "the land that is governing [the Sales Distribution Agreement]," and this Court is the "court[] of the land that is governing this contract."  For that reason, valuation is proper here under Section 17.7.

. . . .

There are other reasons that the valuation should occur in this court.  Derma Pen filed bankruptcy to stop this case.  The bankruptcy court dismissed Derma Pen's filings with a declaration that Derma Pen was not acting in good faith:

The bankruptcy filing is an improper attempt by the Debtor to re-start the contract and trademark battle with the Movants in a new court.  Rather than filing to assuage operational difficulties and financial stress caused by the trademark dispute, Derma Pen's petition is an attempt to disrupt the litigation process. The Debtor has failed to meet its burden that its chapter 11 petition was filed in good faith.

Derma Pen's change of heart on venue—from filing in this court, to repudiating this court—and bankruptcy filing, followed by transfer of the assets at issue evidences Derma Pen's determination to frustrate 4EverYoung's rights of purchase.  Requiring valuation to occur in the United Kingdom, which has been shown to be so difficult and expensive that the parties decided to return to this venue, would aid Derma Pen's strategy.  Derma Pen raised a textbook litany of defenses to the specific performance claim as well as unreasonable construction of the provisions of Sections 12.2 and 14.6.  These were all rejected by the

Specific Performance Defenses Order.  Derma Pen's insistence on valuation in the United Kingdom, when it has repudiated the entire offer process and taken no steps toward that valuation, is merely obstructive.[246]

### The January 6, 2015 Preliminary Injunction

In the hearing on January 6, 2015, Derma Pen consented to continuation of the December 23, 2014 TRO as a preliminary injunction (the "January 6, 2015 Preliminary Injunction"), and the Court issued a written preliminary injunction order on January 12, 2015 (the "January 6, 2015 Preliminary Injunction Order").[247]

In the January 6, 2015 Preliminary Injunction Order, the Court explained that the December 23, 2014 TRO included language similar to Rule 65(d)(2)(C), "reciting that the temporary restraining order binds 'persons who are in active concert or participation with' Derma Pen, which includes Anderer."[248]

On or before January 8, 2014, Anderer, through his counsel, received notice of the January 6, 2015 Preliminary Injunction.[249]  Anderer also likely learned of the January 6, 2015 Preliminary Injunction during his holiday party in early January 2015, which was attended by "Derma Pen people, Derma Gen people," Jones, Morgan, and at least one of Anderer's attorneys, among others.[250]

---

[246] Specific Performance Order at 7-10, 12-13 (footnotes omitted), docket no. 476.

[247] January 6, 2015 Preliminary Injunction Order, docket no. 476, entered January 12, 2015; *see also* January 21, 2015 TRO at 7 ¶ 24, docket no. 505.

[248] January 6, 2015 Preliminary Injunction Order at 4-5, docket no. 476; *see also* January 21, 2015 TRO at 8 ¶ 25, docket no. 505.

[249] *See* E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 8, 2015, docket no. 481 at 32; *see also* Letter D. Scofield to Hon. Faust, dated January 8, 2015, docket no. 481 at 17-18; E-Mail C. Von Maack to Hon. Faust and Counsel, dated January 12, 2015, docket no. 481 at 35; E-Mail C. Von Maack to Counsel, dated January 12, 2015, docket no. 481 at 38; E-Mail D. Scofield to C. Von Maack, dated January 12, 2015, docket no. 481 at 40; E-Mail T. Dance to C. Von Maack, dated January 12, 2015, docket no. 481 at 44.

[250] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 198:5-199:4, docket no. 597.

**The January 9, 2015 UCC Filing**

On January 9, 2015, Anderer (through counsel, Snell & Wilmer) filed a UCC Financing Statement in Delaware.[251]  That UCC filing expressly covered the Trademark and Domain Name.[252]

**The Notice of UCC Sale**

On January 9, 2015, Anderer (through counsel, Snell & Wilmer) issued a notice of public sale of Derma Pen and its assets, including the Trademark.[253]  According to the Notice of Sale, the sale was to take place on January 22, 2015, at 8:00 a.m., at the Salt Lake City office of Snell & Wilmer.[254]

**The Writ of Execution**

On January 12, 2015, Anderer (through counsel, David Scofield) filed an Application for Writ of Execution.[255]  The Application for Writ of Execution sought to execute upon the Trademark and Domain Name.[256]

On January 13, 2015, the State Court issued Anderer's proposed Writ of Execution in the Confession of Judgment Action.[257]  That same day, Anderer (through counsel, David Scofield) executed a Praecipe directing the Sheriff or any constable "to levy upon, attach and hold" Derma Pen's assets, including the Trademark and Domain Name.[258]

---

[251] *See* Delaware UCC Financing Statement, dated January 9, 2015, Ex. 18.

[252] *See id.*

[253] *See* Notice of Public Disposition of Collateral (the "Notice of Sale"), dated January 9, 2015, Ex. 31.

[254] *See* Notice of Sale at 1, Ex. 31.

[255] *See* Application for Writ of Execution, Ex. 32.

[256] *See id.* at 19.

[257] *See* Writ of Execution, Ex. 33.

[258] *See* Praecipe, dated January 13, 2015, Ex. 139.

On January 14, 2015, Anderer (through the Salt Lake County Constable) served upon Derma Pen the Writ of Execution and Praecipe.[259]  That same date, Derma Pen executed a Keeper's Receipt.[260]

On or about January 16, 2015, Anderer (through the Salt Lake County Constable) issued a Notice of Constable Sale.[261]  According to that notice, the Trademark and Domain Name were to be sold on January 30, 2015 at 2:00 p.m. at the Derma Pen offices at 3216 South Highland Drive, Suite 200, Salt Lake City, Utah 84106.[262]

4EverYoung filed a reply (Reply) to the Writ of Execution[263] and according to counsel for Derma Pen, a hearing has been set on the subject on March 4, 2015.[264]  The Reply does not mention the Utah Fraudulent Transfer Act.

### Adding Anderer as a Party

4EverYoung's Motion to add Anderer as a party in this case was filed January 12, 2015,[265] and taken under advisement the next day.[266] Any response was required by January 20, 2015.[267]

On January 21, 2015, 4EverYoung filed a third-party complaint against Anderer and others.[268]

---

[259] *See* Proof of Service, dated January 14, 2015, Ex. 142.

[260] *See* Keeper's Receipt, dated January 14, 2015, Ex. 140.

[261] *See* Notice of Constable Sale, dated January 16, 2015, Ex. 141.

[262] *See id.*

[263] Reply to Writ and Request for Hearing, dated January 26, 2015, in Confession of Judgment Action, docket no. 576, Exhibit 2.

[264] Notice of Hearing, docket no. 615, filed February 23, 2015; February ___, 2015 Preliminary Injunction Hearing Transcript ___;___, docket no. ___, filed _____

[265] Docket no. 475, filed January 19, 2015.

[266] Docket Text Order, docket no. 477, filed on January 20, 2015.

[267] *Id.*

A few hours later, 4EverYoung also filed an *ex parte* motion to effect service on Anderer by serving Anderer's counsel, who previously had only entered a special, limited appearance in the case in connection with the OSC hearing, and who appeared on the form which had given notice of public sale, as well as Anderer's counsel in the Confession of Judgment Action.[269]  An order granting the motion for alternative service was promptly filed.[270]

## The January 21, 2015 TRO

4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer[271] was filed and granted in part on the evening of January 21, 2015.[272]  The TRO was intended to stop the January 22, 2015, 9:00 a. m. public sale for which notice was given January 9, 2015. The January 21, 2015 TRO contained preliminary findings:

> 27.     4EverYoung is likely to suffer irreparable injury in the absence of preliminary injunctive relief by reason of transfer of the Trademark and Domain Name, and defeat of its contractual rights, and the harm it faces outweighs the harm faced by Anderer from the issuance of an injunction which is measurable by monetary damages.  The facts are established by an uncontested record that the sale is set to occur less than 12 hours from now, without any intervening business hours.

> 28.     The public interest favors this restraining order to uphold contractual rights, prevent transfer of assets outside the control of parties subject to orders of the court, and ensure orderly resolution of disputes.

> 29.     4EverYoung is at this stage shown to be likely to prevail on the merits of its claim for fraudulent transfer.

> 30.     Under Utah Code Ann. § 25-6-5(1)(a), a transfer is fraudulent if

---

[268] Second Amended Counterclai, Third-Party Complaint, and Demand for Jury Trial, docket no. 492, filed January 21, 2015.

[269] Docket no. 501, filed January 21, 2015.

[270] Docket no. 503, filed January 21, 2015.

[271] Docket no. 504, filed January 21, 2015.

[272] Order Granting 4EverYoung's Motion for Temporary Restraining Order Against Michael E. Anderer, docket no. 505, filed January 21, 2015.

(1) the creditor has a claim that arose either before or after the transfer was made or the obligation was incurred; and

(2) the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.

31.     The facts recited show the actual intentions of the control group including Anderer to hinder, delay and obstruct 4EverYoung's claims.

32. Under Utah Code Ann. 25-6-6(2), a transfer is fraudulent where:

(1) the creditor has a claim that arose before the transfer was made or the obligation was incurred;

(2) the transfer was made to an insider for an antecedent debt;

(3) the debtor was insolvent at the time;

(4) the insider had reasonable cause to believe that the debtor was insolvent.

33.     4EverYoung's claim arose before Derma Pen transferred the trademark and domain name to Anderer.

34.     Anderer is an insider.

35.     The antecedent debts are the 2012 and 2014 Notes and Security Agreements.

36.     Anderer had reasonable cause to believe that Derma Pen was insolvent. The statements in a paper filed by Derma Pen and by Derma Pen's counsel in court that Derma Pen has a verbal license from Anderer to use the Trademark show the transfer is likely illusory.

38.     Derma Pen and Anderer stated in court that the Public Sale will convey title to the Trademark, Domain Name and other property subject of the sale and that there is no effect on that sale by reason of the levy of execution in the Confession of Judgment Action.

39.     This Temporary Restraining Order is issued without notice because there are no working hours before the time set for the public sale and for the reasons stated in 4EverYoung's Emergency Ex Parte Motion for Alternative Service and the Declaration of Christine T. Greenwood in support of that motion.[273]

---

[273] January 21, 2015 TRO at 8-10 ¶¶ 27-39 (footnotes omitted), docket no. 505.

The Anderer TRO did not prohibit Anderer from selling the Trademark and Domain Name to 4EverYoung.  Accordingly, though Anderer's counsel appeared at the sale on January 22, 2015 4EverYoung did not attend, did not post a deposit as required in the Notice of Sale, did not demonstrate its ability to pay, and did not bid.

## DISCUSSION

### Standard Applicable to Motion for Preliminary Injunction

In order to obtain a preliminary injunction, movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest .[274] "[W]here the moving party has established that the three 'harm' factors tip decidedly in its favor, the 'probability of success' requirement is relaxed.' In such cases, '[t]he movant need only show questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'"[275]

### Irreparable Harm

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"[276] "[T]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."[277] "It is also well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."[278]

---

[274] *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

[275] *Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 653 (10th Cir. 2004) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)) (internal citations omitted).

[276] *Heideman*, 348 F.3d at 1189 (quoting *Wisconsin Gas Co. v. GERC*, 758 F.2d 669, 675 (D.C. Cir. 1985)).

[277] *Id.*

[278] *Id.*

4EverYoung has presented clear and convincing evidence that it faces an irreparable loss if sale under the 2014 SA and DIP Lienn occurs. 4EverYoung has shown that Anderer would likely proceed with the sale if not enjoined.  Anderer would be able to credit bid the entire balance he is owed, which his attorneys claim is approaching $2 million.  4EverYoung's ability to receive its contracted right to purchase the Trademark and Domain Name would be frustrated.

Separate valuation proceedings are underway in this case to determine the price 4EverYoung must pay Derma Pen for the Trademark and Domain Name. This is not inconsistent with 4EverYoung's assertion that they are unique assets, the loss of which would be irreparable. The Sales Distribution Agreement gave 4EverYoung the right to purchase these valuable assets, and gave Derma Pen the right to receive their value.  The Sales Distribution Agreement provided specific property for money.

The circumstances of these parties need stabilization.  After the bankruptcy dismissal, Derma Pen was first approached about a Confession of Judgment.[279]  Then, almost immediately, a Trademark Assignment[280] was presented.  Early on Derma Pen asserted that Derma Pen still had use of the Trademark by a verbal license in spite of the Trademark Assignment.[281]  Derma Pen and Anderer then claimed this Trademark Assignment was not what it appears to be on its face, but was only a possessory transfer.  Then a Notice of Public Sale[282] was given, and an Application for a Writ of Execution[283] was filed, both seeking sales of the same property by different methods.  The last two months have been a fast paced scramble as the means of

---

[279] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[280] Ex. 27.

[281] Response to Sua Sponte Order to Show Cause and Warning, docket no. 488, filed January 20, 2015; Transcript January 21, 2015, at 23:10-12. This is consistent with a statement made in Bankruptcy Court by Mr. Morgan about "'oral understandings' between Derma Pen and Medmetics that grant Medmetics a 'right to use' the U.S. Trademark." Ex. 125 at 10.

[282] Ex. 31

[283] Ex. 32.

effecting a transfer evolve.  Stability can be achieved by stanching the evolution of innovative transfer means, and avoiding a loss of control of the Trademark and Domain Name.

### Balance of Harms

Anderer claims to be a secured creditor with a set amount owing on Notes.  He bargained for recovery of a specific sum of money, with interest, and legal fees.  By contrast, 4EverYoung contracted for purchase of the specific Trademark and Domain Name.  Despite arguments that 4EverYoung has a damages remedy if specific performance is frustrated, the contractual object was the Trademark and Domain Name, not a compensating sum of money.  The difference between Anderer and 4EverYoung shows that the balance of harm from the loss of the Trademark and Domain Name would fall more heavily on 4EverYoung.

### Public Interest

The public has an interest in soundness of secured transactions and also has an interest in having parties comply with agreements that were freely negotiated, such as 4EverYoung's right to purchase.  Public interest favors avoidance of transfers that hinder, delay or defraud creditors. There is no issue of deception to the public since the Trademark and Domain Name are used by both parties with respect to the same product.  The public interest slightly favors 4EverYoung.

### Likelihood of Success on UFTA Claims

4EverYoung contends that certain transfers made by Derma Pen to Anderer were fraudulent pursuant to either Utah Code Ann. §§ 25-6-5(1)(a) or 25-6-6(2) of the Utah Uniform Fraudulent Transfer Act ("UFTA").[284] 4EverYoung's likelihood of success depends on these claims.

---

[284] The Memorandum Decision of February 16, 2015 [Dkt. 589] concluded that 4EverYoung had standing to assert a claim under the UFTA.

To establish a fraudulent transfer claim under Utah Code Ann. § 25-6-5(1)(a), referred to as the "actual fraud" section, 4EverYoung must establish: (i) that it has a claim that arose either before or after the transfer was made or the obligation was incurred, and that (ii) the transfer was made with actual intent to hinder, delay, or defraud any creditor of the debtor.[285] Section 25-6-5 enumerates factors which may be considered, among others, to determine if "actual intent" existed. These include whether:

> (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."[286]

These factors are termed "badges of fraud."[287] "The badges' value as evidence, however, is relative not absolute, and they are considered facts which throw suspicion on a transaction and which call for an explanation."[288] "In other words, '[t]hey are not usually conclusive proof; they are open to explanation.'"[289]  And they are not exclusive, as the statute states.

To establish a fraudulent transfer claim under Utah Code Ann. § 25-6-6(2), referred to as the "constructive  fraud" section, 4EverYoung must establish that: (i) it claim arose before the transfer; (ii) the transfer was made to an insider, (iii) for an antecedent debt; (iii) the debtor was

---

[285] Utah Code Ann. § 25-6-5(1)(a).

[286] Utah Code Ann. § 25-6-5(2).

[287] *Tolle v. Fenley*, 2006 UT App 78, ¶ 27, 132 P.3d 63 (quoting *Dahnken, Inc. v. Wilmarth,* 726 P.2d 420, 423 (Utah 1986)).

[288] *Wasatch Oil & Gas, L.L.C. v. Reott*, 2007 UT App 223, ¶ 33, 163 P.3d 713 (internal quotation marks and citation omitted).

[289] *Id.* (quoting *Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 (Utah Ct. App. 1989)).

insolvent at the time; and (iv) the insider had reasonable cause to believe that the debtor was insolvent.[290]

4EverYoung alleges that the following transfers were fraudulent under §§ -5(1)(a) or -6(2): (i) the 2012 Security Agreement and the 2013 UCC-1 financing statement ("2012 Documents");[291] (ii) the 2014 Security Agreement and the 2015 UCC-1 financing statement ("2014 Documents") ;[292] (iii) the Confession of Judgment and the Trademark Assignment.[293] Each of these alleged transfers will be discussed below.

## 2012 Documents

There is no need to analyze the 2012 Documents because "obligations under the 2012 Note . . . were rolled into the amount of the 2014 Note."[294] Anderer agreed at argument that his current efforts to foreclose on the assets of Derma Pen are not in collection of amounts owing under Note 1.[295]

## 2014 Documents

### (1)     Utah Code Ann. § 25-6-5(1)(a)

The granting of a security interest by Derma Pen to Anderer was a transfer. The UFTA defines transfer as "every mode, direct or indirect, absolute or condition, or voluntary or involuntary, of disposing of or parting with an Asset, or an interest in an Asset, and includes . . . creation of lien or other encumbrance."[296]  At the time of the transfer, 4EverYoung was a

---

[290] Utah Code Ann. § 25-6-6(2).

[291] Third Amended Counterclaim at 46, ¶ 165.

[292] *Id.* at 46, ¶ 166.

[293] *Id.* at 47, ¶ 167.

[294] Exs. 147 and 149. Anderer's FFCC at 51, ¶75.

[295] February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[296] Utah Code Ann. § 25-6-2(12).

creditor[297] and Derma Pen was a debtor.[298] The timing of the transfer is of no importance in this UFTA section. The remaining issue is whether Derma Pen made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.  Derma Pen's intent is established through the presence of several badges of fraud. In addition to the badges of fraud, the statute authorizes the court to consider other facts that may guide the court's conclusion. It is undisputed that Anderer is an insider.[299] Derma Pen has maintained control of the Domain Name and Trademark at all times, even after the Trademark Assignment and Confession of Judgment.[300] The transfer was not made known by concurrent filing of UCC-1 financing statement and 4EverYoung was not aware of the transfer until Derma Pen filed for Bankruptcy.[301] This litigation was pending at the time of the transfer.[302] The 2014 Security Agreement was of substantially all of Derma Pen's assets.[303] Derma Pen became insolvent shortly after the transfer was made.[304] First, Derma Pen declared itself insolvent by its bankruptcy filing, and second, Derma Pen was presumed insolvent because it was unable to pay its attorneys' fees as they became due and had to borrow money to make payments.[305]

The 2014 Documents were executed in contemplation of impending trial in this case. They were also executed in very close proximity to Derma Pen's bankruptcy filing which was

---

[297] 4EverYoung's status as a creditor with a claim was established in the Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[298] *Id.*

[299] Utah Code Ann. § 25-6-5(2)(a).

[300] *Id.* § 25-6-5(2)(b).

[301] *Id.* § 25-6-5(2)(c).

[302] *Id.* § 25-6-5(2)(d).

[303] Ex. 106, exhibit A (Collateral: Those certain items of personal property and intellectual property rights owned by the Grantor including any and all inventory, together with all accessions, replacements, additions, or proceeds therefrom, whether now owned or hereafter acquired, and all of the Grantor's trademarks, tradenames, patent rights, and domain names, including but not limited to "DERMAPEN," the "Dermapen 'D' logo," and "dermapen.com".).

[304] *Id.* § 25-6-5(2)(i).

[305] *Id.* § 25-6-3(2).

dismissed as not filed in good faith, but as a strategic move to avoid consequences in this court.[306] In viewing all of the circumstances and badges of fraud surrounding the 2014 Documents, 4EverYoung is likely to establish by clear and convincing evidence Derma Pen's intent to defraud 4EverYoung.

*Defenses*

After 4EverYoung shows likelihood of success, the burden shifts to Anderer, the transferee, to come forward with rebuttable evidence that he took in good faith and for a reasonably equivalent value.[307] Section 25-6-9(1) of the UFTA states the defense of a good faith purchase for value: "A transfer or obligation is not voidable under Subsection 25-6-5(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."[308] Anderer has failed to show a good faith purchase to rebut the presumption of fraud.

"Good faith embodies the concept that one is free 'from knowledge of circumstances which ought to put the holder on inquiry.'"[309] It is an objective standard.[310] Anderer is not simply a third-party lender to Derma Pen. He is an insider and part owner of Derma Pen, and was aware of the present litigation, which involved, among other things, Derma Pen's post-termination obligation to offer for sale the Trademark and Domain Name to 4EverYoung, the

---

[306] Memorandum at 17–18, Ex. 125.

[307] *See* Utah Code Ann. § 25-6-9(1). *See also Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 n. 18 (Utah Ct.App.1989); *see e.g., In re M & L Bus. Mach. Co., Inc.,* 84 F.3d 1330, 1338 (10th Cir.1996) (stating that transferee has the burden of establishing good faith under § 548(c) of the Bankruptcy Code, a section similar to that of the UFTA); *Aptix Corp. v. Quickturn Design Systems Inc.,* 148 Fed. Appx. 925, 930 (Fed. Cir.2005) (stating that statute requires the transferee present evidence of transferee's good faith).

[308] Utah Code Ann. § 25-6-9.

[309] *S.E.C. v. Madison Real Estate Group, LLC,* 657 F.Supp.2d 1271 (D. Utah 2009) (quoting *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.),* 84 F.3d 1330, 1335 (10th Cir.1996)).

[310] *In re Lockwood Auto Group, Inc.,* 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010) ("First, good faith is determined according to an objective or 'reasonable person' standard, and not based on subjective knowledge or belief of the transferee. Courts thus look to what the transferee objectively knew or should have known concerning the nature of the underlying circumstances involved with the transfer.").

same two assets that were secured as collateral in the 2014 Security Agreement. Many of the same facts that tend to establish 4EverYoung's claim rebut the assertion of good faith. The borrowed funds for 2014 did not go toward operating funds for the business, but to pay legal fees for this litigation. The borrowed funds were very close in time to a jury trial setting in the present litigation and to the bankruptcy filing. Although the value of the Trademark and Domain Name is yet to be determined, Derma Pen has consistently claimed that the value of the Trademark alone is worth over $5 million dollars. Therefore, viewed from Derma Pen's point of view, there is a large disparity between the total secured debt and the value of the collateral. The 2014 Documents can be seen as an effort to take those assets out of reach of 4EverYoung by the imposition of a sizeable encumbrance.

Good faith must pertain specifically to the taking of a security interest.  In *Aptix Corp. v. Quickturn Design Systems, Inc.*,[311] the Federal Circuit carefully distinguished between business needs of the debtor, Aptix; the lending and borrowing motivations of both parties; and the good faith of the creditor, Mohsen, in taking a security interest:

> Here, Mohsen attempts to rebut the presumption of fraudulent intent by focusing on the reason that Aptix needed to borrow money from Mohsen, i.e. it could not obtain funding elsewhere, and its ultimate use of the money, i.e. to pay employees and other creditors. Although Mohsen's argument may explain why Aptix entered into the loan arrangement with Mohsen, it does not explain why it was necessary for Aptix to grant Mohsen a security interest in substantially all of its assets when Mohsen had never required such an interest for his past loans.[312]

Similarly here, Anderer advanced all the funds under Note 1 in 2011 well before there was any documentation of the loan or security interest on that loan. Filing of a financing statement was delayed a year. Then, on Note 2, there was no documentation at all. Note 3 was documented while advances made in the heat of this litigation, to lawyers in this litigation, who would have

---

[311] 148 Fed. Appx. at 929.

[312] *Id.*

had unsecured claims in the bankruptcy, on the eve of bankruptcy filing. Anderer never testified as to needing security, but said he left documentation to his lawyers, and said that he always expected to be paid out of the business operations. He said he never thought he would need to foreclose.

(2)   Utah Code Ann. § 25-6-6(2)

The 2014 Documents were not transferred to Anderer, an insider, for an *antecedent* debt. The 2014 security interest was granted to Anderer for "contemporaneous new value" that Anderer provided to Derma Pen by payment of Derma Pen's legal fees.  Because the antecedent debt element of § 25-6-6(2) is not satisfied, 4EverYoung's fraudulent transfer claim on the 2014 Documents pursuant to § 25-6-6(2) cannot succeed.

**Confession of Judgment and the Trademark Assignment**

(3)   Utah Code Ann. § 25-6-5(1)(a)

The Confession of Judgment and Trademark Assignment fall under the broad definition of transfer.[313] At the time of the transfers, 4EverYoung was a creditor and Derma Pen was a debtor.[314] The timing of the transfers is of no importance in this UFTA section. Derma Pen's actual intent to hinder, delay, or defraud 4EverYoung is likely to be established through the presence of the following badges of fraud: Anderer was still an insider due to his part ownership interest of Derma Pen.[315] After the transfer, Derma Pen originally argued that it no longer owns

---

[313] *See e.g.,* Posner v. S. Paul Posner 1976 Irrevocable Family Trust, 2004 WL 2473984 (N.Y.A.D. 1 Dept.) (A family trust's confession of judgment in a purported lender's favor was not given and taken in good faith, and thus was invalid and had to be set aside as a fraudulent transfer, even if the confession of judgment was a fair equivalent for the purported lender's alleged outstanding loans to the trust); In re XYZ Options, Inc., 154 F3d 1262 (11th Cir. 1998) (court could examine a consent judgment to determine whether or not it constituted a fraudulent transfer); Generic Farms v. Stensland, 518 N.W.2d 800, 802 (Iowa Ct. App. 1994) ("The trial court determined the assignment of the Land O'Lakes seed corn contracts by Stensland to Knecht as a result of the trademark assignment was a fraudulent conveyance.").

[314] Memorandum Decision and Order Denying [581] oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[315] Utah Code Ann. § 25-6-5(2)(a).

the assets, only a license to use the assets. Derma Pen now maintains that it owns and controls all of its assets, and that Anderer simply has possession.[316] The transfers were not made known to 4EverYoung until after the transfers.[317] Derma Pen's own attorneys were not aware of the transfers. The Bankruptcy stay in this litigation had lifted only a few days before the transfers occurred, and notice of a status conference in this litigation had issued at the time of the transfers.[318] The bankruptcy court concluded that Derma Pen had filed bankruptcy as a litigation avoidance tactic and the bankruptcy was not filed in good faith.[319] The transfers included Derma Pen's most valuable assets.[320] Derma Pen was insolvent at the time the transfers were made.[321] First, Derma Pen declared itself insolvent by its bankruptcy filing, and second, Derma Pen was presumed insolvent because it was unable to pay its attorneys' fees as they became due and had to borrow money to make payments.[322] And the Confession of Judgment was executed because Derma Pen's management felt it had no defense to Anderer's claims.[323] The above badges of fraud show 4EverYoung is likely to establish, by clear and convincing evidence, Derma Pen's intent to hinder, delay and defraud 4EverYoung.

---

[316] *Id.* § 25-6-5(2)(b).

[317] *Id.* § 25-6-5(2)(c).

[318] *Id.* § 25-6-5(2)(d).

[319] Memorandum at 17–18, Ex. 125.

[320] Ex. 106, Exhibit A (Collateral: Those certain items of personal property and intellectual property rights owned by the Grantor including any and all inventory, together with all accessions, replacements, additions, or proceeds therefrom, whether now owned or hereafter acquired, and all of the Grantor's trademarks, tradenames, patent rights, and domain names, including but not limited to "DERMAPEN," the "Dermapen 'D' logo," and "dermapen.com".).

[321] *Id.* § 25-6-5(2)(i).

[322] *Id.* § 25-6-3(2).

[323] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 221:6-9, docket no. 597.

*Defenses*

Anderer has failed to meet his burden of proving his good faith in these transfers for the same reasons outlined above.[324] Additional factors strongly suggest the lack of Anderer's good faith. Saunders, on behalf of Anderer (both with the full knowledge of this pending litigation) asked Jones to confess judgment on behalf of Derma Pen the very day that the bankruptcy case was dismissed.[325] Similarly, the following day, Saunders asked Jones to execute the Trademark Assignment—the trademark that has been at issue in this case for over one year.[326] Neither Anderer nor Derma Pen notified 4EverYoung of Anderer's demand, nor gave 4EverYoung an opportunity to pay off Anderer's debt.

(4)     Utah Code Ann. § 25-6-6(2)

Both of these transfers fall under the broad transfer definition.[327] 4EverYoung's claim had arisen before the transfers were made—during this pending litigation. Anderer, was at the time of the transfers, an insider. The transfers were made pursuant to Derma Pen's antecedent debt from the 2014 Documents and the DIP lien. Derma Pen was insolvent at the time the transfers were made.[328] First, Derma Pen declared itself insolvent by its bankruptcy filing, also Derma Pen was presumed insolvent because, by that time, it was not paying its attorneys' fees as they became due.[329] As an insider and part owner of Derma Pen, Anderer had at the time of the transfers reason to know of Derma Pen's finances as he was the one funding Derma Pen's present litigation and was aware of the substantial amount of legal fees that Derma Pen owed its

---

[324] Utah Code Ann. § 25-6-9(1).

[325] *See* February 12, 2015 Preliminary Injunction Hearing Transcript at 202:3-206:19, 220:24-221:3, docket no. 597.

[326] *See* E-Mail Saunders to Jones, dated December 19, 2014 (6:46 p.m.), Ex. 128; *see also* February 12, 2015 Preliminary Injunction Hearing Transcript at 212:7-213:12, docket no. 597.

[327] Utah Code Ann. § 25-6-2(12).

[328] *Id.* § 25-6-5(2)(i).

[329] *Id.* § 25-6-3(2).

attorneys. 4EverYoung is likely to prevail in establishing constructive fraud under § 25-6-6(2) by clear and convincing evidence.

*Defenses*

Anderer argues that even if there is a finding of constructive fraud, "[a] transfer is not voidable under Subsection 25-6-6(2): . . . (c) if made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.[330] This defense is not applicable to the Confession of Judgment and Trademark Assignment transfers because neither transfer was to rehabilitate the debtor. They occurred after the bankruptcy dismissal.

Anderer also argues as a defense that the "transfer is not voidable under . . . Section 25-6-6 if the transfer results from: . . . (b) enforcement of a security interest in compliance with Title 70A, Chapter 9a, Uniform Commercial Code – Secured Transactions."[331] As previously ruled, Anderer is not absolutely insulated from a fraudulent transfer attack simply because he holds a security interest.[332] If Anderer's rationale were true, then any fraudulent transfer of a security interest would be insulated.[333] 4EverYoung has the right to attempt to show that Anderer's security interests and other documents may be part of the alleged fraudulent transfer of assets. If 4EverYoung ultimately prevails at trial on the merits of its UFTA claim(s), then Anderer's security interest, and therefore his valid liens, would be voidable just as any other transfer under

---

[330] This section "reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort to save the debtor from a forced liquidation in bankruptcy or otherwise." Uniform Fraudulent Transfer Act § 8, cmt. 6. Relevant considerations in determining whether the transfer was in good faith under this section include (i) the amount of the present value given, (ii) the size of the antecedent debt secured, and (iii) the likelihood of success for the rehabilitative effort. *Id.; Prairie Lakes Health Care Sys., Inc. v. Wookey*, 1998 S.D. 99, ¶ 26, 583 N.W.2d 405, 417 (determining that rehabilitation defense was inapplicable because transfer was "obviously not made to rehabilitate" but instead to "dispose of [defendants'] entire real estate holdings and thus end their ownership of the farming business").

[331] Utah Code Ann. § 25-6-9(5).

[332] *See* Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief at 9, docket no. 589, filed February 16, 2015.

[333] *Id.*

the UFTA,[334] and his security interest defense would not support the Confession of Judgment and Trademark Assignment transfers.

**Debtor-In-Possession Financing Lien**

4EverYoung's Third-Amended Counterclaim does not identify nor specifically seek to avoid the DIP Lien.[335] At the time 4EverYoung filed the Third Amended Counterclaim, it was aware of the DIP Lien, as it had objected to the lien on several occasions during the Bankruptcy Case.[336] But the Third Amended Counterclaim states no claim against the DIP Lien. Similarly, the draft findings and conclusions submitted by 4EverYoung make no reference to invalidation of the DIP Lien. Whether the DIP Lien is analyzed under § 25-6-5(1)(a) or § 25-6-6(2), the supervision of that financing by the bankruptcy court suggest that evidence could not be clear and convincing that the DIP lien was a fraudulent transfer.

**Summary**

4EverYoung is likely to succeed on its claim that the 2014 Documents, Confession of Judgment and Trademark Assignment were made with the intent to hinder, delay or defraud, and are fraudulent transfers. Anderer is not likely to succeed in proving any defense.

**Other Issues Related to Likelihood of Success**

**Party Status and Service**

Anderer raises other issues, such as his party status, which was discussed in an order previously.[337] And contrary to his claims, service on him by alternative means was properly

---

[334] *Id.* at 12.

[335] Third Amended Counterclaim and Demand for Jury trial, docket no. 547, filed February 3, 2015.

[336] Exs. 117, 119, 121.

[337] *See* Memorandum Decision and Order Granting [569] *Nunc Pro Tunc* Motion, docket no. 588, filed February 16, 2015.

authorized because service was "impracticable under the circumstances."[338]  Further, he

generally appeared through counsel on January 26, 2015.[339]

**Narrow Issues under the UFTA**

Another prior order dealt with arguments under the Uniform Fraudulent Transfer Act.[340]

Anderer argued that as holder of a facially valid security interest, he had a "valid lien" and was

immune from UFTA claims, and that 4EverYoung was not a creditor with a claim. This

argument was resolved in a prior order.[341]

Derma Pen and Anderer also argued that the UFTA does not permit voiding of a

transfer.[342] This argument is unavailing.  Utah Courts have held that "transfers of property

designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the

creditors."[343] In *Tolle*, the trial court found that the transfer of the property at issue was

fraudulent and therefore void.[344] The Utah Court of Appeal held that the "trial court properly

voided the transfers."[345] Moreover, § 25-6-8(1)(c)(iii) of the UFTA stated that "a creditor . . .

may obtain . . . (iii) any other relief the circumstances may require."[346] Voiding a fraudulent

transfer is a relief that is contemplated in the broad language of § 25-6-8(1)(c)(iii).

---

[338] Utah R. Civ. P. 4(d)(4)(A).

[339] Notice of Appearance of Counsel (David E. Leta) docket no. 517, filed January 26, 2015; Notice of Appearance of Counsel (Michael A. Gehret) docket no. 518, filed January 26, 2015; Notice of Appearance of Counsel (Douglas P. Farr) docket no. 519, filed January 26, 2015.

[340] *See* Memorandum Decision and Order Denying [581] Oral Motion for Summary Relief, docket no. 589, filed February 16, 2015.

[341] *Id.*

[342] January 29, 2015 Preliminary Injunction Hearing Transcript at 68.

[343] *Tolle v. Fenley,* 2006 UT App 78, ¶ 13, 132 P.3d 63 (quoting *National Loan Investors, L.P. v. Givens,* 952 P.2d 1067, 1069 (Utah 1998)).

[344] *Id.* ¶ 9.

[345] *Id.* ¶ 30.

[346] Utah Code Ann. § 25-6-8(1)(c)(iii).

**4EverYoung's Claims Were Not Concluded in Derma Pen's Bankruptcy**

Anderer has also argued that 4EverYoung's claims were concluded in the Derma Pen

Bankruptcy.  Anderer argues that the Final Order . . . (I) Authorizing the Debtor to Use Cash

Collateral, (II) Granting Adequate Protection, and (III) Authorizing Post-Petition Financing[347]

finally and completely adjudicates the validity of his 2014 security interest and loan and the

Debtor in Possession financing. On the record in the February 4, 2015 hearing, the court ruled on

these assertions.[348] Anderer cites language about validity of the 2014 SA and Note 3 from a

stipulation to which 4EverYoung was not a party. 4EverYoung never had an opportunity to

present its current claims in Bankruptcy Court and never missed a deadline for such presentation.

The deadline was extended until a date that turned out to be after the bankruptcy dismissal, and

Anderer presented no authority that that date continued to have meaning.  The deadline was

related only to the bankruptcy proceedings and was not a statute of limitation. The bankruptcy

judge was repeatedly careful to note 4EverYoung's claim was specifically reserved. Anderer has

not pointed to an express waiver 4EverYoung made in the Bankruptcy Court.

**The Sales Distribution Agreement Does Not Call for a Transfer in Gross**

Anderer argues that the Sales Distribution provides for an ineffective transfer in gross of

the Trademark.  That is, he contends that the bare transfer of the Trademark is ineffective

because it is not accompanied by a transfer of the associated goodwill.  The Sales Distribution

Agreement neither requires Derma Pen to sell any of its goodwill, business assets or customer

lists to 4EverYoung, nor does it allow 4EverYoung to exercise any form of option or right of

first refusal to acquire those items, upon termination of the Sales Distribution Agreement.

"Courts have consistently held that a valid assignment of a trademark or service mark requires

---

[347] Ex. 123.

[348] Minute Order, docket no. 563, filed February 4, 2015.

the transfer of the goodwill associated with the mark."[349] "A trademark identifies the source and quality of the goods and services offered."[350]  "For a company to purchase the rights to a well-known trademark to use it in a manner which is wholly unrelated to the business or products which made the trademark famous would confuse or deceive the consumer."[351] "The purpose for requiring transfer of goodwill along with the transfer of the . . . [trademark] is to ensure that consumers receive accurate information about the product or service associated with the mark."[352]

"Consonant with this purpose, courts have recognized exceptions to the general rule that trademarks cannot be assigned without the goodwill of the accompanying business."[353] Such assignments are upheld "if . . . the assignee is producing a product or performing a service substantially similar to that of the assignor and that the consumers would not be deceived or harmed."[354]

---

[349] *Vittoria N. Am., L.L.C. v. Euro-Asia Imports Inc.*, 278 F.3d 1076, 1082 (10th Cir. 2001); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 956 (7th Cir.1992) ("[T]he transfer of a trademark apart from the goodwill of the business which it represents is an invalid 'naked' or 'in gross' assignment, which passes no rights to the assignee." (citation and quotations omitted)); *Berni v. Int'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir.1988) (same).

[350] *J. Atkins Holding Ltd. v. English Discounts, Inc.*, 729 F.Supp. 945 (1990).

[351] *Id.*

[352] *See e.g., Vittoria N. Am., L.L.C., 278 F.3d at 1083; Sugar Busters LLC v. Brennan,* 177 F.3d 258, 265 (5th Cir.1999) ("The purpose of the rule prohibiting the sale or assignment of a trademark in gross is to prevent a consumer from being misled or confused as to the source and nature of the goods or service that he or she acquires."); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1289 (9th Cir.1992) (same); *Patterson Labs., Inc. v. Roman Cleanser Co. (In re Roman Cleanser Co.),* 802 F.2d 207, 208–09 (6th Cir.1986) (same); *Marshak v. Green,* 746 F.2d 927, 929–930 (2d Cir.1984) ) (same).

[353] *Id.*

[354] *Marshak,* 746 F.2d at 930 (citations omitted); *see also Sugar Busters,* 177 F.3d at 266; *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.,* 759 F.2d 1053, 1059 (2d Cir.1985) ("[A] trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark." (citation omitted)); *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1376 (Fed.Cir.1982) ( "[T]ransfer of goodwill requires only that the services be sufficiently similar to prevent consumers of the service offered under the mark from being misled from established associations with the mark." (quotations omitted)).

4EverYoung's purchase of the Trademark falls within the exception to the general rule. Under the Sales Distribution Agreement, 4EverYoung granted Derma Pen the exclusive right to sell the Device and the related Tips in the USA and 4EverYoung also provided Derma Pen the Device and the Tips to market and sell.[355] While Derma Pen sold the Device in the USA, 4EverYoung sold the same Device outside of the USA. Under the circumstances of this case, 4EverYoung's purchase of the Trademark, without its associated goodwill, will not separate the trademark from the goods upon which its reputation is based.[356]  The Device that 4EverYoung is selling is not so different from what Derma Pen has been selling, since the inception of the Sales Distribution Agreement, to work a deception upon the public. Variations in type or quality of the product will not invalidate the purchase.[357] No evidence has been presented that 4EverYoung seeks to apply the trademark to an entirely different type of product. Accordingly, the Derma Pen Trademark may be validly purchased without being accompanied by the goodwill.

### Amount of Bond

As with every other issue in this case, views on an appropriate bond are disparate. Anderer claims his $791,012.18 judgment will swell to $2,000,000 by the time this dispute is

---

[355] Ex. 1, § 2.1.

[356] *See e.g., J. Atkins Holding Ltd.* at 729 F.Supp. 945, 950 (1990) ("If, on the other hand, one looks at the overall facts, this is not an assignment that separates the trademark from the goods or services upon which its reputation is based. To the contrary, this was an assignment . . . which is designed to continue the employment of the trademarks in connection with the same goods on which their reputation is based. . . ."). *See also Visa U.S.A., Inc.,* 696 F.2d at 1376 (mark signifying a promise to guarantee a check can be assigned from a supermarket chain to a credit card organization).

[357] *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 907 (E.D. NY 1988); *see also* citing *Hy–Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (1962) (upholding assignment of mark where the mark was transferred to a producer who raised a different variety of chickens); *E.I. DuPont de Nemours & Co. v. G.C. Murphy Co.,* 199 U.S.P.Q. 807, 813 (T.T. & A. Bd.1978) (holding that a change in the quality of a paint from premium priced to budget-type would not interrupt the continuity of the mark, so long as "[t]he inherent and identifiable character of the goods remains the same."); *Glamorene Products Corp. v. Procter & Gamble Co.,* 538 F.2d 894 (upholding assignment of mark used on different dry cleaning detergent); *Beech–Nut Packing Co. v. P. Lorillard Co.,* 299 F. 834, 849 (D.C.N.J.1924) (upholding assignment of mark upon predecessor's liquidation, although assignee applied the mark to tobacco of a different blend and formula); and *White Satin Mills Corporation v. Woodward,* 34 F.2d 158 (D.C.Minn.), *aff'd.,* 42 F.2d 987 (8th Cir.1929) (change in type of sugar sold under the mark did not invalidate assignment).

resolved, and seeks a bond in that amount.[358] His estimate includes legal fees in this case which he asserts Derma Pen is required to pay in collection of the notes, even though the fees are incurred in a separate fraudulent transfer action, defending against a separate party. His theory ignores the security of the Trademark and Domain Name which Derma Pen has consistently valued at millions of dollars. He does acknowledge that 4EverYoung values the Trademark and Domain Name at $353,000.[359]

Another theory advanced by Anderer is that the bond should be set at the entire value of the Trademark and Domain Name on the assumption that they might be valueless as a result of this litigation. However, eighteen months of litigation and combative competition have not dampened the parties' enthusiasm for the Trademark and Domain Name.

4EverYoung provides no rationale for its argument[360] that the $20,000 it already posted in the form of a $10,000 bond on this temporary restraining order[361] and the $10,000 bond it posted on the December 23, 2014 TRO[362] is sufficient security.

These polar positions do little to assist the establishment of a bond amount. The Anderer obligation is on its face fully secured. Interest accrues under the judgment at 5% per annum.[363] The judgment says it bears interest "at the judgment rate." Assuming that rate to be 5%, the

---

[358] [Anderer's Proposed] Findings of Fact, Conclusions of Law and Order . . . , ¶196 at 76, docket no. 611, filed February 21, 2015.

[359] *Id.* ¶197 at 76. This value estimate is highly questionable. Separate proceedings in this case about the value of the Trademark and Domain Name as of August 31, 2013 have yielded evidence showing the estimate is undoubtedly far too low by reason of assumptions 4EverYoung's expert has made about royalty rates and discount rates, among other factors.

[360] [4EverYoung's Proposed] Findings of Fact, Conclusions of Law, and Order . . . , ¶35 at 53-54, docket no. 612, filed February 21, 2015.

[361] Docket no. 508, filed January 22, 2015.

[362] Docket no. 462, filed December 29, 2014.

[363] Judgment in the Confession of Judgment Action, docket no. 496 in this case, filed January 21, 2015 and Ex. 30. *See also* Confession of Judgment, docket no. 460-1 in this action, filed December 24, 2014, and Ex 25.  At the hearing February 23, 2015, counsel for Anderer clarified that the Confession of Judgment is in error in reciting a 10% interest rate for the $100,000 advanced in bankruptcy.  February 23, 2015 Preliminary Injunction Hearing Transcript ___:___, docket no. ___, filed _____.

judgment may increase by $40,000 each year. This litigation may extend three years which yields a total of $120,000. The accrual of interest is a direct cost of delay of Anderer's foreclosure. Anderer also incurs costs which may be recoverable under Fed. R. Civ. P. 54 which should be secured by a bond. Those costs are not likely to exceed $10,000. Thus, the total bond supporting this preliminary injunction will be $130,000 to which the $10,000 bond filed already[364] for restraint of Anderer may be credited.

The new additional bond of $120,000 must be posted by Monday March 2, 2015. If it is not posted, this preliminary injunction shall dissolve.

## ORDER

Based upon the pending motions,[365] the evidentiary hearing and argument, the pleadings and papers on file with the Court, and for good cause shown,

IT IS HEREBY ORDERED:

4EverYoung's Motion for Temporary Restraining Order and Preliminary Injunction Against Michael E. Anderer[366] is GRANTED IN PART and DENIED IN PART.  A preliminary injunction is entered as follows:

(a)     Anderer, his agents, servants, employees, and attorneys, and those acting in concert, with them (collectively, the "Enjoined Parties") shall not transfer the Trademark or Domain Name or any interest therein of any kind or any obligation secured thereby except in connection with a foreclosure based on the Debtor In Possession (DIP) Financing;

---

[364] Docket no. 508, filed January 22, 2015.

[365] Docket nos. 504 and 529.

[366] Docket no. 504.

(b)      Anderer may not credit bid any amounts (specifically including but not limited to amounts claimed under Note 3 also known as the 2014 Note and under the 2014 SA) other than the principal and interest owing under the Debtor In Possession (DIP) Financing (see the Findings of Fact at p. 28–29) at any foreclosure based on the lien of or amounts owing under the Debtor In Possession (DIP) Financing without further order of this court;[367]

(c)      Any foreclosure based on amounts owing under the Debtor In Possession (DIP) Financing shall be subject to the lien interest, if any, represented by the 2014 SA, and any debt or obligation secured thereby, as shall later be adjudicated by this court and all documents issued in connection with such a foreclosure shall recite that fact and refer to this order by court, case number and title, and docket number and date;

(d)      This preliminary injunction will remain in effect until otherwise ordered by the Court; and

(e)      4EverYoung must post $120,000 additional security for the issuance of this preliminary injunction on or before March 2, 2015.

IT IS FURTHER ORDERED that Anderer's Motion to Vacate TRO[368] is DENIED.


Dated February 25, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[367] Anderer's counsel agreed at the hearing February 23, 2015, that if the DIP financing proceeded to foreclosure, and foreclosure of Note 3, the 2014 Note, was restrained, that amounts secured by that latter obligation could not be credit bid.  February 23, 2015, Preliminary Injunction Hearing Transcript at ___:___, docket no. ____, filed _____ _____, 2015.

[368] Docket no. 529.